**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MASTER DOCKET NO.  19- 21551-CV-ALTONAGA**

| | |
|---|---|
| **IN RE FARM-RAISED SALMON AND SALMON PRODUCTS ANTITRUST LITIGATION** | **AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

## <u>TABLE OF CONTENTS</u>

**Page**

NATURE OF ACTION ........................................................................................ 1

JURISDICTION AND VENUE ......................................................................... 3

PLAINTIFFS ..................................................................................................... 3

DEFENDANTS .................................................................................................. 4

AGENTS AND CO-CONSPIRATORS ........................................................ ..11

FACTUAL ALLEGATIONS ........................................................................... 12

    A.   The European Commission Is Investigating Unexplained Price Increases In
        The Salmon Market.................................................................................... 12

    B.   The United States Is A Substantial Market For Farm-Raised Salmon ................ 23

    C.   The Production Process For Farm-Raised Salmon ................................................ 24

    D.   The Structure And Characteristics Of The Market For Atlantic Farm-Raised
        Salmon Support The Existence Of A Conspiracy.................................................. 26

       1.   Barriers To New Entry Are High...................................................... 28

       2.   Farm-Raised Salmon Is A Commodity Product And Prices Are Correlated
            Across the Globe ................................................................................ 31

       3.   Norwegian Companies Dominate The Production Of Farm-Raised Salmon
            And The Defendants Are The Largest Global Producers. ............................. 35

       4.   Atlantic Salmon Production Is Highly Inelastic And The Product Is
            Perishable ............................................................................................ 37

       5.   Industry Connection And Trade Associations Facilitate Collusion................ 38

CLASS ACTION ALLEGATIONS. ................................................................ 40

INTERSTATE TRADE AND COMMERCE. ................................................. 42

PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY. ........................ 43

COUNT I ........................................................................................................................ 44

PRAYER FOR RELIEF ............................................................................................... 46

JURY TRIAL DEMAND .............................................................................................. 48

Plaintiffs Euclid Fish Company and Euro USA Inc. ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to themselves, and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive relief, and other relief pursuant to the federal antitrust laws and demand a trial by jury on all matters so triable.

## NATURE OF ACTION

1.      This lawsuit arises from unlawful coordination of the prices charged to direct purchasers of farm-raised Atlantic salmon (*Salmo salar*) and salmon products derived therefrom which were sold directly by Defendants Mowi ASA (f/k/a Marine Harvest ASA), Mowi USA, LLC (f/k/a Marine Harvest USA, LLC), Marine Harvest Canada, Inc., Ducktrap River of Maine LLC, Grieg Seafood ASA, Grieg Seafood BC Ltd., Bremnes Seashore AS, Ocean Quality AS, Ocean Quality North America Inc., Ocean Quality USA Inc., Ocean Quality Premium Brands, Inc., SalMar ASA, Lerøy Seafood Group ASA, Lerøy Seafood USA Inc., and Scottish Sea Farms Ltd. and/or entities owned or controlled by them (collectively, "Defendants") between July 1, 2015 and the present in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).[1]

---

[1] As used herein, unless otherwise indicated, the term "salmon" refers to "Atlantic salmon." As explained herein, "Atlantic salmon" can be farmed not only in locations that border the Atlantic Ocean (*e.g.*, Norway, Scotland, Chile), but also in certain locations that border the Pacific Ocean (primarily Canada).

2.      The European Commission ("EC") recently confirmed "that on 19 February 2019 its officials carried out unannounced inspections in several Member States at the premises of several companies in the sector of farmed Atlantic salmon."[2]

3.      The EC commenced its investigation by sending a letter in early February 2019 to the world's dominant suppliers of farm-raised salmon and their affiliates, in which it explained that it had received information that the companies—the Defendants—are "participat[ing in] or have participated in anti-competitive agreements and/or concerted practices related to different ways of price coordination in order to sustain and possibly increase the prices for Norwegian salmon".[3]

4.      According to the EC, the Defendants are and have been engaging in the following conduct:

- Coordinating sales prices and exchanging commercially sensitive information;

- Agreeing to purchase production from other competitors when these other competitors sell at lower prices;

- Applying a coordinated strategy to increase spot prices of farmed Norwegian salmon in order to secure higher price levels for long-term contracts.

5.      Plaintiffs seek to represent a Class consisting of all persons and entities in the United States and its territories who directly purchased farm-raised Atlantic salmon or products derived therefrom from one or more Defendants and/or entities owned or

---

[2] *See* http://europa.eu/rapid/press-release_STATEMENT-19-1310_en.htm.

[3] *See* https://www.undercurrentnews.com/2019/02/21/norways-antitrust-regulator-eyes-salmon-price-fixing-probe-with-interest/.

controlled by them from July 1, 2015 to the present (the "Class Period"). Excluded from the Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

## JURISDICTION AND VENUE

6.       Plaintiffs bring this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States for Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3).

7.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

8.       Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

## PLAINTIFFS

9.       Plaintiff Euclid Fish Company ("Euclid") is an Ohio corporation that specializes in the distribution of fish and seafood to restaurants, specialty stores, country clubs, hotels, and casinos throughout the mid-west. Euclid is headquartered at 7839 Enterprise Drive, Mentor, Ohio 44060. During the Class Period, Euclid purchased farm-raised salmon and/or products derived therefrom directly from one or more of the

Defendants and has suffered monetary loss as a result of the antitrust violations alleged herein.

10.     Plaintiff Euro SA Inc. ("Euro USA") is an Ohio corporation that distributes fish and seafood, among other items. Euro USA is headquartered at 4481 Johnston Parkway, Cleveland Ohio 44128. It has distribution offices in Sterling, Virginia and Chicago, Illinois. During the Class Period, Euro USA purchased farm-raised salmon and/or products derived therefrom directly from one or more of the Defendants and has suffered monetary loss as a result of the antitrust violations alleged herein.

## DEFENDANTS

11.     **Mowi Defendants**. Defendant Mowi ASA (fka Marine Harvest ASA) ("Mowi ASA") is a Norwegian seafood company with operations in several countries around the world. Mowi ASA engages in the production, processing, and sale of farmed salmon, the operations of which are focused on Norway, Scotland, British Columbia, Canada, the Faroe Islands, Ireland, and Chile. Mowi ASA has a share of between 25% and 30% of the global salmon and trout market, making it the world's largest company in the sector. Mowi ASA also owns a "value added processing" unit, which prepares and distributes a range of seafood products, and a number of smaller divisions. The company is headquartered at Sandviksboder, 77AB, 5035, Bergen, Norway. Mowi ASA is listed on the Oslo Stock Exchange, where it is a constituent of the benchmark OBX Index.

12.     Mowi USA, LLC (f/k/a Marine Harvest USA, LLC) ("Mowi USA") is a Florida limited liability company that maintains its principal place of business at 8550 N.W. 17th Street #105, Miami, Florida 33126.  Mowi USA, a wholly-owned subsidiary of

4

Mowi ASA, processes salmon in Florida and Texas and distributes it to wholesalers, retailers and others in Florida and elsewhere in the United States. Mowi USA just recently (in May of 2019) moved into its new seafood production plant in Miami which, at 106,000 square feet, is more than triple the size of its former United States production facility.[4]

13.     Marine Harvest Canada, Inc. ("Marine Harvest Canada") is a foreign corporation and wholly-owned subsidiary of Mowi ASA. Marine Harvest Canada processes salmon in British Columbia, Canada, and distributes salmon in Canada and the western United States. Marine Harvest Canada is headquartered at 1334 Island Highway, Suite 124, Campbell River, British Columbia, V9W 8C9, Canada.

