**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF FLORIDA**


**Case No.: 19-21551-CIV-ALTONAGA**


IN RE FARM-RAISED SALMON
AND SALMON PRODUCTS
ANTITRUST LITIGATION,

_____/


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION
TO DISMISS THE CONSOLIDATED AMENDED DIRECT PURCHASER
<u>CLASS ACTION COMPLAINT FOR FAILURE TO STATE A CLAIM</u>**

<u>**TABLE OF CONTENTS**</u>

<u>**PAGE**</u>

PRELIMINARY STATEMENT ...................................................................................................1

PLAINTIFFS' ALLEGATIONS ................................................................................................2

ARGUMENT ...............................................................................................................................6

I.      THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS
        HAVE FAILED TO PLEAD FACTS PLAUSIBLY SUGGESTING A
        CONSPIRACY. ...............................................................................................................6

        A.     Plaintiffs Fail to Allege Direct Evidence of an Agreement. ....................................7

        B.     Plaintiffs Fail to Allege Circumstantial Facts from Which the Court Could
               Plausibly Infer an Agreement. .................................................................................8

        C.     Plaintiffs' Own Allegations Undermine Any Inference of a Conspiracy. .............23

CONCLUSION...........................................................................................................................26

## **TABLE OF AUTHORITIES**

**CASES**                                                                                                          **PAGE(S)**

*Acella Pharmaceutics, LLC v. First DataBank, Inc.*,
    No. 1:17-CV-5013-MHC, 2018 WL 7199992 (N.D. Ga. June 4, 2018) .........................22

*Advanced Technology Corp. v. Instron, Inc.*,
    925 F. Supp. 2d 170 (D. Mass. 2013) ......................................................................15, 20

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................... *passim*

*Berk-Cohen Associates, LLC v. Landmark American Insurance Co.*,
    Nos. 07-9205, 07-9207, 2009 WL 2777163 .........................................................25

*Blomkest Fertilizer, Inc. v. Potash Corp. of,*
    *Sask.*, 203 F.3d 1028 (8th Cir. 2000) ...................................................................17

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011).................................................................................18

*In re Chocolate Confectionary Antitrust Litigation*,
    801 F.3d 383 (3d Cir. 2015).................................................................................15

*In re Chocolate Confectionary Antitrust Litigation*,
    999 F. Supp. 2d 777 (M.D. Pa. 2014) ...............................................................25

*In re Citric Acid Litigation*,
    191 F.3d 1090 (9th Cir. 1999) ............................................................................21

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
    406 F. Supp. 3d 1258 (M.D. Ala. 2019) ............................................................19

*Diamond Resorts International, Inc. v. US Consumer Attorneys, P.A.*,
    No. 18-80311-CIV, 2018 WL 6621363 (S.D. Fla. Oct. 26, 2018) ....................11

*DM Research, Inc. v. College of American Pathologists*,
    170 F.3d 53 (1st Cir. 1999)................................................................................10

*Duty Free Ams., Inc. v. Estee Lauder Co.*,
    946 F. Supp. 2d 1321 (S.D. Fla. 2013) ...............................................................7

*In re Elevator Antitrust Litigation*,
    502 F.3d 47 (2d Cir. 2007) (dismissing .........................................7, 11, 15, 21

*In re Fla. Cement & Concrete Antitrust Litigation*,
    746 F. Supp. 2d 1291 (S.D. Fla. 2010) ................................................... *passim*

*Frone v. JP Morgan Chase & Co.*,
    695 F. App'x 468 (11th Cir. 2017) ...................................................16

*In re Graphics Processing Units Antitrust Litigation*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) .....................................11, 14

*Griffin Industries, Inc. v. Irvin*,
    496 F.3d 1189 (11th Cir. 2009) ...................................................19

*In re ICE LIBOR Antitrust Litigation*,
    No. 19 CIV. 439 (GBD), 2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020) ...................17, 19

*Insurance Brokerage Antitrust Litigation*,
    618 F.3d 300 (3d Cir. 2010).........................................................24

*Jacobs v. Tempur-Pedic International., Inc.*,
    626 F.3d 1327 (11th Cir. 2010) ...................................................10

*Jones v. Micron Technology, Inc.*,
    400 F. Supp. 3d 897 (N.D. Cal. 2019) ........................................23

*Lane v. Capital Acquisitions & Management Co.*,
    No. 04-60602 CIV, 2006 WL 4590705 (S.D. Fla. Apr. 14, 2006) ...................12

*In re LTL Shipping Services Antitrust Litigation*,
    No. 1:08-MD-01895-WSD, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009).........16

*Marion Diagnostic Center, LLC v. McKesson Corp. (In re Generic Pharmaceuticals Pricing Antitrust Litigation)*,
    386 F. Supp. 3d 477 (E.D. Pa. 2019) ..........................................18

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013).........................................................7

*McClure v. Oasis Outsourcing II, Inc.*,
    674 F. App'x 873 (11th Cir. 2016) ...............................................14

*Miller v. Gizmodo Media Group, LLC*,
    No. 18-24227-CIV, 2019 WL 1790248 n.1 (S.D. Fla. Apr. 24, 2019).............22

*In re Musical Instruments & Equipment Antitrust Litigation*,
    798 F.3d 1186 (9th Cir. 2015) ..............................................10, 18, 19

*Mutual Service Insurance Co. v. Frit Industries, Inc.*,
    358 F.3d 1312 (11th Cir. 2004) ...................................................23

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
    911 F.3d 505 (8th Cir. 2018) .......................................................13

iii

*Perry v. NYSARC, Inc.*,
    424 F. App'x 23 (2d Cir. 2011) ......................................................................14

*Pierson v. Orlando Regional Healthcare Systems, Inc.*,
    619 F. Supp. 2d 1260 (M.D. Fla. 2009) ........................................................12

*Piguet v. JP Morgan Chase Bank*,
    No. 14-60869-CIV-ALTONAGA, 2014 WL 11350229 (S.D. Fla. Apr. 29, 2014) .........11

*In re Pork Antitrust Litigation*,
    Civil No. 18-1776 (JRT/LIB), 2019 WL 3752497 (D. Minn. Aug. 8, 2019) ..........8, 10, 13

*Quality Auto Painting Center of Roselle, Inc. v. State Farm Indemnity Co.*,
    917 F.3d 1249 (11th Cir. 2019) ..........................................................6, 8, 9, 13

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*,
    971 F.2d 37 (7th Cir. 1992) ..........................................................................25

*Richards v. Neilsen Freight Lines*,
    810 F.2d 898 (9th Cir. 1987) ........................................................................24

*S. Collision & Restoration, LLC v. State Farm Mutual Automobile Insurance Co*.,
    173 F. Supp. 3d 1293 (M.D. Fla. 2016) ................................................13, 15, 18

*Stafford v. Grifols International, S.A.*,
    No. 1:16-CV-3997-AT, 2017 WL 5201799 (N.D. Ga. Apr. 24, 2017) ..........................20

*In re Text Messaging Antitrust Litigation*,
    No. 08 C 7082, 2009 WL 5066652 (N.D. Ill. Dec. 10, 2009) .........................................16

*Wash. County Health Care Authority, Inc. v. Baxter International Inc.*,
    No. 16-CV-10324, 2020 WL 1666454 (N.D. Ill. Apr. 3, 2020) ..................................9, 14