14.     Ducktrap River of Maine LLC ("Ducktrap") is a Maine limited liability company and wholly-owned subsidiary of Mowi ASA. Ducktrap sells processed salmon products, such as sliced smoked salmon, under a number of trade names, including Ducktrap and Kendall Brook. The company has its headquarters at 57 Little River Dr., Belfast, ME 04915.

15.     Mowi ASA, Mowi USA, Marine Harvest Canada, and Ducktrap are collectively referred to herein as "Mowi."

16.     **Bremnes Defendant**. Defendant Bremnes Seashore AS ("Bremnes Seashore") is a foreign corporation headquartered at Oklandsvegen 90, N-5430 Bremnes, Norway. Bremnes Seashore is in the business of salmon-farming and has operations

---

[4] *See* https://www.undercurrentnews.com/2019/05/10/mowi-starts-full-production-in-new-us-china-salmon-plants/.

5

throughout Norway. Bremnes Seashore owns 40% of Ocean Quality AS and uses that entity to sell and distribute its product around the globe, including in the United States.[5]

17.    **Grieg Defendants**. Defendant Grieg Seafood ASA ("Grieg ASA") is a foreign corporation that describes itself as "one of the world's leading fish farming companies, specializing in atlantic salmon"; Grieg ASA's "farming facilities are in Norway, Canada and the United Kingdom."[6] The company is headquartered at C. Sundtsgate 17/19, 5004, Bergen, 5004, Norway. Grieg ASA is listed on the Oslo Stock Exchange.

18.    Defendant Grieg Seafood BC Ltd. ("Grieg BC"), a foreign corporation and wholly-owned subsidiary of Grieg ASA, is headquartered at 1180 Ironwood Street # 106, Campbell River, British Columbia, Canada, V9W 5P7. Grieg BC farms salmon on 22 sites in British Columbia. It is the owner of Skuna Bay, a branded salmon product, that is marketed and sold throughout the United States. Indeed, in its 2018 Annual Report, Grieg states that "Skuna Bay has become the preferred salmon of choice for top chefs throughout

---

[5] *See* https://www.seashore.no/en/production/ ("We supply salmon around the globe through our sales companies Salmon Brands and Ocean Quality. If you travel to Tokyo, Sydney, Chicago, Paris or Bangkok, you can enjoy the taste of salmon from Bremnes Seashore."); https://www.seafoodsource.com/news/supply-trade/ocean-quality-to-open-british-columbia-operations, ("Ocean Quality AS, in Bergen, Norway, is a sales company established and jointly owned by Bremnes Seashore AS (40 percent) and Grieg Seafood ASA (60 percent)."); https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf, at p. 75 ("The Group owns the company Ocean Quality AS together with Bremnes Fryseri AS on a 60%/40% basis.").

[6] *See* https://www.griegseafood.no/en/.

6

North America . . . .”[7] It claims that its salmon has been served to the President of the United States.

19.     Defendant Ocean Quality AS ("OQ") is a foreign corporation engaged in the salmon distribution business, with its headquarters at Grieg-Gaarden, C. Sundtsgate 17/19, N-5004, Bergen, Norway. Grieg ASA owns 60% of the outstanding shares of OQ and controls its operations.[8] Bremnes Seashore owns the remaining 40% of OQ.

20.     Defendant Ocean Quality North America Inc. ("OQ NA"), a foreign corporation and wholly owned subsidiary of OQ, is headquartered at 4445 Lougheed Highway, 500, Burnaby, BC V5C0E4, Canada. OQ NA facilitates the distribution of farm-raised salmon produced by Grieg and its subsidiaries and Bremnes Seashore throughout the United States. OQ NA has a dedicated sales office headed by General Manager Dennis Bryant, whose direct telephone number bears a Dallas, Texas area code.[9]

21.     Defendant Ocean Quality USA Inc. ("OQ USA") is a Delaware corporation and wholly-owned subsidiary of OQ, with its principal place of business located at 1914 Skillman Street #110-309, Dallas, Texas, 75206-8559. OQ USA distributes salmon

---

[7] *See* https://www.griegseafood.no/wp-content/uploads/2019/04/Grieg_Årsrapport_Børs_110419.pdf. at 85.

[8] *See* https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf, at p. 46 ("OQ sells the fish to Asia, Europe, the USA and Canada."). *See* https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf, at p. 49.

[9] *See* https://oceanquality.com/contact/.

products produced by Grieg and its subsidiaries and Bremnes Seashore throughout the United States.[10]

22.     Defendant Ocean Quality Premium Brands, Inc. ("OQ Premium Brands") is a Delaware corporation and wholly-owned subsidiary of OQ, headquartered at 4445 Lougheed Highway, 500, Burnaby, BC V5C0E4, Canada. OQ Premium Brands' business purpose, according to a December 7, 2018 filing with the California Secretary of State, is "MARKETING AND BRANDING." OQ Premium Brands distributes salmon products produced by Grieg and its subsidiaries and Bremnes Seashore throughout the United States.

23.     Grieg ASA, Grieg BC, OQ NA, OQ USA, and OQ Premium Brands are referred to collectively herein as "Grieg".

24.     **SalMar Defendant**. Defendant SalMar ASA ("SalMar") is a foreign corporation that describes itself as "one of the world's largest and most efficient producers of Atlantic salmon, and is vertically integrated along the entire value chain from broodfish, roe and smolt to harvesting, processing and sales."[11] The company is headquartered at Idustriveien 51, N-7266, Kverva, Norway. SalMar is listed on the Oslo Stock Exchange.

25.     According to SalMar's website:

> SalMar has established a fully integrated system for farming, processing, sales and distribution of farmed salmon and is thus in control of the total value chain.

---

[10] *See* https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf, at p. 75. ("Ocean Quality USA Inc is domiciled in the USA.").

[11] *See* SalMar 2017 Annual report, http://hugin.info/138695/R/2188425/846513.pdf, at p. 45.

8

The salmon that SalMar is producing is sold through an in-house salesforce and/ or through close partners.

Proximity to markets and customers, direct or through partners is important to secure efficient use of a high-quality raw material that has been through a traceable and controlled production process.

InnovaMar is the name of SalMar's new harvesting and processing facility in Frøya, central Norway. It aims to be the world's most innovative and efficient facility for the landing, harvesting and processing of farmed salmon. InnovaMar covers 17,500 m2 of floor space and comprises two departments (harvesting and processing). The facility has the capacity for all kinds of storage. Good internal logistics ensure safe and efficient handling of the products. The increased capacity affords a high level of flexibility with regard to organising production and sales.

SalMar produces a wide variety of fresh and frozen salmon products. The customer base is global and includes small and large importers/exporters, as well as larger processing companies and retail chains.[12]

26.     SalMar sells directly to entities within the United States:

SalMar had direct sales to around 50 different countries in 2017. SalMar's most important geographic market in 2017 was Europe, with Poland, Lithuania and Sweden as the largest individual markets. The second largest market was Asia, with Vietnam, Japan and Singapore as the largest individual markets. After sales to Russia were blocked in 2014, North America has been the third largest market, with the USA as the largest individual market. SalMar experienced particularly strong growth in the American market in 2017.[13]

27.     **Lerøy Defendants**. Defendant Lerøy Seafood Group ASA ("Lerøy ASA"), a foreign corporation, is a seafood production and distribution company. The company is the second largest salmon and trout farming company in the world and has fish farms in

---

[12] *See* https://www.salmar.no/en/sales-distribution/.