*White v. R.M. Packer Co.*,
    635 F.3d 571 (1st Cir. 2011) ........................................................................17

*Williamson Oil Co. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) ..............................................................15, 19

*In re Zinc Antitrust Litigation*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016)..............................................................12

## STATUTES

15 U.S.C. § 1 ..................................................................................................6

## RULES

Federal Rule of Civil Procedure 12(b)(6) ........................................................1

iv

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendants Mowi ASA (f/k/a Marine Harvest ASA), Mowi USA, LLC (f/k/a Marine Harvest USA, LLC), Mowi Canada West, Inc. (f/k/a Marine Harvest Canada, Inc.), Mowi Ducktrap, LLC (an assumed name of Ducktrap River of Maine, LLC), Grieg Seafood ASA, Grieg Seafood BC Ltd., Leroy Seafood AS, Leroy Seafood USA Inc., Ocean Quality AS, Ocean Quality North America Inc., Ocean Quality USA Inc., Ocean Quality Premium Brands, Inc., and SalMar ASA respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Amended Direct Purchaser Class Action Complaint ("CAC," ECF 168).

## PRELIMINARY STATEMENT

Plaintiffs contend that certain Norwegian producers of farm-raised Atlantic salmon and some of their respective subsidiaries and affiliates conspired to fix the price of farm-raised Atlantic salmon and salmon products globally. Plaintiffs' complaint is predicated almost exclusively on a governmental inquiry in Europe and is devoid of any facts supporting the alleged conspiracy. Instead, they rely on vague allegations of unspecified conduct by unspecified defendants at unspecified times, which are insufficient as a matter of law to state a claim.

Plaintiffs do not allege any direct evidence of an agreement to fix prices. The complaint does not identify a single occasion in which any defendants discussed prices, let alone reached an agreement concerning prices. Plaintiffs' allegations based on purported circumstantial evidence are equally deficient. Plaintiffs fail to identify any instance of parallel pricing or other parallel conduct among defendants. Conspicuously absent from the 78-page complaint is even a *single specific example* of a defendant's pricing, sales or purchasing behavior. Plaintiffs are left to rely only on allegations about average prices in the industry. But such averages are neither limited to

pricing by defendants nor evidence of coordinated changes in pricing by defendants and so cannot render plaintiffs' claim plausible. Courts have rejected attempts, like this, to rely on group pleading to mask the absence of specific allegations against individual defendants.

Plaintiffs' failure to identify any parallel conduct by defendants means there is no need to examine "plus factors." But in any event, plaintiffs' effort to allege "plus factors" fares no better. Courts have repeatedly held that the opening of government investigations will not salvage an otherwise-deficient antitrust claim. Plaintiffs' contentions that the market is conducive to collusion, that defendants have a motive to conspire to increase profits and that defendants participate in trade association meetings are similarly insufficient to infer a conspiracy.

Finally, the complaint contains allegations and cites sources that undermine, rather than support, an inference of a conspiracy. For example, while plaintiffs make the conclusory assertion that defendants engaged in "coordination of prices," sources cited in the complaint show that price increases over the past several years can be explained by environmental and regulatory factors that restrict supply and increase production costs, as well as by increased demand for salmon and salmon products. Because the complaint contains nothing more than conclusory and unsupported assertions, plaintiffs fall well short of raising a plausible inference of an unlawful agreement among defendants.

## PLAINTIFFS' ALLEGATIONS

Plaintiffs, seafood distributors who claim to have purchased salmon or salmon products directly from one or more defendants, allege that defendants—four Norwegian companies involved in the primary production of farm-raised Atlantic salmon and their respective subsidiaries or joint ventures involved in secondary processing and distribution of salmon—

2

conspired to fix the price of farm-raised Atlantic salmon and salmon products since July 1, 2015. (CAC ¶¶ 1, 12-18.)[1]  The complaint is premised on reports that in February 2019, the European Commission ("EC") undertook inspections at the facilities of Mowi ASA, Grieg Seafood ASA, and Scottish Sea Farms, which has been voluntarily dismissed as a defendant here.  (*Id.* ¶¶ 3-5, 82-88.)  The complaint also highlights two historical antitrust investigations within the salmon industry: a 1992 EC investigation into price fixing of the Norwegian fish market and a 2003 Australian Competition and Consumer Commission finding of illegality in the salmon trade.  (*Id.* ¶¶ 90-91.)  Neither involved any of the defendants in this case.  (*Id.*)

Plaintiffs allege that beginning in July 2015, defendants' "pricing behavior changed," with "multiple competitors" undertaking "complex and historically unprecedented changes in pricing structure . . . at the very same time."  (*Id.* ¶¶ 98-99.)  In support, plaintiffs rely exclusively on summary charts showing that *average* farm-raised Atlantic salmon prices have increased industry-wide.  These charts do not identify any specific change in pricing undertaken by any particular defendant or even indicate that they include prices of farm-raised Atlantic salmon sold by the defendants here.  (*Id.* ¶ 100.)  Moreover, defendants are only a small number of the producers of farm-raised Atlantic salmon in the world.  (*Id.* ¶ 145.)

Plaintiffs further allege that defendants "[a]ppl[ied] a coordinated strategy to increase spot prices of farmed Norwegian salmon" based on a single market participant's claim that Morpol, a non-defendant Mowi subsidiary, purchased "perhaps 60 truckloads" of salmon on the spot market on unspecified occasions.  (*Id.* ¶¶ 82, 95.)  Plaintiffs claim that "[o]nly one percent

---

[1] Mowi ASA, Grieg Seafood ASA, Grieg Seafood BC Ltd., Leroy Seafood AS, and SalMar ASA are producers engaged in farming Atlantic salmon in Norway, Canada and/or Scotland. (CAC ¶¶ 19, 39, 51, 62, 68, 77.)  The remaining defendants are subsidiaries or affiliates of the Norwegian producers and engage in secondary processing or distribution of salmon in Norway, Canada and/or the United States.  (*Id.* ¶¶ 31-34, 45, 48-49, 71.)

3

of Norway's salmon is sold on the spot market, but those spot prices set the baseline for the longer term contract[s]" into which defendants enter.  (*Id.* ¶ 94.)

Plaintiffs also summarily assert that defendants conspired at "certain trade associations or industry groups."  (*Id*. ¶ 117.)  Plaintiffs identify a number of trade associations and industry groups of which certain defendants are members, but do not allege that defendants met in furtherance of the conspiracy at any particular meeting.  The complaint includes only one event, the North Atlantic Seafood Forum—"the world's largest seafood business conference"—that was attended by employees of multiple defendants.  (*Id.* ¶¶ 131-39.)  Plaintiffs do not allege that this event led to any price increases or agreements between defendants.

Instead, plaintiffs allege that defendants are members of the Norwegian Seafood Council ("NSC") and share sensitive pricing information through NSC's SAS Data Management ("SAS") database.  (*Id.* ¶ 118.)  Plaintiffs further assert that defendants used the Global Salmon Initiative ("GSI") in 2013—years before the conspiracy is alleged to have begun—to cooperate on environmental issues and "eliminate individual environmental improvements as a competitive tool"; plaintiffs then speculate that therefore "it is entirely plausible that they would do likewise with respect to farmed salmon two years later."  (*Id.* ¶¶ 123-25.)  Plaintiffs highlight a 2016 speech by Trond Davidsen, the president of the International Salmon Farmers Association, that did not discuss prices, but instead discussed how the salmon industry has worked together on "finding solutions on common challenges to feeding a growing world population—such as sea lice, feed resources, technology and knowledge in general."  (*Id.* ¶ 122.)