[13] *See* 2017 Annual Report, http://hugin.info/138695/R/2188425/846513.pdf, at p. 53.

Hitra, Kristiansund, Troms and Scotland (Shetland). The company is headquartered at Thormøhlens gate 51 B, 5006 Bergen, Norway. Lerøy is listed on the Oslo Stock Exchange. The company has sales offices in the United States:

> Our main office is located in Bergen, but we have fishing vessels and fish farms in operation along the entire coast of Norway. We have production and packaging plants in Norway, Sweden, Denmark, Finland, France, the Netherlands, Portugal, Spain and Turkey. We also have sales offices in the USA, Japan and China.[14]

28.     Defendant Lerøy Seafood USA Inc. ("Lerøy USA"), a North Carolina corporation and wholly-owned subsidiary of Lerøy, is the U.S. distribution subsidiary for Lerøy's farm-raised salmon business. Lerøy USA's principal place of business is located at 1289 Fordham Blvd., Suite 406, Chapel Hill, NC 27514.

29.     Lerøy ASA and Lerøy USA are collectively referred to herein as "Lerøy."

30.     **Scottish Sea Farms Defendant**. Defendant Scottish Sea Farms Ltd. ("Scottish Sea Farms"), a foreign corporation, is an aquaculture company that engages in the farming and production of salmon. Scottish Sea Farms is the United Kingdom's second largest producer of farmed salmon.[15] The company sells its products to retailers in the United Kingdom, the United States, Europe and internationally. Scottish Sea Farms is a joint venture of Defendants SalMar and Lerøy, and each owns a 50% interest in Scottish Sea Farms. The company is headquartered at Laurel House, Laurelhill Business Park, Stirling, FK7 9JQ, United Kingdom, 01786 44552.

---

[14] *See* https://www.leroyseafood.com/en/about-us/about-leroy/.

[15] *See* SalMar 2017 Annual report, http://hugin.info/138695/R/2188425/846513.pdf, at p. 45.

## AGENTS AND CO-CONSPIRATORS

31.     The acts alleged against the respective Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of the respective Defendants' businesses or affairs. The respective Defendant parent entities identified herein exercise dominance and control over all of their respective Defendant subsidiary entities and those respective subsidiaries have a unity of purpose and interest with their respective parents. To the extent any respective parent Defendant did not keep a tight rein on its respective subsidiary Defendant(s), it had the power to assert control over the subsidiary if the latter failed to act in the parent's best interests. The respective parent Defendants and their respective subsidiary Defendants thus operated as a single economic unit. The respective subsidiary Defendants played a critical role in the conspiracy in that they (as well as the respective parent Defendants) sold price-fixed farmed salmon and products derived therefrom to direct purchasers outside the conspiracy.

32.     When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented at any such meetings and discussions by their agents and were parties to the agreements reached by them.

33.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

34.     Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

## FACTUAL ALLEGATIONS

### A.    The European Commission Is Investigating Unexplained Price Increases In The Salmon Market

35.     On February 19, 2019, *Undercurrent News* reported that in early February, the EC opened an antitrust investigation into the world's major producers of farm-raised salmon:

> According to the letter, the EC has "received information -- from different actors operating at different levels in the salmon market -- alleging that Norwegian producers of farmed Atlantic salmon . . . participate or have participated in anti-competitive agreements and/or concerted practices related to different ways of price coordination in order to sustain and possibly increase the prices for Norwegian salmon".
>
> The letter, which was sent to producers at the start of February, states the Norwegian producers concerned have been allegedly:
>
> • Coordinating sales prices and exchanging commercially sensitive information;
>
> • Agreeing to purchase production from other competitors when these other competitors sell at lower prices; and
>
> • Applying a coordinated strategy to increase spot prices of farmed Norwegian salmon in order to secure higher price levels for long-term contracts.

Based on the information the EC has, these alleged practices have been going on since "at least" November 2017 and "are presumably ongoing".[16]

36.     The EC also released the following statement on February 19, 2019:

**The European Commission can confirm that on 19 February 2019 its officials carried out unannounced inspections in several Member States at the premises of several companies in the sector of farmed Atlantic salmon.**

The Commission has concerns that the inspected companies may have violated EU [(European Union)] antitrust rules that prohibit cartels and restrictive business practices (Article 101 of the Treaty on the Functioning of the European Union). The Commission officials were accompanied by their counterparts from the relevant national competition authorities.[17]

37.     According to an article in *Undercurrent News* dated February 19, 2019, Mowi, Grieg, and SalMar have all confirmed that they were the subject of EC raids:

*Undercurrent* first reported the news earlier on Tuesday, then Mowi, Grieg Seafood and SalMar all confirmed raids on their operations in the UK. Mowi's spokesman said the company's plant in Rosyth, UK, was raided, but then also confirmed a plant in Lemmers, formerly Marine Harvest Sterk, was inspected.

The Sterk plant, the only one the company owns in the Netherlands, is mainly specialized on coating whitefish, but also does some salmon, according to its website.[18]

38.     In a recently released annual report for 2018, Mowi disclosed:

In February 2019, The European Commission carried out unannounced inspections at selected premises of several Norwegian salmon companies,

---

[16]   *See*  https://www.undercurrentnews.com/2019/02/21/norways-antitrust-regulator-eyes-salmon-price-fixing-probe-with-interest/.

[17] *See* http://europa.eu/rapid/press-release_STATEMENT-19-1310_en.htm.

[18]   *See*   https://www.undercurrentnews.com/2019/02/19/mowi-dutch-plant-also-raided-as-ec-confirms-probe-of-alleged-salmon-cartel/.

including Mowi. The Commission was acting on concerns that the inspected companies may have violated EU antitrust rules.[19]

39.     On February 19, 2019, Grieg filed a notice with the Oslo Stock Exchange

stating as follows:

> The European Commission DG (Director General) Competition has today performed an inspection at Grieg Seafood Shetland to explore potential anti-competitive behavior in the salmon industry.
>
> Grieg Seafood aims to be open, transparent and forthcoming and will provide all necessary information requested by the European Commission DG Competition in its investigation.[20]

40.     On February 20, 2019, Lerøy filed a notice with the Oslo Stock Exchange

stating as follows:

> EU's competition authorities (European Commission Director General Competition) has conducted an inspection at the premises of Scottish Sea Farms Ltd.  a company owned 50% by Lerøy Seafood Group ASA (LSG). The purpose is, according to the competition authorities, to investigate accusations of anti-competitive cooperation in the salmon market. In connection with the inspection, the EU competition authorities has also requested for information from the shareholders in Scottish Sea Farms Ltd.[21]

41.     Also on February 19, 2019, SalMar issued the following report to the Oslo

Stock Exchange:

> On 19th of February 2019 the European Commission Director General Competition performed an inspection at Scottish Sea Farms Ltd., in which SalMar ASA indirectly owns 50 per cent. SalMar is in constructive dialogue with the Commission in this regard.[22]

---

[19] *See* http://hugin.info/209/R/2239765/882920.pdf, at pg. 216.

[20] *See* https://www.griegseafood.no/inverstors/stock-exchange-filings/.

[21]  *See* https://www.leroyseafood.com/en/investor/Stockexchangenotices/.

[22] See https://newsweb.oslobors.no/message/470051.