Plaintiffs contend that the market for farm-raised Atlantic salmon is "susceptible to manipulation by the major salmon producers in Norway" for several reasons.  (*Id*. ¶ 93.)  Plaintiffs allege, first, that the market is "highly concentrated."  (*Id*. ¶ 144.)  But defendants

Mowi, SalMar, Leroy Seafood and Grieg Seafood are only four of the top ten producers of farm-raised Atlantic salmon in Norway and account for only 37% of farm-raised Atlantic salmon produced in North America.  (*Id*. ¶ 147.)  And plaintiffs acknowledge that there are close to 50 different players in at least six different countries that produce farm-raised Atlantic salmon.  (*Id.* ¶¶ 145, 147.)  Second, plaintiffs allege that the market has high barriers to entry, including the costly and lengthy production process and government licensing regimes.  (*Id.* ¶¶ 149, 155.)  The salmon farming industry is highly regulated, with authorities restricting the volume of fish that may be produced by each farmer and the industry as a whole.  (*Id.* ¶ 155.)  Third, plaintiffs assert that farm-raised Atlantic salmon is a "standardized product not readily substitutable with other types of salmon."  (*Id.* ¶ 143.)

Finally, according to plaintiffs, the alleged conspiracy was a "react[ion]" to the ban on imports of Norwegian seafood imposed by Russia in 2014, as "Norwegian salmon farmers knew that a huge portion of demand and their export market had been eliminated."  (*Id.* ¶¶ 105, 108.)  Plaintiffs acknowledge, however, that global demand has remained "strong."  (*Id.* ¶ 169.)  The complaint recognizes that in 2018, estimated volumes for Europe, the Americas and Asia were all expected to increase from 2017, and "[s]almon import volumes into the United States through October rose 10.5 percent."  (*Id.* ¶¶ 169-70.)  Plaintiffs also assert that defendants have "no cost justification for the price increases" occurring during the class period because the cost of fish meal and fish oil declined during that time.  (*Id*. ¶¶ 103, 104-08.)  But the complaint does not discuss any other costs involved in the farming and sale of salmon.

## ARGUMENT

I.    **THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO PLEAD FACTS PLAUSIBLY SUGGESTING A CONSPIRACY.**

To state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, plaintiffs must allege "enough factual matter (taken as true) to suggest that an agreement was made" that imposed an unreasonable restraint on trade. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "'[T]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement.'" *Id.* at 553 (citation omitted). A "formulaic recitation of the elements of a cause of action" is insufficient to state a claim and a plaintiff must do more than merely set forth labels and conclusions that an agreement was made. *Id.* at 555.

Applying these pleading standards is critical in antitrust litigation given its *in terrorem* effects and extraordinary costs. As the Supreme Court explained in *Twombly*, "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases" and "it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery." *Id*. at 559.

To satisfy these pleading standards, a plaintiff must "include evidence tending to exclude the possibility of independent action" and "raise a right to relief above the speculative level." *Id.* at 554; *see also Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) ("While we accept the factual allegations in the complaint as true, [. . .] the allegations must state a claim for relief that is plausible, not merely possible."); *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1308 (S.D. Fla. 2010) (Altonaga, J.) ("After *Twombly*, to successfully plead a section 1 claim based on defendants' conduct alone, plaintiffs must allege facts that make the existence of a preceding unlawful agreement the most plausible explanation for defendants' behavior."). This requires a plaintiff to allege either "direct

6

evidence" of an agreement or "parallel conduct" and "plus factors" from which the court can reasonably infer that the challenged conduct was the result of a "preceding agreement." *Twombly*, 550 U.S. at 556-57.  The complaint here does neither.

      **A.**      **Plaintiffs Fail to Allege Direct Evidence of an Agreement.**

Plaintiffs fail to allege direct evidence that defendants reached an agreement to fix prices. Direct evidence expressly identifies "the 'who,' 'what,' 'where,' or 'when'" of the collusive communications and requires no inference of an anticompetitive agreement.  *Duty Free Ams., Inc. v. Estee Lauder Co.*, 946 F. Supp. 2d 1321, 1332 (S.D. Fla. 2013); *see also Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 136-40 (2d Cir. 2013) (direct, "smoking gun" evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level").

Instead, plaintiffs baldly assert that defendants "[c]oordinat[ed] sales prices" and engaged in conduct—*e.g.*, making purchases on the spot market "to drive up prices"—that had "no good non-collusive reason," were "made for no other discernible reason than collusion" or "can only be explained by collusion."  (CAC ¶¶ 82, 97, 99, 108.)  These conclusory assertions need not be accepted as true, and plaintiffs' unsupported conjecture cannot constitute direct evidence that defendants entered into an agreement in violation of the antitrust laws.  *See Twombly*, 550 U.S. at 565 n.10 (noting that plaintiffs had not pled the "specific time, place, or person" involved in any express agreement); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 & n.5 (2d Cir. 2007) (dismissing "conclusory allegations" that defendants "[p]articipated in meetings . . . to discuss pricing and market divisions" and "[a]greed to fix prices").

### B.    Plaintiffs Fail to Allege Circumstantial Facts from Which the Court Could Plausibly Infer an Agreement.

To plausibly allege a conspiracy in the absence of direct evidence, plaintiffs must plead both parallel conduct and "plus factors" indicating that the parallel conduct was the product of collusion rather than independent business decisions. *Quality Auto Painting*, 917 F.3d at 1261. Plaintiffs here plead neither.

### 1.    Plaintiffs Fail to Allege Parallel Conduct by Defendants.

Well-pleaded allegations of parallel conduct are necessary—though not sufficient—to plausibly allege a conspiracy based on circumstantial facts. *See Twombly*, 550 U.S. at 557. Instances of parallel conduct might include uniform pricing, pricing changes, or business practices, such as "a similarity of language, terms, or conditions used by the alleged co-conspirators that would be improbable absent collusion." *Quality Auto Painting*, 917 F.3d at 1266; *id.* at 1269 (considering "identity of price and identity of tactics" to be "mere parallel conduct").