42.     The inspections by the EC were not undertaken casually. They are typically done by an order of the EC and it must have "reasonable grounds for suspecting an infringement of the competition rules"; "[i]t must be borne in mind that the inspections carried out by the Commission are intended to enable it to gather the necessary documentary evidence to check the actual existence and scope of a given factual and legal situation concerning which it already possesses certain information."[23] That was clearly the case here.

43.     The salmon market is susceptible to manipulation by the major salmon producers in Norway. As alleged further below, the industry is highly concentrated and the spot market for salmon in Oslo, Norway, is the most important benchmark for salmon prices around the globe.

44.     Salmon is sold on the spot market and through annual contracts. Only one percent of Norway's salmon production is sold on the spot market, but those spot prices set the baseline for longer term contract prices.[24]

45.     Since 2015, salmon buyers in Europe have complained that Norway's salmon producers, including Mowi, have been rigging the spot market by using subsidiary companies, including Mowi's Polish subsidiary, Morpol S.A. ("Morpol") (a fish processor

───────────────

[23] *Nexans France SAS*, Case No. T-135/09 (Nov. 14, 2012) at ¶ (Nov. 4, 2012), available at http://curia.europa.eu/juris/document/document_print.jsf?doclang=EN&text=&pageIndex=0&part=1&mode=lst&docid=129701&occ=first&dir=&cid=663482.

[24] *See* https://salmonbusiness.com/suempols-gm-does-not-believe-in-price-caps-in-the-second-half-of-2017/.

and distributor) to drive up the spot price. As the purchasing director of Graal S.A. ("Graal") (a Polish salmon processor), Alina Piasecka, has explained, "[w[e've seen examples of prices falling in the spot market, and exporters offering fish at increasingly lower prices". She continued, "[s]uddenly, 15 minutes later there aren't fish available, and we find out that Morpol has purchased perhaps 60 truckloads." Graal's CEO, Boguslaw Kowalski, has explained: "[w]e are seeing that now and again they take advantage of Morpol to buy at higher prices than that charged by the market, to hike up prices."[25]

46.    In 2017, Stale Hoyem ("Hoyem"), general manager of Suempol Norway, one of the biggest smoked salmon producers in Poland and Europe, complained that "companies in Norway buy small quantities of salmon to raise the price for the rest of the players." Hoyem added that "[o]ne last thing that affects prices is that some of the major players choose to create their own purchasing departments buying a truckload here and a truckload there"; he was "suggesting this 'daily' practice is heavily influencing prices on the spot market."[26] Borge Prytz Larsen, purchasing director at Severnaya, which imports salmon into Russia, confirmed Hoyem's statement: "The big players buy fish, and they then use the price as indicators for other customers."[27]

---

[25] *See* https://www.intrafish.com/news/751597/marine-harvest-accused-of-manipulating-polish-salmon-market.

[26] *See* https://www.intrafish.com/news/1330269/norwegian-salmon-giants-accused-of-price-manipulation.

[27] *Id.*

47.    Defendants' pricing behavior changed at the start of the Class Period. Hoyem complains: "In the old days we could negotiate contracts. Producers looked at their cost and then they put on a surcharge of about NOK 1 (€0.11/$.13) to NOK 2 (€0.21/$.25) [per kilo]."[28]

48.    The foregoing are examples of complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors and made for no other discernible reason than collusion.

49.    As a result of the conspiracy, Defendants' prices—and profits—for salmon have been increased since mid-2015, as Mowi itself illustrates in this chart:[29]

---

[28] *Id*.

[29] *See* http://www.mowi.com/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at p. 32.



50.     Defendants frequently—and falsely—asserted that cost increases justify their price increases, but their own data disproves that purported justification. For example, the following chart from Mowi indicates that the "cost in box" of producing salmon (per kilogram) has increased approximately half of one Euro (or less) during the Class Period, far less than salmon prices:[30]

---

[30] *See* http://hugin.info/209/R/2177429/840178.pdf, at p. 246.

18



51.    As the foregoing charts reflect, the price increases for salmon in 2015 and following years, viewed in relation to production costs, represent a structural break from past practices. Indeed, in prior periods, the Norwegian farmed salmon industry has been accused of dumping their product overseas at unreasonably low prices.[31]

52.    It has sometimes been asserted that increased demand explains the price increases since mid-2015, but that explanation also does not hold water. In August of 2014, in response to economic sanctions imposed by the United States, the EU and others for its annexation of the Crimea, Russia banned imports of Norwegian seafood; prices in Norway

---

[31] *See Fresh and Chilled Atlantic Salmon From Norway*, Investigation Nos. 701-TA-302 and 731-TA-454 (January 2006), available at https://www.usitc.gov/publications/701_731/pub3835.pdf; EC Press Release on Norwegian Salmon (Feb. 21, 2006), available at http://europa.eu/rapid/press-release_MEMO-06-87_en.htm.

fell by ten percent as a result.[32] The ban was supposed to last a year, but Russia extended it in late June of 2015 and it remains in effect.

53.     This was highly significant because, as an analyst at Swedbank Markets explained in 2017, "Russia's import ban wiped out 10 percent of Norway's salmon market."[33] Teimuraz Ramishvili ("Ramishivili"), the Russian ambassador to Norway, said in 2018 that "[f]rom an economic point of view, Norway lost a billion dollars from the fish trade with Russia. There were attempts from Oslo to find new markets, great hopes were associated with China, but the Russian market was not replaced."[34]

54.     Ramishvili's estimate of the loss to Norwegian salmon farmers like the Defendants turned out to be severely understated. In January of 2019, *Intrafish* reported that:

> Russia was once one of the seafood sector's most promising markets -- for Norwegian seafood suppliers in particular.
>
> But since the 2015 ban on seafood imports from several Western countries, the Norwegian salmon industry alone has lost NOK 20 billion (€2 billion/$2.3 billion), according to estimates from Asbjørn Warvik Rørtveit, director of market insight and market access at the Norwegian Seafood Council (NSC).[35]

---

[32] *See* https://www.reuters.com/article/ukraine-crisis-sanctions-salmon-idUSL6N0QE32E20140808.

[33] https://www.rt.com/business/416729-norway-fish-russian-market-sanctions/.

[34] *Id.*

[35] https://www.intrafish.com/marketplace/1673343/norways-seafood-firms-have-lost-nearly-usd-3-billion-since-russian-ban.

55.     The Mowi pricing chart depicted above shows declining Norwegian salmon average prices in 2014 attributable to the Russian import ban. But it also shows average prices ramping drastically upward in mid-2015 (shortly *after* Russia extended that ban) and continuing to increase or stabilize in succeeding years while the ban continued. These sustained, historically unprecedented price increases can only be explained by collusion. Norwegian salmon farmers knew that a huge portion of demand and their export market had been eliminated and reacted by collusively raising prices. The planning cycle for Norwegian salmon in 2015 had been set three years earlier in 2012 (before the Russian ban), as MOWI's 2018 Investor's Handbook itself reflects.[36] Yet despite this supply of salmon based on an overall market that no longer existed in 2015 and despite the fact that the ban had caused salmon prices to drop in 2014, Defendants were able to raise prices substantially and keep them at levels significantly above those experienced in 2014 through a conspiracy.

56.     These price increases since mid-2015 have resulted in huge profits for the Defendant farmed salmon producers. According to Mowi's 4Q 2018 financial disclosures:

> "2018 was a very good year for Mowi. Strong demand for salmon and high prices in all markets resulted in great earnings for the company. I am proud of all my colleagues who work hard to produce healthy and tasty seafood for consumers all over the world. They have all contributed to the strong results", says CEO Alf-Helge Aarskog.[37]

---

[36] *See* http://www.mowi.com/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at p. 39.