The complaint contains no facts suggesting anything of the sort.  Instead, plaintiffs offer only unsupported, conclusory contentions that defendants "[a]ppl[ied] a coordinated strategy to increase spot prices of farmed Norwegian salmon" and undertook changes in "pricing structure . . . at the very same time."  (CAC ¶¶ 5, 82, 99.)  Plaintiffs fail to identify a single specific example of any defendant making purchases on the spot market or undertaking a change in pricing structure, let alone facts showing that multiple defendants undertook such similar actions "at the very same time" or even during any reasonably proximate time periods.  Because "[p]laintiffs give no individualized examples of any one [d]efendant" engaging in such conduct, the complaint does not "plausibly plead parallel conduct." *In re Pork Antitrust Litig.*, Civil No. 18-1776 (JRT/LIB), 2019 WL 3752497, at *9 (D. Minn. Aug. 8, 2019).

a. *Plaintiffs Fail to Allege Parallel Conduct Related to Spot Market Purchases.*

Plaintiffs allege that defendants "increase[d] spot prices of farmed Norwegian salmon in order to secure higher price levels for long-term contracts" by "[a]greeing to purchase production from other competitors when these other competitors sell at lower prices." (*Id.* ¶ 5.)  Yet plaintiffs fail to identify *any* spot market purchases made by any defendant.  The complaint's sole allegation regarding spot market purchases involves a claim that Morpol, a *non-defendant* Mowi subsidiary, *unilaterally* purchased "perhaps 60 truckloads" of salmon on the spot market on unidentified occasions.  (*Id.* ¶ 95.)  Even if these spot market purchases had been made by a defendant, purchases by a single party are plainly insufficient to plausibly allege parallel conduct.  *See Wash. Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, No. 16-CV-10324, 2020 WL 1666454, at *8 (N.D. Ill. Apr. 3, 2020) ("If parallel conduct among oligopolists is not itself a sufficient basis to infer participation in an antitrust conspiracy, it is certainly not sufficient to draw such an inference on the basis of allegations about a single firm's unilateral conduct.").  Moreover, there is nothing suspicious about companies making spot market purchases, as those companies, including defendants, have a legitimate, independent basis to engage in such purchases, as discussed further below.  *See infra* Section I.C.

Beyond this single allegation, plaintiffs offer only blanket assertions that "Norway's salmon producers," "companies in Norway," and "[t]he big players" buy salmon in the spot market to drive up prices.  (*Id.* ¶¶ 95-97.)  Neither the complaint nor the sources on which it relies identify any specific spot market purchases by any defendant or the amount, timing or pricing thereof, a factual deficiency that leaves the complaint well short of necessary pleading requirements for parallel conduct.  *See Quality Auto Painting*, 917 F.3d at 1268 ("Although [plaintiffs] do allege uniformity of actions, no facts are actually alleged in support of this

conclusion.  Therefore, the allegation is merely conclusory and insufficient."); *see also DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) ("[F]actual allegations must be specific enough to justify 'drag[ging] a defendant past the pleading threshold,'" and conclusory, unsupported allegations standing alone "are a danger sign that the plaintiff is engaged in a fishing expedition." (citation omitted)).

                             b.  *Plaintiffs Fail to Allege Parallel Conduct Related to any Pricing Changes.*

Plaintiffs' conclusory allegation that changes in pricing structure were made "at the very same time by multiple competitors" also cannot be credited.  (*Id.* ¶ 99.)  Once again, the complaint fails to provide *even one example* of parallel pricing changes made by defendants.  In fact, the complaint alleges no specific pricing conduct by *any* defendant at *any* time during the alleged conspiracy, relying entirely on industry averages that do not and cannot show parallel pricing.

Moreover, plaintiffs do not allege that the charts in the complaint include pricing by any of the defendants, nor that they are limited to pricing by defendants.  *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1197 n.12 (9th Cir. 2015) (holding plaintiffs' general allegations that the average retail price rose during the class period were inadequate, because "[a]s far as we can tell from the complaint, retail prices of defendants' products actually might have fallen during the class period . . . Plaintiffs make no allegation either way"); *Jacobs v. Tempur-Pedic Int'l., Inc.*, 626 F.3d 1327, 1343 (11th Cir. 2010) (affirming dismissal of Section 1 complaint that contained "no indication [. . .] of dates on which distributors moved prices together, or the amounts by which the prices moved, if in fact they did"); *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *8 (holding "[w]hile the industry-wide data certainly shows that pork production decreased . . . it does nothing to indicate how any of

10

the individual Defendants acted" to reduce supply, which is "vital to pleading parallel conduct"). Plaintiffs also allege no facts about any defendant's pricing *prior* to the alleged conspiracy that could suggest an "unprecedented change" in pricing. *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) (holding plaintiffs "fail to show that this behavior was 'historically unprecedented' because they make scant allegations of pricing behavior that came *before* the alleged conspiracy").

### c. *Plaintiffs Improperly Rely on Group Pleading.*

The complaint fails to specify which defendants raised prices, purchased on the spot market or communicated with competitors, instead grouping defendants together with undifferentiated allegations that "Defendants," "Norwegian Defendants," "major salmon producers," or "Norwegian salmon farmers" engaged in the alleged misconduct.[2] "Courts in this district routinely dismiss complaints that 'lump' multiple defendants together, reasoning that such complaints violate Rule 8 for failing to attribute the necessary liability to each individual defendant." *Diamond Resorts Int'l, Inc. v. US Consumer Attorneys, P.A.*, No. 18-80311-CIV, 2018 WL 6621363, at *3 (S.D. Fla. Oct. 26, 2018); *see also In re Elevator Antitrust Litig.*, 502 F.3d at 50-51 (allegations of agreement "without any specification of any particular activities by any particular defendant" do not meet the standard set forth in *Twombly*); *Piguet v. JP Morgan Chase Bank*, No. 14-60869-CIV-ALTONAGA, 2014 WL 11350229, at *2 (S.D. Fla. Apr. 29, 2014) (Altonaga, J.) ("When a complaint indiscriminately lumps all defendants together, it fails to comply with Rule 8.").

Plaintiffs also expressly rely on group pleading within corporate families, referring to all members of a corporate family "by a single name in their allegations of participation in the

---

[2] *See, e.g.*, CAC ¶¶ 93, 97-98, 100, 108, 115, 117, 119, 124, 131, 145, 168-69.

conspiracy." (CAC ¶ 79.) This, too, "fails to differentiate among the defendants," in contravention of Rule 8's basic pleading requirements. *See Lane v. Capital Acquisitions & Mgmt. Co.*, No. 04-60602 CIV, 2006 WL 4590705, at *5 (S.D. Fla. Apr. 14, 2006) (dismissing complaint and noting "[t]he requirements of Rule 8 [are] particularly pertinent here since the Plaintiffs are suing both a parent corporation and its subsidiary"), *aff'd sub nom. Lane v. XYZ Partners, L.L.C.*, 322 F. App'x 675 (11th Cir. 2009). Indeed, "[m]ere generalizations as to any particular defendant—or even defendants as a group—are insufficient. The fact that two separate legal entities may have a corporate affiliation—perhaps owned by the same holding company—does not alter this pleading requirement." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016).

Individualized pleading is particularly necessary where, as here, plaintiffs have pleaded no facts explaining how the majority of defendants participated in the alleged conspiracy at all. Nine of the defendants (Mowi USA, LLC, Mowi Canada West, Inc., Mowi Ducktrap, LLC, Leroy Seafood USA Inc., Grieg Seafood BC Ltd., Ocean Quality AS, Ocean Quality North American Inc., Ocean Quality USA Inc., and Ocean Quality Premium Brands, Inc.) are not alleged to be Norwegian salmon producers that coordinated pricing or spot market purchases, and there are otherwise no allegations in the complaint about these defendants' conduct. *See Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 619 F. Supp. 2d 1260, 1273 (M.D. Fla. 2009) ("The grouping of Defendants as 'Peer Review Defendants' does not afford these Defendants fair notice of the basis for the claims against them, especially considering that as to some of these Defendants, no role in the peer review process is even generally described."), *aff'd*, 451 F. App'x 862 (11th Cir. 2012) (per curiam). Nor are there any specific allegations about what each of the remaining four defendants (Mowi ASA, Grieg Seafood ASA, Leroy Seafood AS, and SalMar

ASA) allegedly did in furtherance of the conspiracy—each is simply lumped in with other defendants.  The Court should not "force Defendants into significant and costly discovery without plausible allegations that they engaged in the conduct alleged."  *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *9.