[37] *See* https://www.mowi.com/about/news-and-media/news_new2/strong-results-for-mowi-in-the-fourth-quarter-2018/.

57.    Mowi's 2017 Annual Report also confirmed that since the uptick in salmon pricing starting in 2015, its operating profits or "Operational EBIT"[38] (reported in Euros) has substantially increased—from 83 million Euros in 2015, to 184 million Euros in 2016, and 214 million Euros in 2017.[39]

58.    Grieg similarly reported that its EBIT per kg gutted weight of fish (in Norwegian Kroner) has increased during the course of the conspiracy. According to Grieg's 2017 Annual Report, its EBIT was 0.7 Kroners/kg in 2015, 18.0 Kroners/kg in 2016, and 14.4 Kroners/kg in 2017.[40] Grieg's Q4 2018 Quarterly Report reports an EBIT per kg (in Norwegian Kroner) of 14.72 for 2018.

59.    Lerøy has also experienced substantial increases in EBIT/kg (measured in Norwegian Kroner), increasing from 8.8 Kroners in 2015 to 18.9 Kroners in 2016, and 23.6 Kroners in 2017.[41] In 2018, Lerøy's EBIT/kg was 19.6.[42]

---

[38] "In accounting and finance, earnings before interest and taxes (EBIT) is a measure of a firm's profit that includes all incomes and expenses (operating and non-operating) except interest expenses and income tax expenses." *See* https://en.wikipedia.org/wiki/Earnings_before_interest_and_taxes.

[39] *See* http://hugin.info/209/R/2177429/840178.pdf, at p. 7.

[40] *See* https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf, at p. 8.

[41] *See* https://www.leroyseafood.com/en/investor/reports-and-webcast/annual-report-2017/to-the-table/#anchor-article-key-figures.

[42] *See* https://www.leroyseafood.com/globalassets/02-documents/english/reports/quarterly-reports/q4-2018-report.pdf.

60.     Similarly, SalMar's EBIT has increased substantially. In 2015, its EBIT was 1404 million Norwegian Kroners. In 2016, its EBIT was 2432 million Kroners. In 2017, EBIT was 3162 million Kroners.[43] In 2018, its EBIT was 3460.8 million Kroners.[44]

61.     These price increases—and the Defendants' coordinated behavior that caused them—have come at the expense of Plaintiffs and the Class, who have paid more for farm-raised salmon than they otherwise would have in the absence of collusion.

**B.    The United States Is A Substantial Market For Farm-Raised Salmon**

62.     The United States is the second largest global market for salmon behind only the EU, as Mowi reports in the graphic reflected below:[45]

## Global volume by market

| Markets | Estimated volumes Q4 2018 | Q4 2017 | Compared to Q4 2017 Volume | % | Est. volumes Q3 2018 | 12 month comparison LTM | PTM | |
|---|---|---|---|---|---|---|---|---|
| EU | 274 900 | 268 100 | 6 800 | 2.5% | 247 600 | 955 700 | 921 200 | 3.7% |
| Russia | 24 300 | 23 200 | 1 100 | 4.7% | 22 000 | 87 200 | 69 800 | 24.9% |
| Other Europe | 22 900 | 24 500 | -1 600 | -6.5% | 20 200 | 81 900 | 79 500 | 3.0% |
| **Total Europe** | **322 100** | **315 800** | **6 300** | **2.0%** | **289 800** | **1 124 800** | **1 070 500** | **5.1%** |
| USA | 107 700 | 103 000 | 4 700 | 4.6% | 102 200 | 427 900 | 397 700 | 7.6% |
| Brazil | 24 000 | 21 800 | 2 200 | 10.1% | 21 600 | 89 400 | 79 900 | 11.9% |
| Other Americas | 38 600 | 31 000 | 7 600 | 24.5% | 29 500 | 122 700 | 108 300 | 13.3% |
| **Total Americas** | **170 300** | **155 800** | **14 500** | **9.3%** | **153 300** | **640 000** | **585 900** | **9.2%** |
| China / Hong Kong | 25 800 | 27 300 | -1 500 | -5.5% | 24 700 | 101 700 | 86 000 | 18.3% |
| Japan | 16 300 | 15 900 | 400 | 2.5% | 12 800 | 53 900 | 57 700 | -6.6% |
| South Korea / Taiwan | 15 600 | 12 100 | 3 500 | 28.9% | 12 700 | 56 000 | 45 500 | 23.1% |
| Other Asia | 22 200 | 21 400 | 800 | 3.7% | 15 100 | 73 100 | 83 500 | -12.5% |
| **Total Asia** | **79 900** | **76 700** | **3 200** | **4.2%** | **65 300** | **284 700** | **272 700** | **4.4%** |
| All other markets | 32 900 | 30 400 | 2 500 | 8.2% | 29 400 | 116 000 | 108 800 | 6.6% |
| **Total** | **605 200** | **578 700** | **26 500** | **4.6%** | **537 800** | **2 165 500** | **2 037 900** | **6.3%** |
| Inflow to US from Europe | 25 700 | 25 100 | 600 | 2.4% | 22 000 | 93 800 | 95 300 | -1.6% |
| Inflow to EU from Chile | 8 400 | 12 200 | -3 800 | -31.1% | 7 600 | 37 700 | 38 300 | -1.6% |

Source: Kontali

- Strong demand globally
- Europe: Increased consumption at higher prices
- US: Convenient and consumer friendly pre-packed products drive growth
- Asia: Increased consumption. Lack of available large sized fish and certain trade restrictions temporarily impacted consumption in China/Hong Kong

Page 26      Source: Kontali
Note: Atlantic Salmon (GWT), LTM: Last Twelve Months, PTM: Previous Twelve Months"

MOWI

---

[43] *See* http://hugin.info/138695/R/2188425/846513.pdf, at p. 4.

[44] *See* http://hugin.info/138695/R/2234948/879657.pdf.

[45] *See* http://hugin.info/209/R/2234685/879436.pdf.

23

63.     A December 12, 2018 article from the industry publication *Intrafish*

further explains:

> Salmon import volumes into the United States through October rose
> 10.5 percent, reaching 272,676 metric tons, according to new figures
> released by the National Marine Fisheries Service (NMFS).
>
> The value of Atlantic salmon imports rose as well, by 9.5 percent,
> to reach $2.9 billion (€2.6 billion), up from $2.6 billion (€2.3 billion)
> during the same period last year.[46]

## C.     The Production Process For Farm-Raised Salmon

64.     Mowi has diagrammed the process for breeding and growing farm-raised

salmon as follows:[47]

---

[46] *See* https://www.intrafish.com/marketplace/1654239/us-imports-of-fresh-salmon-fillets-spike.

[47] *See* https://www.mowi.com/product/seafood-value-chain/.

The life cycle of salmon starts in freshwater and involves several stages before the young salmon (smolt) are ready for the sea.



**EGGS**
Fertilised eggs are kept in incubation tanks in fresh water. There are approximately 5,000 eggs per litre. The eggs hatch into tiny fish (alevins), which have a yolk sac that provides nutrition until they are large enough to feed themselves.

**PARR**
Once they weigh about six grams, the fish are moved to larger freshwater tanks or to an open net cage in a lake. The fish now develop into parr and once they weigh about 60–80 grams they're ready to move on to the smolt stage.