### 2.     *Plaintiffs Fail to Allege Additional Facts That Raise A Plausible Suggestion of Agreement.*

Because plaintiffs "fail[] to plausibly plead parallel conduct, no discussion of any 'plus factors' is necessary."  *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018).  But even where a complaint adequately alleges parallel conduct, the complaint "must provide enough factual matter, taken as true, to show that the [d]efendants took steps that would otherwise have been against their economic self-interest or that tends to show collusion."  *S. Collision & Restoration, LLC v. State Farm Mut. Auto. Ins. Co.*, 173 F. Supp. 3d 1293, 1299 (M.D. Fla. 2016).  Accordingly, a plaintiff must plead "facts supporting plus factors that would tip the scale from equipoise towards conspiracy."  *Quality Auto Painting*, 917 F.3d at 1271.  Here, plaintiffs fail to plead any such facts.

#### a.  *Government Investigations*

The complaint relies heavily on reports that the EC conducted inspections at the facilities of certain Norwegian defendants and has opened an investigation.  (CAC ¶¶ 3-5, 82-84.)  However, the EC press release upon which plaintiffs rely expressly confirms that "[u]nannounced inspections are a preliminary investigatory step" and "[t]he fact that the Commission carries out such inspections does not mean that the companies are guilty of anti-competitive behavior."[3]  The mere existence of a government investigation, in the United States

---

[3] *See* European Commission Press Release Statement/19/1310, *Antitrust: Commission Confirms Unannounced Inspections in the Farmed Atlantic Salmon Sector* (Feb. 19, 2019),

*(cont'd)*

13

and/or abroad, is a "non-factor" that "carries no weight in pleading an antitrust claim" because it is impossible to predict the outcome of such an investigation.  *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d at 1024; *see also Wash. Cty.*, 2020 WL 1666454, at *9 (dismissing antitrust claims and concluding that allegations regarding government investigations "add no meat to the bone; they merely reflect that subpoenas were issued and that the defendants have complied with them by producing records—acts that shed no light whatsoever on whether the defendants engaged in an antitrust conspiracy"); *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d at 1316 (holding the existence of an investigation by the Florida Attorney General "does not make the conspiracy alleged in this case more plausible because the outcome of the investigation cannot be predicted").

Plaintiffs also attempt to bolster their complaint with references to two historical investigations within the salmon industry, expressly stating that their purpose in referencing them is to suggest that "[t]here is a plausible basis to conclude that similar types of unlawful misconduct are occurring now."  (CAC ¶¶ 90-92.)  But those investigations have nothing to do with the conspiracy alleged here.  Both involved entirely different parties, concluded more than fifteen years ago, and concerned different alleged misconduct—namely, agreements to sell at minimum prices or to reduce salmon stocks.  "A conspiracy elsewhere, without more, generally

---

https://Europa.eu/rapid/press-release_STATEMENT-10-1310_en.htm, cited at CAC ¶ 3, n.1. Throughout the complaint, plaintiffs rely on news articles and press releases from which they selectively quote to support their claim.  Additional content from the materials on which plaintiffs rely is cited herein, as the court is "entitled to take notice of the full contents of the published articles referenced in the complaint, from which [] truncated quotations are drawn." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007); *McClure v. Oasis Outsourcing II, Inc.*, 674 F. App'x 873, 875-76 (11th Cir. 2016) (holding court did not err in considering exhibits that were "incorporated into and referenced in [the] pleadings"); *Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011) (holding courts need not credit factual allegations that are "contradicted by the complaint itself [or] documents upon which the pleadings rely").

does not tend to prove a [separate] conspiracy," and these wholly unrelated investigations do not, as a matter of law, plausibly suggest the conspiracy alleged here. *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 403 (3d Cir. 2015); *see also Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1317-18 (11th Cir. 2003) (dismissing complaint despite allegations regarding "industry's history of antitrust violations" because they were not "indicative of a present antitrust violation"); *In re Elevator Antitrust Litig.*, 502 F.3d at 52 (allegations of separate conspiracies and suggestions that "if it happened there, it could have happened here" *do not* "nudge . . . claims across the line from conceivable to plausible" (citation omitted)).

### b.  Nature of the Market

Plaintiffs allege that a number of factors make the market "conducive to anticompetitive conduct among [d]efendants"—namely, that the "market for Atlantic farm-raised salmon" is "highly concentrated," has "high entrance barriers," and involves a commodity product. (CAC ¶¶ 141, 144, 148, 158.)  But "none of these features make conspiracy a more plausible explanation than mere interdependence," and they therefore fail to support an inference of an unlawful agreement. *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d at 1317; *see also Williamson Oil Co.*, 346 F.3d at 1317 (affirming allegations of a concentrated market, inelastic demand, high barriers to entry, and a fungible product are simply "market characteristics" that reflect the "industry is an oligopoly, which is perfectly legal").

*First*, even if the alleged market for farm-raised Atlantic salmon could be described as "highly concentrated" (CAC ¶ 144), allegations that a conspiracy is *possible* because of industry concentration do not render a conspiracy *plausible*.  *See S. Collision & Restoration, LLC*, 173 F. Supp. 3d at 1300 ("The fact that a group of alleged price-fixers possess power in a particular market does not, standing alone, make it more likely that the members of that group have entered into an agreement to fix prices."); *Advanced Tech. Corp. v. Instron, Inc.*, 925 F. Supp. 2d 170,

181-82 (D. Mass. 2013) (dismissing complaint because defendants' 70% market share was "not sufficiently suggestive of any actual collusion between Defendants"); *In re Text Messaging Antitrust Litig.*, No. 08 C 7082, 2009 WL 5066652, at *7 (N.D. Ill. Dec. 10, 2009) (allegations of an "interdependent, concentrated industry where price-fixing is 'feasible' . . . do not support a reasonable inference of an agreement").

In any event, plaintiffs' allegations undermine this conclusory assertion, and therefore the Court need not accept it as true. *See Frone v. JP Morgan Chase & Co.*, 695 F. App'x 468, 472 (11th Cir. 2017) ("We need not ignore the [complaint's] more specific facts for their contradictory conclusory allegations."). Far from being "highly concentrated," the complaint acknowledges that defendants constitute only a few of the farm-raised Atlantic salmon producers in Norway and make up only 37% of total salmon produced in North America, and that close to 50 different players compete in at least six different countries to produce farm-raised Atlantic salmon. (*Id*. ¶¶ 145, 147.)

*Second*, while plaintiffs allege that geographic, regulatory and production factors create barriers to entry (CAC ¶¶ 148-55), high barriers to entry are not necessarily suggestive of conspiracy—they also create market-wide incentives that make parallel conduct equally if not more consistent with independent action. *See In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-01895-WSD, 2009 WL 323219, at *15 (N.D. Ga. Jan. 28, 2009) (noting "[s]ubstantial barriers to entry" meant all defendants "would be equally impacted by market variables" and "have the same incentive[s]" and thus did not render a conspiracy plausible); *see also In re Text Messaging Antitrust Litig.*, 2009 WL 5066652, at *9 ("Where . . . the fixed costs associated with an industry are high, self-interested producers might attempt to charge higher than marginal cost prices for their products in order to recover some of their fixed costs." (citation omitted)).