**SMOLT**
This stage is when the fish undergo a physiological change that enables them to move from fresh water to seawater and become young adult salmon. The smolts are kept in net pens in the sea until they mature into adult salmon.

**HARVEST**
After just over a year in the sea the fish will have reached market weight (4.5 to 5.5kg) and are then harvested – in a variety of ways depending on the region.

65.    A report commissioned by the European Union titled "Developing Innovative Market Orientated Prediction Toolbox to Strengthen the Economic

Sustainability and Competitiveness of European Seafood on Local and Global markets" further depicts how salmon is processed:[48]



### D.     The Structure And Characteristics Of The Market For Atlantic Farm-Raised Salmon Support The Existence Of A Conspiracy

66.     The structure and other characteristics of the market for Atlantic farm-raised salmon make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive.

67.     The United States Department of Justice has emphasized that structural market factors can be important in assessing whether conspiratorial conduct in violation of the antitrust laws has occurred:

> While collusion can occur in almost any industry, it is more likely to occur in some industries than in others. An indicator of collusion may be more meaningful when industry conditions are already favorable to collusion.
>
> • Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers and the rest are "fringe" sellers who control only a small fraction of the market.

---

[48] *See* the EU's Horizon 2020 research and innovation program, "Deliverable No. 3.4 - Report on evaluation of industry dynamics opportunities and threats to industry".

- The probability of collusion increases if other products cannot easily be substituted for the product in question or if there are restrictive specifications for the product being procured.

- The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.

- Repetitive purchases may increase the chance of collusion, as the vendors may become familiar with other bidders and future contracts provide the opportunity for competitors to share the work.

- Collusion is more likely if the competitors know each other well through social connections, trade associations, legitimate business contacts, or shifting employment from one company to another.

- Bidders who congregate in the same building or town to submit their bids have an easy opportunity for last-minute communications.[49]

68.      These factors are all present here. As explained herein, *inter alia*: (1) the Norwegian salmon industry is dominated by a few top producers with a number of smaller players; (2) farmed Atlantic salmon is a standardized product not readily substitutable with other types of salmon; (3) opportunities to conspire abound through numerous trade associations and otherwise; (4)  Mowi, OQ, Grieg and Lerøy are all headquartered in Bergen, Norway and Bremnes is located in a city only 72 miles away; (5) Grieg BC and Marine Harvest Canada are both located in Campbell River, British Columbia, while OQ NA and OQ Premium Brands are located in Burnaby, British Columbia, which is only 115 miles away; and (6) there is mobility among executives of certain Defendants, an example being Ole-Eirik Lerøy ("O-E Lerøy"), the Chairman of the Board of Mowi since 2010, who was the Chief Executive Officer of Lerøy from 1991 to 2008.

---

[49] https://www.justice.gov/atr/file/810261/download.

### 1.      __Barriers To New Entry Are High__

69.      A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. The market for farming salmon has high barriers to entry.

70.      Atlantic salmon is viewed as a separate product distinct from other types of salmon. The EC, in approving Mowi's acquisition of Morpol, a salmon processor, noted that there is a separate product market for the farming and processing of farmed Atlantic salmon.[50]

71.      Mowi's 2018 Investor's Handbook notes that there are relatively few locations in the world that provide the right mix of oceanic conditions for salmon farming and a political environment willing to allow the practice. Moreover, even if new entry could occur in the right geographic location, no additional salmon supply could be brought on line in the short run:[51]

---

[50] *Marine Harvest/Morpol*, Case No. Comp/M.6850 at ¶68 (Sept. 30, 2013), available at http://ec.europa.eu/competition/mergers/cases/decisions/m6850_20130930_20212_33152 20_EN.pdf.

[51] *See* https://www.mowi.com/globalassets/investors/handbook/2018-salmon-industry-handbook, pdf, at p. 26.

04 **Salmon Supply**

4.3 Few coastlines feasible for salmon farming



The main coastal areas adopted for salmon farming are depicted on the above map. The coastlines are within certain latitude bands on the Northern and Southern Hemisphere.

A key condition is a temperature range between above zero and 18-20ºC. The optimal temperature range for salmon is between 8 and 14ºC.

Salmon farming also requires a certain current to allow a flow of water through the farm. The current must however be below a certain level to allow the fish to move freely around in the sites. Such conditions are typically found in waters protected by archipelagos and fjords and rule out several coastlines.

Certain biological parameters are also required to allow efficient production. The biological conditions vary significantly within the adopted areas and are prohibitive for certain other areas.

Political willingness to permit salmon farming and to regulate the industry is also required. Licence systems have been adopted in all areas where salmon farming is carried out.

72.     Mowi explains that "[i]n all salmon producing regions, the relevant authorities have a licensing regime in place. In order to operate a salmon farm, a license is

29

the key prerequisite. The licenses constrain the maximum for each company and the industry as a whole."[52]

73.     Moreover, wild caught salmon cannot reasonably constrain prices for farm-raised salmon. National Public Radio summarized the breeding and cost advantages that farm-raised salmon have over wild caught salmon in an August 29, 2017 article:

### Why Are Atlantic Salmon Raised In The Pacific Northwest?

Atlantic salmon are not native to the Pacific Northwest. For years, they have been bred to become easier to farm — they're more "highly domesticated," according to the Washington Department of Fish and Wildlife. Most commercial fish farms raise Atlantic salmon.

The WDFW says Atlantic salmon is a "favored species" to farm in cold marine waters because the species grows quickly and consistently, is resistant to disease, and is something people like to eat. Farmed Atlantic salmon are more docile than wild fish.

Atlantic salmon also have been bred to more "efficiently turn feed into flesh," says Michael Rust, the science adviser for NOAA's office of aquaculture.

What used to cost several dollars per pound to grow, worldwide, now costs about $1.25, Rust says. That makes for higher profits.

In the U.S., Washington and Maine are the two largest Atlantic salmon producing states, but they're small beans compared to salmon farms in Canada, Norway and Chile.

Atlantic salmon today, Rust says, probably grow twice as fast as when aquaculture first started. [53]

---

[52] *See:* https://www.mowi.com/globalassets/investors/handbook/2018-salmon-industry-handbook, pdf, at p. 69.

[53] *See* https://www.npr.org/sections/thesalt/2017/08/29/546803147/why-are-atlantic-salmon-being-farmed-in-the-northwest.

74.     Wild caught salmon is generally twice as expensive per pound as farm-raised salmon.

### 2.     Farm-Raised Salmon Is A Commodity Product And Prices Are Correlated Across the Globe

75.     Mowi explains that salmon production is a "commodity" business: "[a]s in most commodity industries, the producers of Atlantic salmon are experiencing large volatility in the price achieved for the product."[54] A report issued in 2018 by the EU confirms this point: "[t]he output of most salmonid aquaculture, and Atlantic salmon in particular, is highly commoditised *i.e.* there is little differentiation between farms and competition is based purely on price. These products, mostly head-on gutted fresh fish, serve as raw material for further processing. In that situation, large enterprises which can reduce costs of production through economies of scale and offer the lowest price, have a competitive advantage."[55] Commodity products are fungible and consumers and other purchasers have a variety of supply options which makes raising prices by any one supplier difficult in the absence of a conspiracy.

76.     Atlantic salmon is also viewed as a commodity product by third parties. NASDAQ maintains a commodity price index for farmed Atlantic salmon.[56] Market

---

[54] *See* https://www.mowi.com/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at p. 33.