*Third*, the complaint asserts that farm-raised Atlantic salmon is a "standardized product not readily substitutable with other types of salmon," and that the "more standardized a product is, the easier it is for competing firms to reach agreement." (CAC ¶¶ 142-43.) However, even if plaintiffs had alleged any price uniformity—which they do not—such a pricing structure is normal in a commodity market with "fungible products" and provides no basis to infer an unlawful agreement. *See White v. R.M. Packer Co.*, 635 F.3d 571, 576-77 (1st Cir. 2011) ("Some markets are particularly conducive to maintaining consciously parallel pricing without the need for agreement among the producers," such as those with "a stable market environment, fungible products, and a small number of variables upon which the firms seeking to coordinate their pricing may focus." (citation omitted)); *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1033 (8th Cir. 2000) ("Particularly when the product in question is fungible . . . courts have noted that parallel pricing lacks probative significance.").

### c.   *Motive to Conspire*

Plaintiffs also ask the Court to infer that defendants "reacted" to Russia's import ban in 2014 and alleged associated declining demand "by collusively raising prices," contending without any substantiation that alleged industry-wide price increases "can only be explained by collusion." (*Id.* ¶ 108.) As an initial matter, plaintiffs' reliance on such aggregated industry-wide data does not plausibly establish that any defendant actually raised prices or had a motive to conspire. *See supra* Section I.B.1.b; *see also In re ICE LIBOR Antitrust Litig.*, No. 19 CIV. 439 (GBD), 2020 WL 1467354, at *5 (S.D.N.Y. Mar. 26, 2020) (noting that "[i]t is inappropriate for [p]laintiffs to rely upon aggregate data to demonstrate how an entire group of [d]efendants might stand to profit").

Moreover, the mere fact that the price of a product has increased over time does not support an inference of conspiracy, as "such a price increase is no more suggestive of collusion

17

than it is of any other potential cause." *In re Musical Instruments & Equip. Antitrust Litig.*, 798

F.3d at 1197.  Allegations of a profit motive likewise do not give rise to a reasonable inference of

conspiracy, because "[i]f the existence of a profit motive was enough to make it plausible that

the defendants had colluded to fix prices, then essentially every alleged price-fixing agreement

would survive a motion to dismiss."  *S. Collision & Restoration, LLC*, 173 F. Supp. 3d at 1300;

*see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 229 (3d Cir. 2011) ("'[A]ll entrepreneurs

have a legitimate understandable motive to increase profits' and without a 'scintilla of evidence

of concerted, collusive conduct,' this motive does not on its own constitute evidence of a 'plus

factor.'") (citations omitted); *Marion Diagnostic Ctr., LLC v. McKesson Corp. (In re Generic*

*Pharm. Pricing Antitrust Litig.)*, 386 F. Supp. 3d 477, 485 (E.D. Pa. 2019) (plaintiffs' allegation

that defendant made "billions of dollars of additional . . . margin[s]" because of its price mark-up

did not make conspiracy more plausible because "'[p]rofit is a legitimate motive in pricing

decisions'" (alterations in original) (citations omitted)).

  Even putting these flaws aside, plaintiffs' allegation regarding declining demand is

contradicted by the complaint itself and sources it cites, which acknowledge *increased* demand

globally, including in the United States.  (*See, e.g.*, CAC ¶ 24 ("Mowi ASA experienced a 7.6%

increase in the 'market distribution and demand' in the United States."); *id.* ¶ 169 (identifying

"strong demand globally" and increased estimated volume in Q4 of 2018 compared to Q17 in

Europe, the Americas and Asia); ¶ 170 ("Salmon import volumes into the United States through

October rose 10.5%.")).[4]  As a result, plaintiffs' general, conclusory allegations can be rejected

---

[4] *See also* Anders Furuset, *Marine Harvest Accused of Manipulating Polish Salmon Market*, INTRAFISH (Apr. 8, 2016), https://www.intrafish.com/news/marine-harvest-accused-of-manipulating-polish-salmon-market/1-1-751597 (hereinafter, *Furuset*), cited at CAC ¶ 95, n.97 (noting that the global market was "growing by around 6 percent each year"); Ole Petter Skonnard, *Russia sanctions throw Norway's fish industry into turmoil*, Reuters (Aug. 8, 2014),

*(cont'd)*

in favor of the complaint's specific allegations that undermine any decreased demand or motive to conspire. *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205-06 (11th Cir. 2009) ("Our duty to accept the facts in the complaint as true does not require us to ignore specific factual details of the pleading in favor of general or conclusory allegations. Indeed, when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern."); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1272 (M.D. Ala. 2019) (disregarding allegation that is "[n]ot only [. . .] conclusorily asserted" but is "*contradicted* by more specific alleged facts that [plaintiff] pleads, cites in its briefing, and asserts to be subject to judicial notice") (emphasis in original), *appeal filed*, No. 19-14125 (11th Cir. Oct. 18, 2019).

### d. Trade Associations and Industry Events

Plaintiffs allege that defendants "transition[ed] to openly collusive behavior reflected in the activities of certain trade associations or industry groups," listing a number of trade associations of which certain defendants are members. (CAC ¶¶ 117-21.) But "participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement" because it presents, at most, a potential opportunity to conspire. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d at 1196; *see also In re: ICE LIBOR Antitrust Litig.*, 2020 WL 1467354, at *4 (dismissing conspiracy allegation describing only an "opportunity to conspire" and based "wholly in speculation and wishful thinking as to what Defendants *might* have done") (emphasis in original); *Williamson Oil Co.*,

---

https://www.reuters.com/article/ukraine-crisis-sanctions-salmon/update-1-russia-sanctions-throw-norways-fish-industry-into-turmoil-idUSL6N0QE32E20140808 (hereinafter, *Skonnard*), cited at CAC ¶ 105, n.108 ("Brokerage Carnegie said the import ban situation had created an overhang of around 120,000 tonnes (of salmon) but added that would 'be absorbed by global demand growth in the next 6-12 months.'").

346 F.3d at 1319 ("[T]he mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy." (citation omitted)).

None of plaintiffs' allegations regarding defendants' participation in trade associations go beyond mere opportunities to conspire.  The complaint fails to identify any specific meetings or conversations between defendants at trade association meetings.  And, critically, the complaint makes no effort to link the timing of any trade or industry events to any allegedly "coordinated conduct" by defendants.  Indeed, the North Atlantic Seafood Forum—"the world's largest seafood business conference"—is the only trade event that plaintiffs even allege was attended by employees of multiple defendants.  (CAC ¶¶ 131-39.)  Plaintiffs do not allege that any of defendants' employees ever met at this conference to discuss any improper topic, let alone met in furtherance of the alleged price fixing conspiracy.  Nor do plaintiffs connect this conference to any subsequent actions by the defendants to coordinate pricing or limit salmon supply.