[55] *See* the EU´s Horizon 2020 research and innovation program, "Deliverable No. 3.4 - Report on evaluation of industry dynamics opportunities and threats to industry" at p. 4.

[56] https://salmonprice.nasdaqomxtrader.com/public/report;jsessionid=820D4389ED92CEF09633BA4FC20BC06D?0.

analysts have also recognized that farmed salmon is a commodity.[57] And since 2005, "Fish Pool ASA [has been] established as an international, regulated marketplace for buying and selling of financial salmon contracts …. Fish Pool ASA ['Fish Pool'] is licensed by the Norwegian Ministry of Finance to operate as a regulated marketplace for commodity derivatives with fish and seafood as underlying products."[58]

77.     Furthermore, according to Grieg, salmon prices are linked across the globe, and the Defendants and others closely follow these prices: "[t]here are several reference prices for salmon available. In Norway, Fish Pool ASA provides historic price information as well as salmon derivative prices FCA Oslo. In the United States, Urner Barry provides reference prices for North American salmon in Seattle and Chilean salmon in Miami. *Market prices are correlated across regions*."[59] (emphasis added.)

78.     Mowi also recognizes that "price correlation across regional markets is generally strong for Atlantic salmon."[60] It further explains that arbitrage between regions is one of the factors constraining prices for Atlantic salmon.[61] Accordingly, price-fixing of salmon prices in one market will affect prices globally.

---

[57] *See* https://www.undercurrentnews.com/2018/11/13/marine-harvest-aims-to-be-coca-cola-of-salmon/.

[58] http://fishpool.eu/about/.

[59] *See* https://www.griegseafood.no/wp-content/uploads/2018/04/GSF_2017_ENG.pdf at p. 40

[60] *See* http://www.mowi.com/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at p. 31.

[61] *Id.* at p. 32.

79.     In fact, Mowi tracks the correlation of salmon prices globally in the normal course of its business.[62] The company illustrates this graphically in its 2018 Investor Handbbok:[63]



80.     This point was also recognized in a 2016 report issued by the Fish Pool  and DNB Foods & Seafood (which is part of Norway's largest financial services organization)

---

[62] *See* http://www.mowi.com/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 32.

[63] *Id.* at 33.

entitled "World market for salmon: pricing and currencies."[64] The report pointed out that Norwegian farmed salmon gate prices are "strongly linked" and that the collusion by Defendants on those Norwegian prices directly affected prices for farmed salmon raised elsewhere pursuant to the "law of one price".[65]

81.     Indeed, the 2016 report noted as follows on page 7:[66]



<hr />

[64] *See* http://fishpool.eu/wp-content/uploads/2016/04/final-dag.pdf.

[65] As explained below, Mowi operates salmon farms in Chile, as well as Norway.

[66] *See* http://fishpool.eu/wp-content/uploads/2016/04/final-dag.pdf.

82.     The 2016 report further elaborates on the economic principle of the "law of one price" as it relates to the farm-raised salmon market in the Unites States:[67]

## The law of one price
### *Norwegian and Chilean prices are linked*

- Price US = Norwegian farm gate price + air freight cost Atlantic
- Price US = Chilean farm gate price + air freight cost Americas
- Chilean farm gate price = Norwegian farm gate price + difference in freight cost Atlantic vs Americas



Must be measured in same currency. There can be price premiums/discount due to perceived or real differences in quality, consistency of supply, etc. There will be time lags in price adjustments due to logistics.

### 3.     Norwegian Companies Dominate The Production Of Farm-Raised Salmon And The Defendants Are The Largest Global Producers

83.     A January 3, 2018 article in *salmonbusiness.com*—an industry publication—tracks Norway's dominance in the salmon industry:[68]

---

[67] *See* http://fishpool.eu/wp-content/uploads/2016/04/final-dag.pdf.

[68] *See* https://salmonbusiness.com/norways-market-share-shrinking/.



84.    Moreover, Norway's salmon industry is dominated by Defendants Mowi, Lerøy, SalMar and Grieg. According to Mowi:[69]

---

[69] *See* http://www.mowi.com/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at p. 36.

## 06    Industry Structure

### 6.1 Top 5-10 players of farmed Atlantic salmon

| | Top 10 - Norway | H.Q. | Top 5 - United Kingdom | H.Q. | Top 5 - North America | H.Q. | Top 10 - Chile | H.Q. |
|---|---|---|---|---|---|---|---|---|
| 1 | Marine Harvest | 210 200 | Marine Harvest | 60 200 | Cooke Aquaculture | 57 000 | Salmones Multiexport | 58 700 |
| 2 | Salmar | 135 200 | Scottish Seafarms | 31 000 | Marine Harvest | 39 400 | Cermaq** | 54 000 |
| 3 | Lerøy Seafood | 132 000 | The Scottish Salmon Co. | 25 300 | Cermaq** | 21 000 | Marine Harvest | 44 900 |
| 4 | Cermaq** | 48 000 | Cooke Aquaculture | 20 000 | Northern Harvest | 12 500 | Empresas Aquachile | 43 300 |
| 5 | Grieg Seafood | 40 900 | Grieg Seafood | 12 100 | Grieg Seafood | 9 600 | Pesquera Los Fiordos | 41 000 |
| 6 | Nova Sea | 40 700 | | | | | Australis Seafood | 39 100 |
| 7 | Nordlaks | 40 000 | | | | | Camanchaca | 30 800 |
| 8 | Norway Royal Salmon | 31 900 | | | | | Blumar | 27 000 |
| 9 | Alsaker Fjordbruk | 25 000 | | | | | Nova Austral | 24 500 |
| 10 | Bremnes Seashore | 24 000 | | | | | Invermar | 23 200 |
| | Top 10 | 727 900 | Top 5 | 148 600 | Top 5 | 139 500 | Top 10 | 386 500 |
| | Total | 1 087 000 | Total | 156 900 | Total | 145 500 | Total | 521 200 |
| | Share of total | 67 % | Share of total | 95 % | Share of total | 96 % | Share of total | 74 % |

Note: All figures in tonnes GWT for 2017

\* UK and North American industry are best described by top 5 producers.

\*\* Cermaq is a fully owned subsidiary of Mitsubishi Corporation

The Marine Harvest Group represents the largest total production and produces around one fifth of the salmon produced in Norway, and about one third of the total produced in North America and the UK.

### 4.    Atlantic Salmon Production Is Highly Inelastic And The Product Is Perishable

85.    Mowi acknowledges that:

Due to the long production cycle and the short shelf life of the fresh product (about 3 weeks), the spot price clears on the basis of the overall price/quantity preference of customers. As salmon is perishable and marketed fresh, all production in one period has to be consumed in the same period. In the short term, the production level is difficult and expensive to adjust as the planning/production cycle is three years long. Therefore, the supplied quantity is very inelastic in the short term, while demand also shifts according to the season. This has a large effect on the price volatility in the market.[70]

---

[70] *See* http://www.mowi.com/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at p. 32.

86.     Accordingly, in the absence of coordinated conduct among producers, Defendants are price-takers. They are unable to reduce supply in the short term to raise prices unilaterally, and they must sell during a very short window while their product is fit for human consumption. These market constraints make the market more susceptible to collusion than markets where goods are not perishable and production levels can be rapidly modulated. As Mowi has noted in its 2017 Annual Report, "[a]lthough the market price of salmon is established through supply and demand for the product, in the short term, salmon producers are expected to be price takers. The long production cycle and a short time window available for harvesting leave salmon farmers with limited flexibility to manage their short-term supply."[71] As claimed price takers, Defendants had every incentive to collude to ensure that the price they took in the market was as high as they could collectively get it.