"Courts that have found an opportunity [to collude] significant have done so in the context of allegations of particular meetings or conversations, including the dates of meetings and names of the participants, closely on the heels of unprecedented or anomalous parallel conduct." *Advanced Tech. Corp.*, 925 F. Supp. 2d at 182; *see also Stafford v. Grifols Int'l, S.A.*, No. 1:16-CV-3997-AT, 2017 WL 5201799, at *4 (N.D. Ga. Apr. 24, 2017) (allegations "merely identif[ying] the 'opportunity' [d]efendants had to collude by attending annual conferences together—which appear to be relatively infrequent interactions" are insufficient to infer a conspiracy); *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d at 1316 (allegation that defendants have "formed close business and personal relationships" through repeated dealings at trade and industry events "do[es] not on its own or when paired with parallel conduct suggest [d]efendants entered into an agreement to fix prices").  That is not the situation here.

The complaint quotes a former industry member's speech that is alleged to support the conclusory allegation that defendants have "shifted from [price] competition to cooperation" through their participation in trade associations.  (CAC ¶ 122.)  But the plain language of the speech makes clear that the referenced cooperation does not involve pricing at all, but rather cooperation in addressing industry-wide environmental challenges, including "sea lice, feed resources, technology and knowledge in general."  (*Id.*)  It is entirely appropriate for trade associations to work to address environmental challenges facing the industry, and defendants' participation in such associations does not support an inference of conspiracy.  *See, e.g.*, *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999) ("As the Supreme Court has recognized . . . trade associations often serve legitimate functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services.").

Plaintiffs' conclusory allegation that defendants used the GSI in 2013 to "engage explicitly in 'precompetitive cooperation' . . . [and] eliminate individual environmental improvements as a competitive tool" similarly ignores the legitimate function of GSI to address industry-wide environmental challenges.  (CAC ¶ 125.)  And, in any event, plaintiffs concede that their allegations regarding GSI in 2013 have no relevance to the conspiracy they allege began in mid-2015, but rather are included simply to suggest that "it is entirely plausible that [defendants] would do likewise with respect to farmed salmon prices two years later."  (*Id.*)  As discussed above, allegations regarding unrelated conspiracies and suggestions that "if it happened there, it could have happened here" do not "nudge . . . claims across the line from conceivable to plausible."  *In re Elevator Antitrust Litig.*, 502 F.3d at 52 (citation omitted); *see also supra* Section I.B.2.a.

21

In an attempt to allege that defendants improperly shared pricing information with each other in furtherance of the alleged conspiracy, plaintiffs also misstate the source on which they rely with respect to the activities of the NSC.  Plaintiffs assert that NSC provides defendants with access to a SAS database that allows defendants "to share current individualized competitor data, including price data."  (CAC ¶ 118.)  However, the SAS webpage cited in the complaint contains no reference to "current" or "real-time" price and market share data, nor does it claim to offer defendants access to any "individualized" data.  (*Id.* ¶¶ 118, 127.)  And other sources cited by plaintiffs make clear that the database does not provide access to individualized, real-time pricing, but rather "uses SAS software to structure, store and retrieve the *historical aggregated* data and then makes that data available to Norwegian industry members."[5]  Moreover, plaintiffs' unsupported assertions to the contrary are entirely implausible given that (i) NSC is owned and

---

[5] *Trade Statistics*, NORWEGIAN SEAFOOD COUNCIL, https://en.seafood.no/about-norwegian-seafood-council/privacy/statement/ (last updated Aug. 27, 2019) (emphasis added), cited at CAC ¶ 118, n. 120-23.  As with other materials they cite in the complaint, plaintiffs rely on and selectively quote from the Norwegian Seafood Council's website, a government website from which the court can take judicial notice of facts.  *See Acella Pharm., LLC v. First DataBank, Inc.*, No. 1:17-CV-5013-MHC, 2018 WL 7199992, at *6 (N.D. Ga. June 4, 2018) ("The 'public records' of which courts may take judicial notice have been defined by several courts to include facts found on federal government websites."), *vacated on other grounds*, No. 1:17-CV-5013-MHC, 2018 WL 7199807 (N.D. Ga. Oct. 4, 2018); *see also Miller v. Gizmodo Media Grp., LLC*, No. 18-24227-CIV, 2019 WL 1790248, at *2 n.1 (S.D. Fla. Apr. 24, 2019) (Altonaga, J.) (considering document linked to website referenced in complaint because "it is incorporated by reference . . . , it is central to Plaintiff's claims, and neither party challenges its authenticity").

*(cont'd)*

22

operated by the Norwegian Ministry of Trade, Industry, and Fisheries, a governmental body;[6]

and (ii) defendants' participation in NSC is required by Norwegian law.[7]

Courts have found the sharing of historical or aggregated information by trade groups—

the same conduct plaintiffs' own sources attribute to the NSC—to be presumptively legitimate.

*See Jones v. Micron Tech., Inc.*, 400 F. Supp. 3d 897, 918 (N.D. Cal. 2019) ("Data-gathering and

information sharing are perfectly legitimate objectives of trade associations."); *see also* Federal

Trade Commission & United States Department of Justice, *Antitrust Guidelines for*

*Collaborations Among Competitors* 15-16 (2000) (sharing of "historical information" or

"aggregated data" is unlikely to raise competitive concerns).  This principle should apply with

even greater force when the data sharing is done under the auspices of a government agency in

which defendants' membership is required by law.  Accordingly, plaintiffs' allegations regarding

defendants' participation in the NSC and access to the SAS database do not support a plausible

inference of improper information sharing suggestive of conspiracy.

### C.      Plaintiffs' Own Allegations Undermine Any Inference of a Conspiracy.

Plaintiffs' antitrust claim also is implausible because the complaint provides "obvious

alternative and legitimate explanations" for the alleged misconduct.  *In re Fla. Cement &*

---

[6] *The Norwegian Seafood Council Uses SAS to Give Norwegian Fish Exporters a Competitive Advantage*, SAS INSTITUTE, INC., https://www.sas.com/no_no/customers/norwegian-seafood-council.html, cited at CAC ¶ 126, n.134 ("The Ministry of Trade, Industry and Fisheries is the sole shareholder of the Norwegian Seafood Council."); *see also About Us*, NORWEGIAN SEAFOOD COUNCIL (Nov. 18, 2016, 2:36 PM), https://en.seafood.no/about-norwegian-seafood-council/about-us/, cited at CAC ¶ 118, n.120.

[7] To export fish and fish products from Norway, an exporter must be registered with the Norwegian Seafood Council.  *See* Act No. 9 of 1990 Relating to the Regulation of Exports of Fish and Fish Products (last amended by Act No. 65 of 2015).  "[T]he court is permitted to take judicial notice of authoritative statements of foreign law" such as this regulation.  *See Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1321 (11th Cir. 2004) (citation omitted).

*Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1314 (S.D. Fla. 2010) (courts should not infer a conspiracy where "there are obvious alternative and legitimate explanations" for the allegedly anticompetitive conduct); *see also Twombly*, 550 U.S. at 557 ("[W]hen allegations of parallel conduct are set out to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."). The complaint and sources cited therein demonstrate that (i) even the isolated spot market purchases purportedly identified in the complaint would be consistent with defendants' unilateral self-interest; and (ii) constraints on supply and rising production costs plausibly explain any alleged increase in average industry prices.