### 5.   Industry Concentration And Trade Associations Facilitate Collusion

87.     A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

88.     Here, there has been significant (and rapid) consolidation of salmon farming operations around the globe in recent years, as Mowi reports:[72]

---

[71] *See* http://hugin.info/209/R/2177429/840178.pdf, at p. 235.

[72] *See* https://www.mowi.com/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at p. 37.



The graph shows the number of players producing 80% of the farmed salmon and trout in each major producing country.

During the last decade the salmon farming industry has been through a period of consolidation in all regions and this is expected to continue.

Historically, the salmon industry has been made up by many small firms. As illustrated above, this has been the case in Norway, and to some degree in Scotland and Chile.

89.     Collusion is also facilitated by the participation of several Defendants in multiple trade associations that provide opportunities to conspire. These include the Norske Sjømatbedrifters Landsforening (the Norwegian Seafood Association), the Fiskeri-og havbruksnæringens landsforening (the Norwegian Seafood Federation, whose former Chairman was O-E Lerøy), the International Salmon Farmers Association, and the BC Salmon Farmers Association.

## CLASS ACTION ALLEGATIONS

90.       Plaintiffs bring this action on behalf of itself and as a class action under

Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the

following class (the "Class"):

> All persons and entities in the United States who purchased farm-raised Atlantic salmon and/or products derived therefrom directly from Defendants, or any current or former subsidiary or affiliate of Defendants, or any co-conspirator, during the period of July 1, 2015 until the date on which a class is certified in this case. Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, officers, directors, employees, assigns, successors, agents, or co-conspirators, and the court and its staff.

91.       While Plaintiffs do not know the exact number of members of the Class,

Plaintiffs believe the class size is so numerous that joinder is impracticable given

Defendants' substantial nationwide presence.

92.       Common questions of law and fact exist as to all members of the Class. This

is particularly true given the nature of Defendants' unlawful anticompetitive conduct,

which was generally applicable to all the members of the Class, thereby making appropriate

relief with respect to the Class as a whole. Such questions of law and fact common to the

Class include, but are not limited to:

> (a)      Whether Defendants and their co-conspirators engaged in a combination
>
>          and conspiracy among themselves to restrict output and fix, raise,
>
>          maintain or stabilize the prices of local television advertising time;
>
> (b)      The identity of the participants of the alleged conspiracy;
>
> (c)      The duration of the alleged conspiracy and the acts carried out by
>
>          Defendants and their co-conspirators in furtherance of the conspiracy;

40

(d)     Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;

(e)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Class;

(f)     The effect of the alleged conspiracy on the price of farm-raised salmon and products derived therefrom during the Class Period;

(g)     Whether the Defendants and their co-conspirators fraudulently concealed the existence of their anticompetitive conduct from Plaintiffs and the members of the Class;

(h)     The appropriate injunctive and related equitable relief for Plaintiffs and the Class; and

(i)     The appropriate class-wide measure of damages.

93.     Plaintiffs' claims are typical of the claims of the members of the Class, and Plaintiffs and undersigned counsel will fairly and adequately protect the interests of the Class.  Plaintiffs and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for farm-raised salmon and products derived therefrom from Defendants and/or their co-conspirators.

94.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiffs are

represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

95.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

96.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

97.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## INTERSTATE TRADE AND COMMERCE

98.     Hundreds of millions of dollars of transactions in farm-raised salmon and products derived therefrom are entered into each year in interstate commerce in the United States and the payments for those transactions flowed in interstate commerce.

99.    Defendants' manipulation of the market has a direct, substantial, and foreseeable impact on interstate commerce in the United States.

100.    Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for farm-raised salmon and products derived therefrom.

101.    Defendants' unlawful conduct has a direct and adverse impact on competition in the United States. Absent Defendants' combination, conspiracy, and/or agreement to manipulate the market for the sale of local television advertising, the prices of local television advertising would have been determined by a competitive, efficient market.

## PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY

102.    Defendants' antitrust conspiracy had the following effects, among others:

    (a)    Price competition has been restrained or eliminated with respect to the pricing of farm-raised salmon and products derived therefrom;

    (b)    The prices of farm-raised salmon and products derived therefrom have been fixed, raised, maintained, or stabilized at artificially inflated levels;

    (c)    Purchasers of farm-raised salmon and products derived therefrom have been deprived of the benefits of free and open competition; and

    (d)    Purchasers of farm-raised salmon and products derived therefrom paid artificially inflated prices.

43

103.     The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize and/or maintain the price of farm-raised salmon and products derived therefrom.

104.     The precise amount of the overcharge impacting the prices of farm-raised salmon and products derived therefrom paid by Plaintiffs and the Class can be measured and quantified using well-accepted models.

105.     By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Class have sustained injury to their businesses or property, having paid higher prices for farm-raised salmon and products derived therefrom than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

### COUNT I
**Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)**
**(Conspiracy in Restraint of Trade)**

106.     Plaintiffs repeat the allegations set forth in paragraphs 35-105 above.

107.     From at least July 1, 2015 until the effects of their unlawful conduct cease, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regards to farm-raised salmon and products derived therefrom in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

108.     The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially

44

high levels the prices they charged for farm-raised salmon and products derived therefrom in the United States and elsewhere.

109.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

(a)    exchanging competitively sensitive information among themselves, with the aim to fix, increase, maintain, or stabilize prices of farm-raised salmon and products derived therefrom in the United States and elsewhere;

(b)    participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of farm-raised salmon and products derived therefrom in the United States and elsewhere;

(c)    participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached.

(d)    engaging in conduct designed to raise and stabilize the prices of farm-raised salmon sold on the spot market and pursuant to contracts.

110.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, raise, or stabilize prices of farm-raised salmon and products derived therefrom.

111.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for farm-raised salmon and products derived therefrom has been restrained, suppressed, and/or eliminated;

45

(b)     Prices for farm-raised salmon and products derived therefrom provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States and elsewhere; and

(c)     Plaintiffs and members of the Class who purchased farm-raised salmon and products derived therefrom from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

112.    Plaintiffs and members of the Class have been injured and will continue to be injured in their business and property by paying more for farm-raised salmon and products derived therefrom purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

113.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

114.    Plaintiffs and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and the Class respectfully request the following relief:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as representatives of the Class and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal

Rules of Civil Procedure, be given to each and every member of the Class;

B.      The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

C.      The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination allege herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate to the extent provided by law;

E.      That each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy,

agreement, understanding, or concert of action as alleged herein; and

F.      That the Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: May 20, 2019.

Respectfully submitted,

By: */s/ Robert C. Gilbert*
Robert C. Gilbert, FBN 561861
Daniel E. Tropin, FBN 100424
**KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT**
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: 305/384-7269
*gilbert@kolawyers.com*
*tropin@kolawyers.com*

Michael P. Lehmann (*pro hac vice*)
Christopher L. Lebsock (*pro hac vice*)
**HAUSFELD LLP**
600 Montgomery St. #3200
San Francisco, CA 94111
Tel: (415) 633-1908
*mlehmann@hausfeld.com*
*clebsock@hausfeld.com*

Reena A. Gambhir (*pro hac vic*)
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650
Washington D.C. 20006
Tel: (202) 540-7200
*rgambhir@hausfeld.com*

*Counsel for Plaintiffs and Proposed Class*

48

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Robert C. Gilbert*
Robert C. Gilbert, FBN 561861

49