The complaint makes clear that any alleged spot market purchases would be consistent with defendants' independent business interests. Plaintiffs allege that defendants enter into long-term contracts to supply farm-raised Atlantic salmon, but that short-term supply is inelastic given salmon's long production cycle. (*Id.* ¶¶ 82, 149, 167-68.) It is thus entirely consistent with independent action for a defendant to make periodic purchases on the spot market to meet its contractual obligations to supply salmon or take advantage of low prices, and plaintiffs' contradictory allegations undermine rather than support a plausible inference of conspiracy. *See In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d at 1314 ("The existence of an unlawful conspiracy cannot be plausibly inferred from Defendants' use of cement swaps because there are obvious alternative and legitimate explanations for the use of swaps and their settlement pricing."); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 328 (3d Cir. 2010) ("[I]n light of the market dynamics alleged by plaintiffs, the obvious explanation" for the parallel conduct was "that each insurer found that the benefits justified the costs."); *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 904 (9th Cir. 1987) ("The fact that many, if not all, firms in an

industry react similarly to a particular practice does not evidence an industrywide agreement when there is a legitimate business purpose for each firm's behavior.").

Plaintiffs similarly ignore innocuous explanations for alleged price increases in the salmon industry.  As courts consistently recognize, prices are not a function of *just* demand; they reflect demand, supply and the costs of production.  *See Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 52 (7th Cir. 1992) ("[W]e are unpersuaded by [the plaintiff's] argument that the economically rational action for [defendants] during a time of reduced demand necessarily would have been to cut price in order to increase sales."); *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 793 n.14 (M.D. Pa. 2014) ("Even if costs were stable or demand was in decline during the conspiracy period, pricing action without consideration of changes in cost does not, by itself, tend to disprove the possibility of independent and self-interested conduct."), *aff'd*, 801 F.3d 383 (3d Cir. 2015); *Berk-Cohen Assocs., LLC v. Landmark Am. Ins. Co.*, Nos. 07-9205, 07-9207, 2009 WL 2777163, at *4 n.1. (E.D. La. Aug. 27, 2009) (stating as "axiomatic" that supply and price "are inversely related in the context of market demand," such that both supply and demand must be considered in evaluating or determining price (citing Richard A. Posner, *Economic Analysis of the Law* 8 (6th ed. 2003))).  The complaint acknowledges that supply of farm-raised Atlantic salmon is inherently limited by a long planning and production cycle and that regulatory "licenses constrain the maximum [production] for each company and the industry as a whole."  (CAC ¶¶ 155, 167.)

Supply is further impacted by environmental factors, as explained in the sources plaintiffs cite.  For example, despite quoting extensively from the September 2016 speech of Trond Davidsen, the complaint ignores Davidsen's remarks in that very speech regarding the industry's

"decline in production" as a result of sea lice, algaes and diseases.[8]  Similarly, multiple sources cited in the complaint identify the treatment of sea lice as a "central cause" of increased salmon prices during the relevant period and expressly link sea lice treatment to increased salmon prices.[9]  The complaint and sources cited therein thus explain that any alleged increase in average industry prices is attributable to factors other than the alleged conspiracy.

## <u>CONCLUSION</u>

For the foregoing reasons, defendants respectfully submit that the Consolidated Amended Direct Purchaser Class Action Complaint should be dismissed.

---

[8] Trond Davidsen, *Producing Healthy Sustainable Food for the World*, INTERNATIONAL SALMON FARMERS ASSOCIATION, http://www.salmonfarming.org/producting-healthy-sustainable-food-for-the-world, at 4 (hereinafter, *Davidsen*), cited at CAC ¶ 122, n.129; *see also Furuset*, supra n.4 ("Global salmon supply is expected to drop by around 6 percent this year, McGinley noted. 'Meanwhile the market is growing by around 6 percent each year.  It doesn't tally.  Obviously prices rise.  That's the norm when there is insufficient fish in the market,' he said."); *Skonnard*, supra n.4 ("[S]upply growth is seen limited and other markets are growing rapidly, analysts added.").

[9] *See Davidsen*, supra n.8 ("Huge resources are being spent by the industry to deal with these [sea lice, algae and disease] challenges.  In Norway alone, calculations indicate that the sea lice issue accounted for about 1 billion USD in treatments in 2015—more than 10% of the total production value."); Aslak Berge, *Suempol Norway's GM doesn't believe in price caps for second half of 2017*, SALMON BUSINESS (Aug. 16, 2017), https://salmonbusiness.com/suempols-gm-does-not-believe-in-price-caps-in-the-second-half-of-2017/, cited at CAC ¶ 94, n.96 ("We have never had such major product quality challenges as at this moment, nor have we ever had such high salmon prices.  There is certainly a connection there, and it is particularly important for lice treatment as a central cause.").

Dated: April 20, 2020

Respectfully submitted,

By: */s/ Lawrence D. Silverman*          
Lawrence D. Silverman
Florida Bar No: 7160
Diane O. Fischer
Florida Bar No: 994560
AKERMAN LLP
Three Brickell City Centre
98 SE 7ᵗʰ Street, Suite 1100
Miami, Florida 33131
lawrence.silverman@akerman.com
deedee.fischer@akerman.com

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Karen Hoffman Lent *(pro hac vice)*
Matthew M. Martino *(pro hac vice
forthcoming)*
One Manhattan West
New York, NY 10001
karen.lent@skadden.com
matthew.martino@skadden.com

*Counsel for Defendants Mowi ASA (f/k/a
Marine Harvest ASA), Mowi USA, LLC
(f/k/a Marine Harvest USA, LLC), Mowi
Canada West, Inc. (f/k/a Marine Harvest
Canada, Inc.), and Mowi Ducktrap, LLC
(an assumed name of Ducktrap River of
Maine, LLC)*

By: */s/ John C. Seipp*          
John C. Seipp
Florida Bar No: 289264
Christine L. Welstead
Florida Bar No: 970956
BOWMAN AND BROOKE, LLP
Two Alhambra Plaza, Suite 800
Miami, Florida 33134
john.seipp@bowmanandbrooke.com
christine.welstead@bowmanandbrooke.com

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
David I. Gelfand *(pro hac vice)*
Matthew Bachrack *(pro hac vice)*
2112 Pennsylvania Avenue, NW
Washington, D.C. 20037
dgelfand@cgsh.com
mbachrack@cgsh.com

*Counsel for Defendants Leroy Seafood AS and
Leroy Seafood USA Inc.*

By: */s/ Sara L. Salem*
Sara L. Salem
Florida Bar No: 1011429
Eric J. Mahr *(pro hac vice)*
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, D.C. 20005
sara.salem@freshfields.com
eric.mahr@freshfields.com

*Counsel for Defendants Grieg Seafood
ASA, Grieg Seafood BC Ltd., Ocean
Quality AS, Ocean Quality North
America Inc., Ocean Quality USA Inc.,
and Ocean Premium Brands, Inc.*

By: */s/ Adam L. Schwartz*
Adam L. Schwartz
Florida Bar No: 0103163
HOMER BONNER JACOBS ORTIZ, P.A.
1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
aschwartz@homerbonner.com

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Stephen Neuwirth *(pro hac vice)*
Sami Rashid *(pro hac vice)*
Christopher Tayback *(pro hac vice)*
51 Madison Avenue, 22nd Floor
New York, New York 10010
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
stephenneuwirth@quinnemanuel.com
samirashid@quinnemanuel.com
christayback@quinnemanuel.com

*Counsel for Defendant SalMar ASA*