**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| **IN RE: FARM-RAISED SALMON AND SALMON PRODUCTS ANTITRUST LITIGATION** | **Master File No. 19-21551-CV-ALTONAGA**<br><br><br>**JURY TRIAL DEMANDED** |

| |
|---|
| **SECOND CONSOLIDATED AMENDED**<br>**DIRECT PURCHASER CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

I.     NATURE OF ACTION ........................................................................................... 2

II.    JURISDICTION AND VENUE ............................................................................. 5

III.   PLAINTIFFS ......................................................................................................... 6

IV.    DEFENDANTS ..................................................................................................... 8

V.     AGENTS AND CO-CONSPIRATORS ............................................................... 27

VI.    FACTUAL ALLEGATIONS ............................................................................... 28

       A.     The European Commission And The United States Department Of Justice
              Are Investigating Unexplained Price Increases In The Salmon Market. ........... 28

       B.     The Influence Of Spot Prices In The Salmon Market Makes It Susceptible
              To Collusion And Defendants Were Well-Aware Of This Opportunity ............. 34

       C.     Defendants Were In Constant Communication And Were Dedicated To
              Cooperation, Particularly After Russia Ceased Importing
              Norwegian Salmon. ............................................................................................ 41

       D.     Defendants' Direct Communications Have To Be Viewed In The
              Context Of the Culture of Cooperation Fostered Within The
              Norwegian Salmon Industry ............................................................................... 49

       E.     During The Class Period, Defendants Have Engaged In Closely
              Parallel Pricing Behavior That Has Resulted In Record Profitability ................ 55

       F.     Defendants' Pricing Behavior Is Not Justified By Cost Factors. ....................... 61

       G.     The Structure And Characteristics Of The Market For Salmon Support The
              Existence Of A Collusive Restraint .................................................................... 64

              1.  Industry Concentration Facilitates Collusion. ........................................... 65

              2.  Barriers To New Entry Are High. .............................................................. 68

              3.  Farm-Raised Salmon Is A Commodity Product And Prices
                  Are Correlated Across The Globe. ............................................................ 71

              4.  Norwegian Companies Dominate The Production Of Farm-Raised
                  Salmon And The Defendants Are The Largest Global Producers. ............ 74

              5.  Farmed Salmon Production Is Highly Inelastic And The Product Is
                  Perishable. ............................................................................................... 75

i

      H.    The Alleged Conspiracy Adversely Affected Direct Purchasers In The United States, Which Is A Substantial Market For Salmon.........................76

VII.    TOLLING OF THE STATUTE OF LIMITATIONS.........................................80

VIII.    CLASS ACTION ALLEGATIONS .............................................................82

IX.    INTERSTATE TRADE AND COMMERCE ................................................84

X.    PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY .........84

XI.    CAUSE OF ACTION ...............................................................................85

XII.    PRAYER FOR RELIEF .............................................................................87

1.      Plaintiffs Euclid Fish Company; Euro USA Inc.; Schneider's Fish and Sea Food Corporation; Beacon Fisheries, Inc.; Cape Florida Seafood; The Fishing Line LLC; and Hesh's Seafood, Inc. (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," as defined below), file this Second Consolidated Amended Complaint ("SCAC") pursuant to this Court's order of July 22, 2020 (ECF No. 242), against Defendants Mowi ASA (formerly known as Marine Harvest ASA), Mowi USA, LLC (formerly known as Marine Harvest USA, LLC), Marine Harvest Canada, Inc., and Mowi Ducktrap, LLC (formerly known as Ducktrap River of Maine LLC) (collectively, "Mowi" or "Marine Harvest"); Grieg Seafood ASA, Grieg Seafood BC Ltd., Ocean Quality AS (collectively, "Grieg"); Ocean Quality North America Inc., Ocean Quality USA Inc., and Ocean Quality Premium Brands, Inc. (collectively, "Ocean Quality"); SalMar ASA ("SalMar"); Lerøy Seafood AS and Lerøy Seafood USA Inc. (collectively, "Lerøy"); and Cermaq Group AS, Cermaq US LLC, Cermaq Canada Ltd., and Cermaq Norway AS (collectively, "Cermaq"); and entities owned or controlled by them (collectively, "Defendants").

2.      In the SCAC, which supersedes the prior Consolidated Amended Complaint ("CAC"), Plaintiffs bring an action for damages, injunctive relief, and any other relief pursuant to the federal antitrust laws. The allegations in the SCAC are based on Plaintiffs' personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, including the investigation of counsel and review of documents that Defendants produced to the Antitrust Division of the United States Department of Justice ("DOJ") and the European Commission ("EC") in connection with this litigation pursuant to this Court's orders of April 6 and June 3, 2020 (ECF Nos. 207, 233).[1]  Plaintiffs demand a trial by jury on all matters so triable.

---

[1]      The documents that Defendants furnished to the DOJ include primarily documents from the files of Defendants' United States subsidiaries; the documents obtained by the EC came from Defendants' European offices *other than those in Norway*.  Norway is not part of the European Union.  Given that the conspiracy was centered in Norway, many documents relevant to this litigation located in Norway were not produced to either regulatory agency. For example,

## I.      NATURE OF ACTION

3.      This lawsuit alleges that Mowi, Lerøy, SalMar, Ocean Quality/Grieg, and Cermaq unlawfully coordinated prices charged to direct purchasers of farm-raised Atlantic salmon[2] (*Salmo salar*) and salmon products derived therefrom, which Defendants directly sold to Plaintiffs and the class between April 10, 2013 and the present, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), which prohibit all forms of contracts, combinations, or conspiracies that, in any manner, tend to restrain trade by fixing, raising, or stabilizing the prices at which goods or services are sold to customers in the United States.



The NASDAQ Salmon Index, which is discussed in greater detail below, is the weighted average of weekly reported sales prices and corresponding volumes in fresh Atlantic Superior Salmon, head on gutted reported to NASDAQ's offices in Copenhagen, Denmark by a panel of Norwegian salmon exporters and salmon producers with export licenses. As Plaintiffs have learned from Defendants' production, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Thus, for many reasons, the productions Plaintiffs have received are far from a complete set of relevant discovery from Defendants. And the Cermaq entities are newly added Defendants and have yet to produce any documents.

[2]      As used herein, unless otherwise indicated, the term "salmon" refers to "Atlantic salmon." As further explained below, "Atlantic salmon" can be farmed not only in locations that border the Atlantic Ocean (*e.g.*, Norway and Scotland), but also in certain locations that border the Pacific Ocean (primarily in Canada and Chile).

4.      The suit parallels antitrust investigations by the EC and the DOJ.  The EC confirmed "that on 19 February 2019 its officials carried out unannounced inspections in several Member States at the premises of several companies in the sector of farmed Atlantic salmon."

5.      The EC commenced its investigation by sending a letter in early February 2019 to the world's dominant suppliers of farm-raised salmon and their affiliates, in which it explained that it had received information that Defendants are "participat[ing in] or have participated in anti-competitive agreements and/or concerted practices related to different ways of price coordination in order to sustain and possibly increase the prices for Norwegian salmon."  Though Cermaq was not included in the EC's raids, Cermaq has no offices in the EU and is not subject to the EC's regulatory oversight.

6.      The DOJ also issued criminal subpoenas on November 15, 2019 (after Plaintiffs filed the CAC) to Mowi, SalMar, and Grieg entities in connection with its own antitrust investigation into price-fixing in the Atlantic salmon market; according to press reports, "[t]he companies said that the probe was about previously announced European Commission inspection on possible collusion between Norwegian producers of farmed Norwegian Atlantic salmon and class action complaints in the United States." At the same time, Lerøy Seafood AS issued an announcement indicating that its United States subsidiary, Lerøy Seafood USA Inc., had also received a similar subpoena from the DOJ.

7.      As alleged in detail below, the Defendants, *inter alia*, have been engaging in the following misconduct:





*See*

Appendix A (comparing Defendants' pricing offered in the United States and NASDAQ Salmon Index prices on a weekly basis). The results were significant. Defendants achieved record profitability in 2013. Then, in August of 2014, Russia banned the importation of Norwegian salmon, a ban which continues today. But Defendants' anticompetitive conduct allowed them to obtain supra-competitive profits and prices in 2014, despite what should have been significant downturn in prices and profitability caused by the ban and the loss of one of Defendants' largest markets. In the following years, Defendants again reaped record revenues from skyrocketing prices caused by their anticompetitive conduct.

9.      Plaintiffs seek to represent a Class consisting of all persons and entities in the United States, its territories, and the District of Columbia who directly purchased farm-raised Atlantic salmon or products derived therefrom from one or more Defendants and/or entities owned or controlled by them from April 10, 2013 until the effects of the anticompetitive conduct alleged herein cease (the "Class Period"). Excluded from the Class are the Court and its personnel and

---

[3] Spot markets are also referred to as cash markets or physical markets because assets are sold for cash and delivered immediately, as opposed to through longer term contracts.

any Defendants and their parent or subsidiary companies.  This Class Period is based on newly obtained information from Defendants' productions to regulators of which Plaintiffs were previously unaware.

## II.        JURISDICTION AND VENUE

10.        Plaintiffs bring this class action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to: (a) recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; (b) enjoin Defendants' anticompetitive conduct; and (c) obtain any other relief afforded under the antitrust laws of the United States for Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

11.        This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

12.        This Court has personal jurisdiction over the Defendants pursuant to Fed. R. Civ. P. 4(k) and 15 U.S.C. § 22, which states that "[a]ny suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."

13.        The Court further has personal jurisdiction over the Defendants based on, *inter alia*, their residency or transaction of business in the State of Florida; their purposeful actions in placing price-fixed salmon and products derived therefrom into the stream of commerce seeking to serve Florida (into which collectively tens of millions of kilograms of Norwegian, Scottish and Chilean salmon have been shipped during the Class period); Defendants' purposeful availment of the benefits and protections of the laws of the State of Florida; Defendants' commission of tortious acts within the State of Florida; Defendants' United States subsidiaries' purposeful activities within the State of Florida that are imputable to parent-entity Defendants located outside the United States; and/or the "conspiracy theory of jurisdiction" recognized by the Florida Supreme Court in *Execu-Tech Business Sys., Inc. v. New Oji Paper Co., Ltd.*, 752 So. 2d 582 (2000). This

5

Court also has jurisdiction over Defendants for claims arising under the Sherman and Clayton Acts based on their minimum contacts with the United States as a whole, and not simply through their contacts with the State of Florida. And this Court also has jurisdiction over the Mowi, SalMar, Grieg/Ocean Quality, and Lerøy Defendants because they declined to contest jurisdiction when filing a prior Rule 12 motion in this action.

14.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26) and 28 U.S.C. §§ 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

### III.        PLAINTIFFS

15.     Plaintiff Euclid Fish Company ("Euclid") is an Ohio corporation that specializes in the distribution of fish and seafood to restaurants, specialty stores, country clubs, hotels, and casinos throughout the Midwest.  Euclid is headquartered at 7839 Enterprise Drive, Mentor, Ohio 44060.  As a result of Defendants' collusive and anticompetitive conduct, during the Class Period, Euclid purchased farm-raised salmon and/or products derived therefrom directly from one or more of the Defendants at artificially high or fixed prices and has suffered monetary losses as a result of the antitrust violations alleged herein.

16.     Plaintiff Euro USA Inc. ("Euro USA") is an Ohio corporation that distributes fish and seafood, among other items. Euro USA is headquartered at 4481 Johnston Parkway, Cleveland, Ohio 44128.  It has distribution offices in Sterling, Virginia and Chicago, Illinois. As a result of Defendants' collusive and anticompetitive conduct, during the Class Period, Euro USA purchased farm-raised salmon and/or products derived therefrom directly from one or more of the Defendants at artificially high or fixed prices and has suffered monetary losses as a result of the antitrust violations alleged herein.

17.     Plaintiff Schneider's Fish and Seafood Corp. ("Schneider's") is a New York corporation that specializes in the distribution of fish and seafood to restaurants, specialty stores, hotels, and other entities in the general area of Upstate and Western New York, headquartered at

2150 Old Union Road, Cheektowaga, New York 14227.  As a result of Defendants' collusive and anticompetitive conduct, during the Class Period, Schneider's purchased farm-raised salmon and/or products derived therefrom directly from one or more of the Defendants at artificially high or fixed prices and has suffered monetary losses as a result of the antitrust violations alleged herein.

18.     Plaintiff Beacon Fisheries Inc. ("Beacon") is a Florida corporation with its principal place of business at 7357 Digital Circle, Jacksonville, Florida 32258.  Beacon also has a warehouse facility located in Miami, Florida. As a result of Defendants' collusive and anticompetitive conduct, during the Class Period, Beacon purchased farm-raised salmon and/or products derived therefrom directly from one or more of the Defendants at artificially high or fixed prices and has suffered monetary losses as a result of the antitrust violations alleged herein.

19.     Plaintiff Cape Florida Seafood ("Cape Florida") is a Florida corporation that specializes in the distribution of fresh and frozen seafood to restaurants and other fine establishments locally, nationally, and internationally.  Cape Florida is headquartered at 7304 N.W. 34th Street, Miami, Florida 33122.  As a result of Defendants' collusive and anticompetitive conduct, during the Class Period, Cape Florida purchased farm-raised salmon and/or products derived therefrom directly from one or more of the Defendants at artificially high or fixed prices and suffered monetary losses as a result of the antitrust violations alleged herein.

20.     Plaintiff The Fishing Line LLC ("The Fishing Line") is a New Jersey corporation that is a fresh fish market which supplies fish, including farm-raised salmon, to retailers and institutions throughout the United States. The Fishing Line is headquartered at 6774 Highway 9 South, Howell, New Jersey 07731. As a result of Defendants' collusive and anticompetitive conduct, during the Class Period, The Fishing Line purchased farm-raised salmon and/or products derived therefrom directly from one or more of the Defendants at artificially high or fixed prices and has suffered monetary losses as a result of the antitrust violations alleged herein.

21.     Plaintiff Hesh's Seafood, Inc. ("Hesh's") is a Pennsylvania corporation that specializes in the distribution of fresh and frozen seafood to restaurants and other fine establishments locally, nationally, and internationally.  Hesh's is headquartered at 1428 Ford Road,

Unit C, Bensalem, Pennsylvania 19020.  As a result of Defendants' collusive and anticompetitive conduct, during the Class Period, Hesh's purchased farm-raised salmon and/or products derived therefrom directly from one or more of the Defendants at artificially high or fixed prices and suffered monetary losses as a result of the antitrust violations alleged herein.

IV.     **DEFENDANTS**

22.     **Marine Harvest/Mowi Defendants**.  Defendant Mowi ASA ("Mowi ASA") was formerly known as "Marine Harvest ASA" during most of the Class Period and is now known as "Mowi ASA."

23.     Mowi ASA has long touted that it is a "global corporate brand" and the largest producer of Atlantic salmon.  It is headquartered at Sandviksboder, 77AB, 5035, Bergen, Norway. Mowi ASA is listed on the Oslo Stock Exchange, where it is a constituent of the benchmark OBX Index.

24.     Mowi ASA is and advertises itself as a single unified global company. A recent example of this is its business strategy, unveiled in late 2018, of renaming itself from "Marine Harvest" to "Mowi," which functions as a global brand for its products.  Indeed, after Mowi ASA announced its name change, its wholly owned and controlled subsidiaries also changed their names. For example, Marine Harvest USA, LLC renamed itself as Mowi USA, LLC ("Mowi USA") and Ducktrap River of Maine, LLC renamed itself as Mowi Ducktrap, LLC ("Mowi Ducktrap").

25.     Mowi ASA is a global organization that operates through numerous subsidiaries and divisions in 25 countries, including the United States.  Through its subsidiaries and divisions, Mowi ASA produces, processes, and sells salmon, the operations of which are focused in Norway, Scotland, Canada, the Faroe Islands, Ireland, and Chile.  Mowi ASA has a share of between 25% and 30% of the global salmon and trout market, making it the world's largest company in the sector.   Mowi ASA also owns a "value added processing" operation, which prepares and distributes a range of seafood products, and a number of smaller divisions.

26.     Using its operations in the United States and other countries, Mowi ASA has sold its products to the United States as well as more than 70 different countries. Today, Mowi ASA's website states that "[m]ore than 6 million Mowi meals are enjoyed around the world every day."

27.     In December of 2012, Marine Harvest ASA acquired shares and a 48.5% stake in Morpol ASA ("Morpol"), which played a critical role in the conspiracy alleged herein. Marine Harvest ASA later acquired the majority of Morpol's shares in March of 2013.  The EC initially approved the acquisition, subject to certain divestitures. However, it later fined Mowi ASA 20 million Euros for having exercised effective control over Morpol before the acquisition was approved. The European Court of Justice affirmed that decision in March of 2020.  Mowi delisted Morpol from the Oslo Stock Exchange in November of 2013, cutting off the public's insight into much of Morpol's activity.

28.     Brattvoll, the COO of Mowi ASA's sales and marketing starting in January of 2014, took over as the Chairman of Morpol in 2012.  Brattvoll had previously worked for Lerøy ASA, before following another former Lerøy executive, Aarskog, Mowi ASA's former CEO, to Mowi ASA.

29.     



30.     As stated in a January 2014 *Undercurrent News* article, "[w]hen the world's biggest buyer of salmon stops purchases from sources other than its parent Marine Harvest, it is going to impact prices."  The article describes how in a week where Morpol did not buy salmon on the spot market, prices fell.  The converse is equally true.

10



32.     Mowi ASA has long held a unified global business strategy. Today, it promotes itself on its website and in its marketing materials as one "global fully integrated company"— "Mowi." Instead of having separate websites for each wholly owned and controlled subsidiary, Mowi ASA integrates most of these subsidiaries within its main webpage under the "Contact us" tab.  On that webpage, it represents all of these subsidiaries—including Mowi USA, Mowi Canada West, LLC, and Mowi Canada East, LLC—as one entity, stating that "Mowi is located in 25 countries worldwide." Mowi ASA's American subsidiaries are intertwined with the parent entity, as evidenced by Mowi USA's webpage that only identifies and provides contact information for three employees—one of whom is identified as the Sales Manager for Mowi Ducktrap. In advertising employment vacancies and new job opportunities within its company, Mowi ASA provides the public only one webpage, which is not divided by company (or subsidiary name). Instead, Mowi ASA consciously gives the impression that all job opportunities are within the larger "Mowi" conglomerate. The "Vacancies" webpage only identifies: (1) a brief job vacancy

description; (2) the workplace (described as a destination, *e.g.*, Fort William, Bruges); and (3) the application due date.

33.     Mowi ASA's promotional materials note that Mowi employs 667 full time "[s]ales & [m]arketing" employees in "the Americas" alone, and that "[t]he [sales and marketing] division is organized geographically to support our worldwide client base." Mowi ASA further explains that it has "significant new product development competence in [Mowi's] central markets like the Americas."

34.     Mowi ASA targets and transacts business in the United States, including Florida, through its wholly owned and wholly controlled subsidiary, Mowi USA, headquartered in Miami, Florida, formerly Marine Harvest USA.  Mowi ASA ships salmon regularly to Mowi USA for the express purpose of transacting business within Florida and the United States.  Mowi ASA is so intertwined with its United States subsidiary that Mowi USA does not even have its own website independent of Mowi ASA. Instead, as alleged above, Mowi USA is relegated to one short webpage within Mowi ASA's larger website. Like the other subsidiaries identified on Mowi ASA's website, Mowi USA is marketed and advertised on that website using Mowi ASA's logo. Mowi USA's registered trademarks "REBEL FISH" and "THE SALMON KITCHEN.COM" are marketed on Mowi ASA's website as well. The public perception is such that media outlets continually describe Mowi in the United States and abroad as one interchangeable entity, referring, for example, to Mowi USA's processing plants in the United States as belonging to Mowi.  Mowi USA has also been described as the "US downstream division" of Mowi ASA.

35.     As stated on Mowi USA's single webpage within Mowi ASA's main website: "Everyday fresh fish is flown to Miami and Dallas where we package and ship it across the country. Our strategic plant locations enable us to ship fresh, never frozen fish anywhere in the US. Mowi USA is located in sunny Florida where salmon are flown in daily from Canada, Chile, Norway and other fish farms around the world." Mowi ASA identifies high level employees as contacts in Miami, such as Robert Clark (Sales Director for Consumer Products) and Diana Dumet (Marketing Director).

36.     Describing its expansion into the United States' seafood market, Mowi ASA explained that "[t]hrough our logistical network and well-situated facilities, we are able to reach the west coast, east coast[,] and central states within days, enabling us to provide fresh, healthy and delicious salmon and fish products to the entire US market." Fulfilling the crucial role of targeting American consumers, Mowi ASA uses not only its factories in Florida, Maine, and Canada, but also its factory in Dallas, Texas, which opened in December of 2016 and replaced the role of its old factory in Los Angeles, California.

37.     As described in its annual report, Mowi ASA also launched a skin pack program of farmed Norwegian Atlantic Salmon in the United States with "a new nationwide retail partner . . . giving [Mowi] a new revenue stream." According to at least one media site, the nationwide partner being referred to is Walmart, where Mowi ASA and Walmart's partnership with the skin pack program dates back to mid-2015.

38.     Further targeting American consumers nationwide, Mowi ASA sells its farm-raised Atlantic salmon through Amazon's website, something it has done from at least late 2017 through the present.

39.     Mowi ASA has availed itself of the laws and privileges of the United States, filing forms with the United States Securities & Exchange Commission ("SEC") and benefitting from its sale to United States investors of depositary shares evidenced by American depositary receipts through Citibank, N.A. in the United States.  Marine Harvest further was listed on the New York Stock Exchange from 2014 until it was delisted in 2017, after posting record high earnings in 2016.

40.     In November of 2013, Marine Harvest ASA purchased a 25.81% ownership interest in Grieg ASA, which it later sold in May 2016, after Marine Harvest and Grieg had successfully raised prices across the industry and Grieg ASA reported its best ever quarterly results, "boosted by record-high salmon prices."  Marine Harvest ASA gained 511.8m Norwegian kroner ("NOK") on its sale of the Grieg ASA shares.

41.     Defendant Mowi USA is a Florida limited liability company that maintains its principal place of business at 8550 N.W. 17th Street #105, Miami, Florida 33126. Mowi ASA wholly owns and controls its subsidiary Mowi USA for the purposes of causing Mowi USA to process salmon in Florida and Texas and distribute it to wholesalers, retailers, and others in Florida and elsewhere in the United States.

42.     In May of 2019, Mowi USA moved into its new seafood production plant in Miami which, at 106,000 square feet, is more than triple the size of its former United States production facility. Brattvoll, now of Mowi ASA, explained that the Miami factory is one of Mowi ASA's biggest plants.

43.     Defendant Mowi Ducktrap is a Maine limited liability company and a wholly owned and controlled subsidiary of Mowi ASA.  The company has its headquarters at 57 Little River Drive, Belfast, Maine 04915.  Mowi Ducktrap sells processed salmon products, such as sliced smoked salmon, under a number of trade names, including Ducktrap and Kendall Brook. These products are sold throughout the United States, including Florida. For example, Mowi Ducktrap has promoted its Kendall Brook smoked salmon products at the Whole Foods Market PGA, located in Palm Beach Gardens, Florida.

44.     Defendant Mowi Canada West ("Mowi Canada") (f/k/a Marine Harvest Canada) is a foreign corporation and wholly owned and controlled subsidiary of Mowi ASA.  Mowi Canada is headquartered at 1334 Island Highway, Suite 124, Campbell River, British Columbia, V9W 8C9, Canada.  Mowi Canada processes salmon in British Columbia, Canada.  Mowi ASA uses its ownership and control over Mowi Canada to sell Atlantic salmon in Canada and the United States, including Florida. As discussed above, Mowi ASA also targets the United States and Florida through its wholly owned and controlled subsidiary Mowi USA, and, to achieve that purpose, Mowi ASA uses its control over Mowi Canada to ship fresh salmon to Mowi USA in Florida and Mowi Ducktrap in Maine on a regular basis.

45.     Employees of Mowi Canada also attended the 2018 Aquaculture Innovation Workshop ("AIW") held in Miami, Florida.

14

46.     As evidenced in Mowi ASA's 2018 annual report, Mowi ASA's consolidated financial statements include its subsidiaries in the United States and Canada, such as Mowi USA, Mowi Canada, and Mowi Ducktrap.

47.     Through its financial, investor, and promotional materials, Mowi ASA (and formerly Marine Harvest ASA) clearly conveys that it consists of a single global, integrated entity, and Mowi USA, Mowi Canada, and Mowi Ducktrap are each agents and/or divisions of Mowi ASA. Each of the Mowi entities is vicariously liable for the conduct of the others because they operate as a single enterprise, whose over-arching objective—as relevant to the claims made in this complaint—is to distribute salmon within the United States.  In addition, the presence of Mowi ASA, Mowi USA, Mowi Canada, and/or Mowi Ducktrap in the United States subjects all Mowi entities to the jurisdiction of this Court for the actions giving rise to this litigation.

48.     Mowi ASA, Mowi USA, Mowi Canada, and Mowi Ducktrap, as well as the former iterations of these companies under the Marine Harvest brand, are collectively referred to herein as "Mowi" (or "Marine Harvest" where appropriate) and are vicariously liable for the antitrust violations of each of them described herein.

49.     **Ocean Quality/Grieg Defendants**. Defendant Grieg Seafood ASA ("Grieg ASA") is a foreign corporation that describes itself as "one of the world's leading fish farming companies, specializing in Atlantic salmon."  Grieg ASA owns farming facilities in Finnmark and Rogaland in Norway, British Columbia in Canada, and Shetland in the United Kingdom. The company is headquartered at C. Sundtsgate 17/19, 5004, Bergen, 5004, Norway. Grieg ASA is listed on the Oslo Stock Exchange.

50.     Grieg ASA targets and sells its salmon to the United States, including Florida, using its majority-owned sales agent, Ocean Quality AS ("OQ AS"). This company, founded in November 2010, operates in the United States and Canada through three wholly owned subsidiaries, Defendants Ocean Quality N.A. Inc. ("OQ NA"), Ocean Quality USA Inc. ("OQ USA"), and Ocean Quality Premium Brands, Inc. ("OQ Premium Brands").

51.     Defendant OQ AS is a foreign corporation engaged in the salmon distribution business, with its headquarters at Grieg-Gaarden, C. Sundtsgate 17/19, N-5004, Bergen, Norway. Grieg ASA owns 60% of the outstanding shares of OQ AS. Bremnes Fryseri AS ("Bremnes") owns the remaining 40% of OQ AS. Grieg ASA controls the operations of OQ AS and its various subsidiaries; indeed, in its 2018 annual report, Grieg ASA describes OQ AS (including its subsidiaries) as "Grieg Seafood's sales company" with "offices in the UK and Canada, taking care of Grieg Seafood's fish from the processing plant and all the way to the customers." OQ AS has repeatedly shipped salmon from Norway to Doral, Florida as part of its activities.

52.     The control and dominance that Grieg ASA exercises over OQ AS was confirmed by a report issued by a Committee of Experts of the Financial Services Authority of Norway, attached as Appendix B. The report states:

> Grieg owns 60% of OQ [AS] and, according to the shareholder agreement, has the right to appoint 3 out of 5 directors, while Bremnes owns 40% and has 2 out of 5 directors.
>
> In the Financial Supervisory Authority's assessment, OQ [AS] is not a joint arrangement, since the relevant activities that significantly affect OQ [AS]'s return do not have to be decided on unanimously by the owners, but can be made by the board or the management of the company. In the assessment of the Financial Supervisory Authority, Grieg, with a majority of the board, has control over OQ [AS], and the company must recognize OQ [AS] as a subsidiary. The company has taken note of the Financial Supervisory Authority's assessment, and in the first quarterly report for 2015 presented OQ [AS] as a subsidiary and restated the comparative figures in accordance with IAS 8 Accounting Policies, Changes in Accounting Estimates and Errors.

53.     During the Class Period, the Board of Directors of OQ AS has included Per Grieg ("P. Grieg") (Chairperson of the Board for Grieg ASA); Nina Grieg (Manager Business Development for Grieg ASA); Andreas Kvame ("Kvame") (CEO of Grieg ASA); Alte Harald Santorv (Chief Financial Officer ("CFO") of Grieg ASA), and Knut Utheim (COO of Grieg ASA).

54.     OQ AS's managing director and CEO was Arne Aarhus (previously Lerøy's Team Manager) from 2010 until 2017, when Espen Engevik ("Engevik") (also formerly of Lerøy) took

over the role.  Hans Petter Berge ("Berge") has been OQ AS's financial director during the relevant period.  He and Engevik are located in OQ AS's Bergen office in Norway.

55.    Defendant OQ NA is a foreign corporation and a wholly owned subsidiary of OQ AS.  OQ NA is headquartered at 4445 Lougheed Highway, 500, Burnaby, BC V5C0E4, Canada. OQ NA was set up to undertake distribution and sale of farm-raised salmon produced by Grieg ASA and its subsidiaries and Bremnes throughout the United States, including Florida. As explained in a 2014 article:

> Norway-based Grieg Seafood announced the launch of Ocean Quality North America, which will assume exclusive responsibility for all sales and marketing of Grieg Seafood British Columbia's farmed seafood products in North America.

> According to Dave Mergle, manager of the new sales organization, the move follows Grieg Seafood in Europe's launch of Ocean Quality for selling and marketing Grieg Seafood's fish a few years ago.

> "That model has gone very well so recently the decision was made that this is how it should work everywhere so it's being implemented here in North America," Mergle told SeafoodSource. "What they found was that it's given [Grieg] a lot more proximity to the market and allowed them to get closer to the customers.["]

> "Grieg Seafood farms in British Columbia predominantly serve the North American market. Since its inception, they've used a third party broker, Calkins and [B]urke, for sales and marketing and focused mostly on producing their fish. We've had a great relationship [with our broker, who has] done a nice job for us but we think it hasn't really allowed us to get close to marketplace. We want to bring transparency to the entire chain and deliver more value by being integrated. It will also allow us to start giving our customers more option[s] across our entire portfolio including fish from Scotland and Norway and accessing the power of the whole Grieg Network."

56.    OQ NA has sold salmon to customers based in Florida. For example, in 2016 and 2017, it sold salmon in transactions with a Miami-based company, Ocean Group and Seafood Distributors, Inc. When that customer failed to pay the invoices sent to it by OQ NA, the latter sued for collection in the Circuit Court of the 11th Judicial Circuit in Miami Dade-County, Florida on April 10, 2017.  *See* Appendix C.

57.     OQ NA has a dedicated sales office in the United States headed by General Manager Dennis Bryant ("Bryant"), whose direct telephone number bears a Dallas, Texas area code. Bryant is listed as an employee for both OQ AS and OQ USA.

58.     Defendant OQ USA is a Delaware corporation and wholly owned subsidiary of OQ AS, with its principal place of business located at 1914 Skillman Street #110-309, Dallas, Texas, 75206-8559.  OQ USA distributes salmon products produced by Grieg ASA and its subsidiaries throughout the United States, including Florida. ███████████████████ █████████████████████████████████████████████████ ████████████████████.

59.     Defendant OQ Premium Brands is a Delaware corporation and wholly owned and controlled subsidiary of OQ NA, headquartered at 4445 Lougheed Highway, 500, Burnaby, BC V5C0E4, Canada. OQ Premium Brands' business purpose, according to a December 7, 2018 filing with the California Secretary of State, is "MARKETING AND BRANDING."  OQ Premium Brands distributes salmon products produced by Grieg ASA and its subsidiaries throughout the United States, including Florida.

60.     Grieg ASA's own website also evidences the link among all these subsidiary entities.  For example, Grieg AS's website states: "Ocean Quality is the sales organization of Grieg Seafood and Bremnes Seashore (60% owned by Grieg Seafood ASA and 40% owned by Bremnes Fryseri AS."  Likewise, there is a similar interconnectedness and dependence between the Ocean Quality entities as the website fails to mention the other Ocean Quality entities.  Instead, on one brief "Contact" page within OQ AS's website, OQ AS lists its sales offices across the world, identifying only one employee for the USA region—Bryant—and only one employee for the North America region—Managing Director Alexander Krutoy.

61.     In addition to targeting and selling salmon into the United States through OQ AS and its subsidiaries, Grieg ASA targets and sells its salmon to the United States, including Florida, by also using its wholly owned and controlled subsidiary, Defendant Grieg Seafood BC Ltd. ("Grieg BC"). Grieg BC is a foreign corporation and wholly owned and controlled subsidiary of

Grieg ASA. Grieg BC is headquartered at 1180 Ironwood Street # 106, Campbell River, British Columbia, Canada, V9W 5P7. Grieg BC farms salmon on 22 sites in British Columbia.

62.     Due to its key location, Grieg ASA uses and controls Grieg BC to produce salmon targeted for the American market. In its 2017 annual report, Grieg ASA explained Grieg BC's increase in earnings before interest and taxes ("EBIT"), noting that "[h]aving production close to the US market is advantageous due to fast deliveries and shorter transport." A year later, in its 2018 annual report, Grieg ASA again correlated the success between the increased sales in the United States market and Grieg BC's production in Canada: "[t]he main change in our share of sales was an increase to the USA from 9 % in 2017 to 14 % in 2018 due to record high harvest volumes in Grieg Seafood British Columbia."

63.     Grieg BC produces Skuna Bay, a branded salmon product that is marketed and sold throughout the United States, including Florida. Evidencing the interconnected nature of the different Grieg and Ocean Quality entities, Grieg ASA's 2018 annual report explained that Skuna Bay is "Grieg Seafood's premium brand from British Columbia" and is sold, along with its other salmon products, by OQ AS's subsidiaries.

64.     As part of its success in the American market, Grieg ASA's annual report publicized that "[t]he White House served Skuna Bay Salmon on the menu for the Inauguration Dinner to former President and First Lady of the United States, Barack and Michelle Obama." Indeed, Skuna Bay Salmon had been "served at more than 2,500 high-end restaurants and boutique retailers" across the United States by 2015, and Grieg ASA's 2018 annual report listed a half dozen top restaurants throughout the United States that purchased Skuna Bay salmon.  In addition to being served at top American restaurants, Skuna Bay salmon has gained marketing and exposure through its partnerships with the James Beard Foundation, headquartered in New York, and the Women Chefs and Restaurateurs organization.

65.     The report highlighted the significance of Skuna Bay sales for Grieg ASA.  Adam O'Brien, General Manager for Skuna Bay at Ocean Quality Canada, explained that "[m]ost

months, Skuna Bay accounts for approximately only five % of the volume and delivers roughly 25% of our margins."

66.    Skuna Bay salmon was first sold to the United States market in 2011 and by mid-2015, Skuna Bay was being sold across the country, including in Florida. Now "Skuna Bay salmon has achieved national U.S. distribution, available in all continental U.S. states . . . and sixteen exclusive distributor relationships across North America."

67.    As a notable example of Grieg's distributor relationships, in April of 2015, Florida-based North Star Seafood began selling Skuna Bay salmon throughout Florida. Less than a year later, North Star Seafood was acquired by "US foodservice giant Sysco Corporation ['Sysco']," thereby supporting North Star Seafood's growth throughout Florida due to Sysco's "multi-billion dollar broadline food distribution business."  North Star Seafood is still Skuna Bay salmon's exclusive distributor in Florida and is "the largest independent wholesale distributor of fresh and frozen seafood in Florida," reaching over 650 Floridian customers and 25 major cruise lines and specialty markets. By mid-2016, Louisiana Foods, also owned by foodservice giant Sysco, distributed Skuna Bay throughout Texas.

68.    Grieg ASA and OQ AS (through OQ USA, OQ NA, and OQ Premium Brands) have sold Skuna Bay salmon to top restaurants throughout Florida, including but not limited to, the following restaurants in Miami: the River Seafood Oyster Bar, Habitat at the 1 Hotel South Beach, Water at the Rooftop at the 1 Hotel South Beach, the Sandbox at the 1 Hotel South Beach, and Marion (Marion's current menu does not highlight the Skuna Bay salmon, but one of its menus (likely a former one) posted on Allmenus.com does.  Skuna Bay salmon has even been publicized in articles and reviews discussing restaurants in Miami, Florida.  For example, in January of 2018, the *Miami New Times* wrote an entire paragraph describing the flavors of the Skuna Bay salmon dish being served, noting that: "[t]his is the Skuna Bay salmon, the highlight of any visit to Habitat inside the 1 Hotel South Beach . . . the newest restaurant by the five-time James Beard-nominated chef Jose Mendin."  In August of 2015, the Miami Food Pug's review of the River Oyster Bar also

described the Skuna Bay salmon dish's flavors being served and raved that "[o]ur main[] [entrée]—sweet-spicy [S]kuna [B]ay salmon . . . —absolutely killed it."

69.     Grieg Seafood BC, through executives Frode Mathiesen and Rocky Boschman ("Boschman"), attended the AIW session held in Miami, Florida in 2018.

70.     Each of the Grieg and Ocean Quality entities is vicariously liable for the conduct of the others because they operate as a single enterprise, whose over-arching objective—as relevant to the claims made in this Complaint—is to distribute salmon within the United States.

71.     On May 26, 2020, Grieg ASA announced that it was dissolving the OQ AS joint venture with Bremnes and would commence its own North American sales company in 2021. Kvame, Grieg's CEO, was quoted as saying: "A crucial part of our downstream strategy is to further strengthen the cooperation between our production network and the sales organization. Fully integrating sales and marketing with current operations enables us to optimize upstream activities with local customer demand." The sales partnership with Bremnes will continue until December 31, 2020.  It will be totally dissolved and a new sales organization will be implemented by June of 2021.  According to the same source, "Grieg's new sales organization will be partly based on the Ocean Quality sales force…. 'All personnel in Ocean Quality North America, Ocean Quality UK and Ocean Quality USA will from 2021 be employed in Grieg Seafood.'"

72.     Grieg ASA, Grieg BC, OQ AS, OQ NA, OQ USA, and OQ Premium Brands are referred to collectively herein as "Grieg." Grieg ASA is vicariously liable for the conduct of its Norwegian, Canadian, and United States subsidiaries and affiliates in relation to the antitrust violations committed by it complained of herein and vice versa. The term "Ocean Quality" as used herein refers to OQ As acting on behalf of itself, the other OQ entities and Grieg ASA, unless otherwise noted.

73.     **SalMar**. Defendant SalMar ASA ("SalMar") is a foreign corporation that describes itself as "one of the world's largest and most efficient producers of Atlantic salmon, and is vertically integrated along the entire value chain from broodfish, roe and smolt to harvesting,

processing and sales." The company is headquartered at Idustriveien 51, N-7266, Kverva, Norway. SalMar is listed on the Oslo Stock Exchange.

74.     According to SalMar's website:

SalMar has established a fully integrated system for farming, processing, sales and distribution of farmed salmon and is thus in control of the total value chain.

The salmon that SalMar is producing is sold through an in-house salesforce and/ or through close partners.

Proximity to markets and customers, direct or through partners is important to secure efficient use of a high-quality raw material that has been through a traceable and controlled production process.

InnovaMar is the name of SalMar's new harvesting and processing facility in Frøya, central Norway. It aims to be the world's most innovative and efficient facility for the landing, harvesting and processing of farmed salmon. InnovaMar covers 17,500 m2 of floor space and comprises two departments (harvesting and processing). The facility has the capacity for all kinds of storage. Good internal logistics ensure safe and efficient handling of the products. The increased capacity affords a high level of flexibility with regard to organising production and sales.

SalMar produces a wide variety of fresh and frozen salmon products. The customer base is global and includes small and large importers/exporters, as well as larger processing companies and retail chains.

75.     SalMar sells directly to entities within the United States:

SalMar had direct sales to around 50 different countries in 2017. SalMar's most important geographic market in 2017 was Europe, with Poland, Lithuania and Sweden as the largest individual markets. The second largest market was Asia, with Vietnam, Japan and Singapore as the largest individual markets. After sales to Russia were blocked in 2014, North America has been the third largest market, with the USA as the largest individual market. SalMar experienced particularly strong growth in the American market in 2017.

76.     North America is the third largest export destination for SalMar.  In 2018, its group revenue from the USA and Canada totaled 1,989,222 (measured in thousands of NOK).

77.     SalMar targets and transacts business in the United States, including Florida, and has sold salmon to customers based in Florida. For example, on July 5, 2016, SalMar shipped

19,894 kg of salmon to Miami.  SalMar's shipment was received by Platina Seafood, Inc., a Florida corporation with its principal place of business at 31 SE 5th Street, #214, Miami, Florida 33131. From Platina, Seafood, Inc., SalMar's salmon was destined for distribution throughout the United States, including Miami, Florida. Platina Seafood, Inc. is owned by Norwegian salmon farming pioneer Johan Andreassen, the co-founder of Norwegian fish farmer Villa Organic, which now belongs to SalMar and Lerøy Seafood Group ASA.

78.     SalMar also sold salmon to Plaintiff Beacon, which is based in Florida.



80.     SalMar and Lerøy are partners in other respects as well, including through their joint, 50/50% ownership of Scottish Sea Farms, Ltd. ("SSF").

81.     **Lerøy Defendants**. Defendant Lerøy Seafood AS, formerly known as Hallvard Lerøy AS ("Lerøy AS"), a foreign corporation, is a seafood production and distribution company. Lerøy AS is the second largest salmon and trout farming company in the world and has fish farms in Hitra, Kristiansund, Troms and Scotland (Shetland). The company is headquartered at Thormøhlens gate 51 B, 5006 Bergen, Norway.

82.     On its website, Lerøy AS describes itself as a "global presence stretching from China to the USA" and selling to "more than 70 markets worldwide." Lerøy AS's website also promotes its global reach and sales offices in the United States:

> Our main office is located in Bergen, but we have fishing vessels and fish farms in operation along the entire coast of Norway. We have production and packaging plants in Norway, Sweden, Denmark, Finland, France, the Netherlands, Portugal, Spain and Turkey. We also have sales offices in the USA, Japan and China.

83.     A press release advertised the "Lerøy Seafood Group [as] the world's second largest farmer of Atlantic salmon . . . . [e]stablished in 1899, its global network today spans Sweden, France, Portugal, China, Japan and the USA."

84.     Defendant Lerøy Seafood USA Inc. (f/k/a "Hallvard Lerøy USA, Inc.") ("Lerøy USA"), a North Carolina corporation and wholly owned and controlled subsidiary of Lerøy ASA, is the United States distribution subsidiary for Lerøy ASA's farm-raised salmon business and sells and distributes Lerøy AS's salmon throughout the United States, including Florida.  Lerøy USA's principal place of business is located at 1289 Fordham Blvd., Suite 406, Chapel Hill, NC 27514. Lerøy AS ships from Bergen, Norway a large volume of salmon to a customs broker in Miami, Florida, where it is then processed.  Commercial manifests reveal that between October of 2017 and July of 2019, Lerøy ASA made 75 shipments of salmon totaling over 2.4 million kilograms in this manner. *See* Appendix D.

85.     Lerøy USA operates as a division of Lerøy AS.  Indeed, Lerøy USA does not have its own official website.  Instead, Lerøy USA is identified within Lerøy AS's main website as one of Lerøy ASA's offices for "VAP [value-added processing], Sales & Distribution." The only information provided on Lerøy AS's website for Lerøy USA is the address, contact telephone number, and contact email address for one employee.  Lerøy USA's Bloomberg profile states that it has only three employees and that its business consists of "the wholesale distribution of fresh, cured, or frozen fish and seafood."

86.     Lerøy AS's premiere brand of salmon is Aurora salmon.  Aurora salmon is sold by Lerøy USA throughout the United States, including Florida.

87.     Lerøy AS has availed itself of the laws and privileges of the United States, filing SEC forms and benefitting from its sale of depositary shares to United States investors evidenced by American Depositary receipts through Citibank, N.A. in the United States.

88.     Each of the Lerøy entities is vicariously liable for the conduct of the others because they operate as a single enterprise, whose over-arching objective—as relevant to the claims made in this complaint—is to distribute salmon within the United States. In addition, the presence of

Lerøy USA in the United States subjects all Lerøy entities to the jurisdiction of this Court for the actions giving rise to this litigation.

89.    Lerøy AS and Lerøy USA are collectively referred to herein as "Lerøy" and are vicariously liable for the acts of each other in connection with the antitrst violations descibed herein.

90.    **Cermaq Defendants.** Defendant Cermaq Group AS (formerly Cermaq ASA) is a company incorporated and domiciled in Norway, and headquartered in Oslo, Norway, whose shares previously were publicly traded at the Oslo Stock Exchange. In October 2014, Mitsubishi Corporation ("Mitsubishi") acquired Cermaq ASA and delisted it from Oslo Stock Exchange with the last listing date on November 14, 2014. The company changed name to Cermaq Group AS. All the shares in Cermaq Group AS are now owned by Mitsubishi Corporation through its wholly owned subsidiary MC Ocean Holdings Limited.

91.    Cermaq Group AS is the parent company of Cermaq Norway AS ("Cermaq Norway") and Cermaq Canada Ltd. ("Cermaq Canada"), as reflected in the chart below;



92.    Cermaq Norway shares an office with Cermaq Group AS in Oslo, and Cermaq Canada is headquartered at 919 Island Hwy #203, Campbell River, BC V9W 2C2, Canada. Cermaq Group AS also owns a 100% controlling interest in Cermaq US LLC, which was formed

in 2014. All of these entities use the same "cermaq.com" website and website domain name for their emails.

93.     Cermaq is the third-largest salmon (including coho salmon) farming, processing and sales company in the world, producing salmon in Norway, Chile, and Canada for a total production quantity of around 180 thousand metric tons per year. More than 2.5 million daily salmon meals are accounted for by Cermaq products. And Cermaq also supplies salmon and salmon products to 70 countries around the world, including by selling the salmon it farms in Norway, Chile, and Canada in the United States and in Canada.

94.     Cermaq appointed Arild Aakre ("Aakre") as its head of sales for North America in February of 2017 and tasked him to run Cermaq's sales offices in Vancouver, Canada, and Miami, including leading the company's marketing and business development support. Aakre was promoted from his prior position as Cermaq's head of European business development, where he worked since February 2016.  He previously served as global marketing and business development director for Marine Harvest in its Bergen office. Aakre continues to work with strategic customers in Europe in addition to North American customers, including customers in the United States.

95.     Cermaq US LLC has its principal place of business and is located at 5835 Blue Lagoon Drive, Miami, Florida 33126.  It was registered as an LLC in July of 2014 in Florida. It has very few employees, and instead operates as an arm of Cermaq's North American operations. Aakre identifies himself as the "General Manager" of Cermaq US LLC, though he continues to work in Oslo at Cermaq's main office. Cermaq's North American operations, including in the United States and Canada, were controlled by the Cermaq Group in Norway.

96.     Cermaq's sales in the United States account for a significant portion of its revenues. In 2014, Cermaq's sales to customers in the United States has accounted for at times more than double its sales within Norway and up to nearly 25% of Cermaq Group's global revenues.

97.     Cermaq Group AS, Cermaq Norway, Cermaq US LLC, and Cermaq Canada are collectively referred to herein as "Cermaq" and are vicariously liable for each other's antitrust violations alleged herein.

## V.     AGENTS AND CO-CONSPIRATORS

98.     The acts alleged against the respective Defendants in this Consolidated Amended Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of the respective Defendants' businesses or affairs. The respective Defendant parent entities identified herein exercise dominance and control over all of their respective Defendant subsidiary entities and those respective subsidiaries have a unity of purpose and interest with their respective parents. To the extent any respective parent Defendant did not keep a tight rein on its respective subsidiary Defendant(s), it had the power to assert control over the subsidiary if the latter failed to act in the parent's best interests. The respective parent Defendants and their respective subsidiary Defendants thus operated as a single economic unit.  The respective subsidiaries played a critical role in the conspiracy in that they (as well as the respective parent Defendants) sold price-fixed salmon and products derived therefrom to direct purchasers outside Defendants' conspiracy in the United States, including Florida.

99.     When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented at any such meetings and discussions by its agents and was a party to the agreements reached by them.

100.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

101.    Each Defendant acted as the principal, agent, or joint venturer of or for other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

## VI.    FACTUAL ALLEGATIONS

### A.    The European Commission And The United States Department Of Justice Are Investigating Unexplained Price Increases In The Salmon Market.

102.    Plaintiffs' proposed class action parallels investigations by the EC and European Union and the DOJ in the United States, both of which are investigating illegal anticompetitive behavior in the farmed Atlantic salmon market.

103.    On February 19, 2019, *Undercurrent News,* a fishing industry trade publication, reported that the EC had opened an antitrust investigation into the world's major producers of farm-raised salmon:

> According to the letter, the EC has "received information -- from different actors operating at different levels in the salmon market -- alleging that Norwegian producers of farmed Atlantic salmon . . . participate or have participated in anti-competitive agreements and/or concerted practices related to different ways of price coordination in order to sustain and possibly increase the prices for Norwegian salmon."

104.    The letter, which was sent to producers at the start of February, states the Norwegian producers allegedly have been:

- coordinating sales prices and exchanging commercially sensitive information;

- agreeing to purchase production from other competitors when these other competitors sell at lower prices; and

- applying a coordinated strategy to increase spot prices of farmed Norwegian salmon in order to secure higher price levels for long-term contracts.

105.    The EC itself also released a statement on February 19, 2019 regarding its investigation:

> The European Commission can confirm that on 19 February 2019 its officials carried out unannounced inspections in several Member States at the premises of several companies in the sector of farmed Atlantic salmon.
>
> The Commission has concerns that the inspected companies may have violated EU [("European Union")] antitrust rules that prohibit cartels and restrictive business practices (Article 101 of the Treaty on the Functioning of the European Union). The Commission officials were accompanied by their counterparts from the relevant national competition authorities.

106.    According to another article in *Undercurrent News* dated February 19, 2019, Mowi, Grieg, and SalMar have all confirmed that they were the subject of EC raids, in which the antitrust and competition enforcement authorities undertook unannounced searches of premises to obtain evidence of competition law violations:

> Undercurrent first reported the news earlier on Tuesday, then Mowi, Grieg Seafood and SalMar all confirmed raids on their operations in the UK. Mowi's spokesman said the company's plant in Rosyth, UK, was raided, but then also confirmed a plant in Lemmers, formerly Marine Harvest Sterk, was inspected.
>
> The Sterk plant, the only one the company owns in the Netherlands, is mainly specialized on coating whitefish, but also does some salmon, according to its website.

107.    In its annual report for 2018, Mowi admitted that it was the subject of an EC raid:

> In February 2019, The European Commission carried out unannounced inspections at selected premises of several Norwegian salmon companies, including Mowi. The Commission was acting on concerns that the inspected companies may have violated EU antitrust rules.

108.    On February 19, 2019, Grieg filed a notice with the Oslo Stock Exchange also admitting that it had been the subject of an EC raid:

> The European Commission DG (Director General) Competition has today performed an inspection at Grieg Seafood Shetland to explore potential anti-competitive behavior in the salmon industry.
>
> Grieg Seafood aims to be open, transparent and forthcoming and will provide all necessary information requested by the European Commission DG Competition in its investigation.

109.    A day later, on February 20, 2019, Lerøy filed a notice with the Oslo Stock

Exchange stating as follows:

> EU's competition authorities (European Commission Director General Competition) has
> conducted an inspection at the premises of Scottish Sea Farms Ltd.  A company owned
> 50% by Lerøy Seafood Group ASA (LSG). The purpose is, according to the competition
> authorities, to investigate accusations of anti-competitive cooperation in the salmon
> market. In connection with the inspection, the EU competition authorities has also
> requested for [sic] information from the shareholders in Scottish Sea Farms Ltd.

110.    SalMar—the co-owner of SSF—also issued the following report to the Oslo Stock

Exchange:

> On 19th of February 2019 the European Commission Director General Competition
> performed an inspection at Scottish Sea Farms Ltd., in which SalMar ASA
> indirectly owns 50 per cent. SalMar is in constructive dialogue with the
> Commission in this regard.

111.    The inspections by the EC were not undertaken casually. Inspections are typically

done by an order of the EC, and the EC must have "reasonable grounds for suspecting an

infringement of the competition rules;" "[i]t must be borne in mind that the inspections carried out

by the Commission are intended to enable it to gather the necessary documentary evidence to

check the actual existence and scope of a given factual and legal situation concerning which it

already possesses certain information." The EC relied on multiple sources to support its very

specific allegations that justified the raids.

112.    Cermaq was not investigated by the EC, but it has no facilities within the EU, and

therefore no offices or facilities subject to a dawn raid.

113.    The EC's recent investigation into the salmon industry is also not without

precedent. In a decision entered in 1992, the EC found the former *Fiskeoppdretternes Salgslag*

Organization ("FOS") (the Norwegian Fresh Fish Trade Association), the Scottish Salmon

Growers' Association ("SSGA"), the Scottish Salmon Farmers' Marketing Board ("SSB"), and

the Shetland Salmon Farmers Association ("SSA") had entered into an unlawful agreement to fix

the minimum prices of farmed Atlantic salmon back in 1989 to 1991. The decision is attached as Appendix E. The scheme began after the three Scottish entities had accused the FOS of dumping salmon at low prices. The FOS decided to create a minimum pricing system on exported Norwegian salmon. The Scottish entities accepted this proposal and adjusted their own prices accordingly. The EC found that FOS had created a "coordinated plan to stabilize and increase salmon prices" and that the SSB, SSGA, and SSFA "contributed to this plan by assuring FOS that they urged their members to exercise price discipline in support of the Norwegian action." One of the means of implementing the agreement was the SSB providing FOS with confidential price and volume statistics by SSGA and SSFA members. "The regular contacts to exchange price information provided the parties with an opportunity to monitor the success of their agreement."

114.    Similarly, the Australian Competition and Consumer Commission found in 2003 that the Tasmanian Salmonid Growers Association facilitated an illegal agreement in 2002 to have salmon farmers cull 10 percent of their salmon stocks in order to reduce the scope of any price reductions caused by oversupply.

115.    The current EC investigation has also been examining price movements of Norwegian salmon after the Russian government instituted a ban on importation of those products in the summer of 2014, as described in more detail below. In early 2020, the EC sent an electronic questionnaire to European market participants asking them about Defendants' pricing strategies since the ban, including potential manipulation of spot prices, as well as instances of bid-rigging, refusals to supply product, and customer allocations.

116.    The EC is not the only antitrust regulator investigating the conduct of Defendants. In November of 2019, the DOJ had grand jury subpoenas issued against Mowi, SalMar, Lerøy, Grieg, and Ocean Quality that sought information on practices similar to those being investigated by the EC.

117.    On November 14, 2019, Mowi issued the following announcement:

With reference to the previously announced European Commission inspection which concerned possible collusion between Norwegian producers of farmed

Norwegian Atlantic salmon and class action complaints in the USA related to the same matter.

Further to this Mowi has been informed that we will receive a subpoena from the Antitrust Division of the Department of Justice in the USA where they are opening a criminal investigation involving allegations of similar conduct.

118.    On November 14 as well, SalMar made the following announcement:

Reference is made to the previously announced European Commission inspection which concerned possible collusion between Norwegian producers of farmed Norwegian Atlantic salmon and class action complaints in the USA related to the same matter.

SalMar has today received a subpoena from the Antitrust Division of the Department of Justice in the USA where they are opening an investigation involving allegations of similar conduct.

119.    A day later, Grieg issued the following statement:

With reference to the previously announced European Commission inspection which concerned possible collusion between Norwegian producers of farmed Norwegian Atlantic salmon and class action complaints in the USA related to the same matter.

Further to this, Grieg Seafood ASA has been informed that the two US-based subsidiaries of Ocean Quality AS, Ocean Quality USA, Inc, and Ocean Quality Premium Brands, Inc. have received a subpoena from the Antitrust Division of the Department of Justice in the USA, where they are opening a criminal investigation involving allegations of similar conduct.

120.    And also on November 15, Lerøy disclosed the following:

We refer to our stock exchange notice of 20 February 2019 regarding certain on-site inspections carried out by the European Commission in relation to an investigation into accusations of anti-competitive cooperation in the salmon market.

Lerøy has been informed that the Antitrust Division of the US Department of Justice (DOJ) has now also opened an investigation into the farmed raised salmon industry.

In connection with this investigation, Lerøy Seafood USA, Inc., a company in the Lerøy Seafood Group, has today received a subpoena from the DOJ, containing certain requests for information.

121.     Thus, the DOJ is investigating in this country the same potential illegal practices that the EC is investigating in Europe.

122.     The subpoenas in question were issued by a criminal grand jury. That fact is significant because it indicates that the DOJ is considering a criminal prosecution against the Defendants, as reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are listed for all attorneys general who will participate in the grand jury investigation." "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district where the price-fixed sales were made or where conspiratorial communications occurred." Thus, the issuance of the subpoenas here reasonably supports an inference of collusion.

123.     Either after the EC raids or after the issuance of subpoenas at the request of the DOJ, several developments occurred at certain of the Defendant companies that were unusual and suspicious.

124.     On July 9, 2019, Stephen Leask, the Managing Director of Mowi UK's Scottish salmon farming operations who had served in that position since January of 2014, resigned suddenly with no explanation. As alleged above, the EC had conducted a dawn raid on Mowi's Scottish facilities as part of its investigation.

125.     On November 12, 2019 (a few days before the disclosure of the DOJ's antitrust investigation), Aarskog, who had been the CEO of Mowi for nearly a decade, abruptly resigned without any explanation. He was replaced by Mowi's COO, Ivan Vindheim ("Vindheim").

33

126.    Also on November 12, 2019, Engevik, the CEO of OQ AS, who had served at the company in various positions since 2011 (and before then at Lerøy), abruptly left for undisclosed reasons. He was replaced by Berge as acting CEO.

127.    On May 26, 2020, Grieg ASA abruptly terminated its joint venture with Bremnes in OQ AS.

128.    The Global Salmon Initiative ("GSI") is an organization developed by Aarskog of Mowi in 2013—the original members of which included the Norwegian entities for Mowi, Grieg, Lerøy, Cermaq, and SalMar. On July 14, 2020, it was announced that Mowi was unilaterally pulling out of the GSI for undisclosed reasons.

**B.      The Influence Of Spot Prices In The Salmon Market Makes It Susceptible To Collusion And Defendants Were Well-Aware Of This Opportunity.**

129.    The salmon market is susceptible to manipulation by the major salmon producers in Norway, in large part because the spot market for salmon in Oslo, Norway is the most important benchmark for salmon prices around the globe, and ████████████████████████████ ████████████████████████████████████. Weekly spot transactions— which are limited to sales within Europe—involving a NASDAQ Salmon Index panelist are reported not later than Tuesday at 2:00 p.m. CET to the Index. The spot price formulated by the NASDAQ Salmon Index then directly serves as the benchmark price for the sale of salmon around the world, including in the United States.

130.    Approximately 1-2.5% of Norway's salmon production is sold on the spot market, but those spot prices set the baseline for longer term contract prices.

131.    Since April 10, 2013, the NASDAQ Salmon Index has been used to provide a weekly listing of the spot price for Norwegian salmon. In the spring 2012, NOS Clearing ASA ("NOS") and the Oslo Fish Pool worked closely with the "key players" in the salmon industry to establish a new method of reporting salmon spot prices. They decided to abandon use of a spot price index based on purchase prices, which were reported to NOS on a weekly basis by a panel of independent salmon exporters, in favor of a spot price index based on sales prices made by

vertically-integrated salmon farmers, including the Defendants here. This is what is now known as the NASDAQ Salmon Index.

132. Like the prior NOS benchmark, the NASDAQ Salmon Index is also based on weekly reports of a panel of companies, but with the shifted focus on sales price by vertically-integrated salmon farmers, the composition of the panel of reporting companies was changed to include salmon producers with an export license and subsidiaries of salmon producers engaged in exportation. During the negotiations on the development of NASDAQ, the key players— vertically-integrated companies like the Norwegian Defendants—insisted that they wanted a standard spot price calculation, something that made it much easier for them to manipulate spot prices. It also meant that sales between them and their subsidiary companies—like Mowi's Morpol—could now be counted in creating the weekly index. The introduction of the NASDAQ Salmon Index thus gave Defendants the direct ability to impact and influence the market through their purchases of salmon on the spot market. They used that power to manipulate and exploit spot price levels that served as reference points for wholesale prices.

133. A test run of the NASDAQ Salmon Index was commenced in Week 29 of 2012 and concluded in Week 8 of 2013. The NASDAQ Salmon Index was formally unveiled on April 10, 2013 and remains in use today.

134. NQSALMON is described by NASDAQ as reflecting the weekly spot price for Fresh Atlantic Superior Salmon, Head on Gutted to the European market. NQSALMON is calculated based on actual physical transactions and is reported to NASDAQ by a panel of ten Norwegian salmon exporters or salmon producers with export licenses. Prices are reported in Norwegian kroner and calculated to FCA Oslo. It has become the industry standard as a price reference in the bilateral physical contracts.

135. The NASDAQ Salmon Index publishes eleven separate indices as part of NQSALMON: an overall index price and then separate weighted average prices for salmon from Norway across ten different weight classes (from 1 to 2 kg to over 9 kg). The average price per

35

kilogram in each weight class is determined by the Advisory Panel consisting of "10 exporters, representing 50-60% of all Norwegian salmon exports."[4]

136.    The identity of the members of the Advisory Panel is a closely guarded secret and is not disclosed by NASDAQ. Through Defendants' productions, it is now known that 

137.

138.                                                                        Indeed, Gary Botzelis, an economist who has written extensively on salmon spot prices noted that the NASDAQ prices are survey prices and as such do not cover the entire spot market. He also noted that "no explicit mechanism for

---

[4]    Until recently, spot sales by Panel participants could include all sales to their respective subsidiaries.  Historical versions of the Nasdaq Salmon Index procedures indicated that this could be done as long as the "internal pricing mechanisms [are] in compliance with the Spot Transactions definition" or it was verified "that they satisfy the NQSALMON Rules." Only on December 19, 2019 (after this lawsuit was filed), have the rules been modified to exclude "[t]ransactions that are internal transactions (transactions where both parties are owned by the sane ultimate parent company) which have not been agreed at arm's length."

ensuring fair reporting appears to exist" for the NASDAQ Salmon Index. 

139.

For example, SalMar's annual report for 2018 publicly acknowledges that 39 percent of the volume harvested was sold under fixed-price contracts, but that "[o]verall, these fixed-price contracts have resulted in a price achievement in line with the spot price (NASDAQ) for the year as a whole."

140.    Since at least 2014, salmon buyers in Europe have complained that Norway's salmon producers, including Mowi, have been rigging the spot market by using subsidiary companies, including Mowi's Polish subsidiary, Morpol (which is, as alleged above, a fish processor and distributor and the world's leading producer of smoked salmon products) to fix, raise, or stabilize the spot price for salmon.

141. 

142. The allegations became public in a series of articles in *Undercurrent News* in January and February of 2014, where it was indicated that Polish processors were contemplating legal action; in these articles, Bratvoll denied any wrongdoing. The supra-competitive prices paid by Morpol for salmon on the spot market ensured that its parent could utilize those prices to fix, raise, and stabilize spot prices reported on the NASDAQ Salmon Index.

143. Such misconduct was confirmed by others as well. As the purchasing director of Graal S.A. ("Graal") (a Polish salmon processor), Alina Piasecka, has explained, "[w]e've seen examples of prices falling in the spot market, and exporters offering fish at increasingly lower prices." She continued, "[s]uddenly, 15 minutes later there are aren't fish available, and we find out that Morpol has purchased perhaps 60 truckloads." Graal's CEO, Boguslaw Kowalski, also explained that "[w]e are seeing that now and again they take advantage of Morpol to buy at higher prices than that charged by the market, to hike up prices."

144. In 2017, Stale Hoyem ("Hoyem"), general manager of Suempol Norway, one of the biggest smoked salmon producers in Poland and Europe, complained that "companies in Norway buy small quantities of salmon to raise the price for the rest of the players." Hoyem added that "[o]ne last thing that affects prices is that some of the major players choose to create their own purchasing departments buying a truckload here and a truckload there"; he was "suggesting this 'daily' practice is heavily influencing prices on the spot market." Borge Prytz Larsen, purchasing director at Severnaya, which imports salmon into Russia, confirmed Hoyem's statement: "The big players buy fish, and they then use the price as indicators for other customers."

145. The volume of commerce in spot transactions reported on the NASDAQ Salmon Index is very small compared to the overall market for farm-raised salmon. For example, the estimated value of farm-raised Norwegian salmon in 2019 was over 68 billion NOK, while the volume of commerce for spot transactions reported for the NASDAQ Salmon Index was only ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

146.

147. ████████████████████████████████ has to be viewed in the context of the Russian ban, which commenced in August of 2014, was extended in June of 2015, and continues to this day.

148.

149.



150.

151.

152.

**C.** **Defendants Were In Constant Communication And Were Dedicated To Cooperation, Particularly After Russia Ceased Importing Norwegian Salmon.**

153.    The farmed salmon industry in Norway is very close-knit, with executives often moving from a position at one Defendant to a position at another and executives at the Defendant companies talking freely to each other about price or competition.

154.    Through the development of the NASDAQ Salmon Index panel and other industry activities, including the GSI,



[REDACTED]

157.    Defendants were keenly aware of the importance of the Russian market. For example, Leroy's annual report in 2012 explained that "[i]t is also a fact that Russia now represents a large market for Atlantic salmon" and "[t]he markets showing the greatest growth are currently . . . Russia with 36%." SalMar's 2012 annual report similarly explained that "Russia, which was SalMar's third largest market, imported by itself around 5 per cent of SalMar's 2012 volumes." The Russian ban put all the companies, including Defendants, at significant risk due to the loss of a substantial source of demand.

158.    Despite the serious implications of an impending Russian ban, in mid-2014, when the ban went into effect, Lerøy noted in its financials that it would only have an impact "[i]n the *short term* . . . on the Group's activities and earnings" (emphasis added).

159.    Mowi's second quarter 2014 report likewise notes that, "*[s]hort term*, the trade sanctions recently imposed by Russia is impacting the market balance adversely" as "Russia constitutes about 7% of the world market for farmed Atlantic salmon" (emphasis added).  Mowi explained: "The situation is putting the industry's logistical and marketing skills to a serious test in the *short term*, as spot prices have dropped to a level of around NOK 30. However, the forward market for the fourth quarter 2014 and 2015 remains strong, with price of NOK 39 and NOK 41 respectively" (emphasis added).

160.    SalMar likewise acknowledged in a second quarter 2014 report: "The most recent changes in the political climate with respect to international trade with Russia could have a significant *short-term* impact on the market balance. With a high proportion of output destined for the spot market, changes in price will have an immediate effect on the company's earnings" (emphasis added).

161.     The Defendants were thus aware of the significant effect that the loss of the Russian market could have on them.  But they were optimistic, that despite the loss of this major market, it would only have a "short-term" impact. Cermaq similarly downplayed the likely harm to the industry from loss of the Russian market, noting: "[T]here are ample opportunities to compensate for this, both through growth in existing markets and development of new. Therefore, market access is not a significant limiting factor, neither for Cermaq *nor for the industry as such*" (emphasis added).



164. █████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████

165.     In August of 2014, Russia banned imports of Norwegian seafood in response to economic sanctions imposed by the United States, the EU, and others, ostensibly for its annexation of Crimea. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████

166.     Critically, contrary to every indication, rather than prices falling dramatically following the ban, Defendants' prices rose in the third and fourth quarters of 2014 immediately after the ban was first implemented and rose again in the third quarter of 2015, after the ban was extended, as reflected in this Marine Harvest chart:



167.     As a result of the Defendants' meetings and coordination in 2014, they were able to manipulate the spot prices to protect themselves from the effect of the Russian ban. ██████ ████████████████████████████████████████████████████████████████ ████████████████████████

168.     Defendants acknowledge that much of their success in 2014 was thanks to the pricing on the spot market. As SalMar's 2014 annual report explains: "Exclusion from the Russian market has been a challenge, but these sales volumes have been replaced during the period in new and existing markets. *In addition, the generally shrewd sale of volumes at spot prices has contributed to better margins for the segment*." (Emphasis added). Likewise, Lerøy's 2014 annual report indicates that despite the Russian ban—which presented an "extremely difficult situation," forcing the company to reallocate large volumes of fish to new markets practically overnight— 2014 nevertheless went "down in the history books as a record-breaking year for Lerøy Seafood Group ASA" with the prices at "record high" levels.

169.     While Defendants had success stabilizing prices, the impact of the ban was nevertheless significant.  As an analyst at Swedbank Markets explained in 2017, "Russia's import ban wiped out 10 percent of Norway's salmon market." Teimuraz Ramishvili the Russian ambassador to Norway, said in 2018 that "[f]rom an economic point of view, Norway lost a billion dollars from the fish trade with Russia. There were attempts from Oslo to find new markets, great hopes were associated with China, but the Russian market was not replaced."

170.     This estimate of the loss to Norwegian salmon farmers like the Defendants turned out to be severely understated.  In January of 2019, the industry publication *Intrafish* reported that:

> Russia was once one of the seafood sector's most promising markets -- for Norwegian seafood suppliers in particular.
>
> But since the 2015 ban on seafood imports from several Western countries, the Norwegian salmon industry alone has lost NOK 20 billion (€2 billion/$2.3 billion), according to estimates from Asbjørn Warvik Rørtveit, director of market insight and market access at the Norwegian Seafood Council (NSC).

171.     As Grieg explained in its 2014 annual report, "2014 was characterised by a strong market with high market prices throughout the year, but suspension of trade with Russia has entailed a lower price than expectable towards the end of the year." A later portion of the report reiterated this point: "[i]n addition, a ban on imports of Norwegian salmon to Russia entailed re-allocation of bigger volumes to other markets and lower-than-expected prices in the last quarter of 2014."

172.     The ban was supposed to last a year, but Russia extended it in late June of 2015, and it still remains in effect.

173.     In a period where Norwegian salmon producers had lost one of their biggest traditional customers—Russia—one would have expected that each of the Norwegian Defendants would compete more vigorously with each other on prices in an effort to increase sales and thereby wrest market share from their rivals. That did not happen.

174.     ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████





.

### D.   Defendants' Direct Communications Have To Be Viewed In The Context Of the Culture of Cooperation Fostered Within The Norwegian Salmon Industry.

186.   **Trade Associations And Industry Organizations**. The Norwegian Seafood Council ("NSC"), which is based in Tromsø, Norway, has offices in 12 countries (including an office in Boston) and bills itself  as "the industry's main source for market insight based on statistics, trade information, consumption and consumer insight." It licenses the "Seafood From Norway" trademark utilized by Norwegian seafood producer-exporters. The NSC conducts a co-funded "Joint Marketing Program" that utilizes this trademark. The NSC utilizes "advisory groups" that meet periodically and give it input and opinions regarding its work; among the members of such groups are Knut Hallvard Lerøy of Lerøy, Witzøe of SalMar, Arne Aarhus of Ocean Quality, and Erik Holvik of Mowi. As explained in detail below, the data analytics firm SAS Data Management ("SAS") has created a database and analytical tools for the NSC that allow industry members to share current individualized competitor data, including price data.

187.   Another Norwegian industry group of note is the Norwegian Seafood Federation ("NSF"), in which the Norwegian Defendants are members. Its former Chairman was Ole-Eirik Lerøy, the Chairman of the Board of Mowi since 2010, who was the CEO of Lerøy from 1991 to 2008; Ole-Eirik Lerøy was also not the only executive from Lerøy to move to Mowi. The CEO of Mowi until recently was Aarskog, who previously served as Executive Vice-President and then

CEO of Lerøy, and is now Vindheim, who was formerly Mowi's CFO and who formerly served in that role at Lerøy.[5] The Deputy Managing Director of the NSF is Trond Davidsen ("Davidsen").

188.    **Switch To Cooperation Rather Than Competition**.   In a speech given in November of 2016, Davidsen explained how the salmon industry in recent years has shifted from competition to cooperation:

> We have without doubt moved from battling each other in trade wars to cooperating and finding solutions on common challenges to feeding a growing world population – such as sea lice, feed resources, technology and knowledge in general.
>
> Of course, a general good market situation has removed some of the stress in the salmon industry. But it seems also to be a fact that a continuously increasing cross border activity in the industry has moved the whole industry into a new way of thinking. We had cross border activities in the past as well, with Norwegian salmon companies involved in operations in Scotland, Ireland and the US.
>
> However, the way the salmon business has developed in the last years – with a vast increase in cross border ownership and operations – will probably decrease the risk of any battles between the producing countries in the future. I am convinced that the increased business integration strengthens the whole industry, improves our operations and makes us even more suited to produce healthy and valuable products to a growing population.
>
> ***
>
> I know for sure that all parties involved in the salmon business agree that the potential for further growth is tremendous – and that we need to develop our industry to meet the global demand rather than fight each other.

189.    Davidsen's reference to "trade wars" or "battles" or "fight[ing]" in this speech are code words for price competition. As explained below, salmon is a commodity product and the way producers can compete with respect to the sale of it is on the dimension of price. But as can be seen from the foregoing discussion of meetings among top executives of the Defendants, Davidsen's remarks were accurate and the "cooperation" among ostensible competitors was not

---

[5]    Mowi          ASA          (MNHVF.PQ)          People,          REUTERS,
https://www.reuters.com/finance/stocks/company-officers/MNHVF.PQ   (last   visited   Aug.   16,
2019).

limited to merely combatting sea lice, discussing feed resources, or talking about technology. Indeed, in 2018 Aarskog encouraged Mowi's competitors in Chile to embrace additional environmental compliance measures as cover to increase salmon prices and specifically EBIT per kilo of salmon produced.

190.     **Activities Of The Global Salmon Initiative**. This commitment to cooperation is also reflected in the activities of the Global Salmon Initiative ("GSI")—an organization that was formed in 2013.  As explained on GSI's website:

> In 2012, a small group of CEOs from salmon farming companies from Norway, Chile and Scotland attended a talk about improving environmental reputation. Inspired by stories from other sectors, these CEOs decided to continue the discussions and look at ways they could break down barriers to environmental improvement in the salmon aquaculture sector.

> Those leaders quickly realized that when one company performs poorly, it harms the reputation of all, and *instead of using environmental performance as a means of competition, they would secure greater advantages and economic success by working together to lift the performance of the sector as a whole.*

> The GSI was launched in August 2013. Now with 16 members, with operations covering 8 countries – Australia, Canada, Chile, Faroe Islands, Ireland, New Zealand, Norway, and the United Kingdom the group represents approximately 50% of the global farmed salmon sector. (Emphasis added).

191.     The GSI explicitly referred to its activities as "precompetitive cooperation." The original members of the GSI included Mowi, Grieg, Lerøy, and SalMar. Aarskog, the former CEO of Mowi, came up with the idea for the GSI in 2012—contemporaneous with the creation of the NASDAQ Salmon Index—and Aarskog was GSI's Co-Chair. The closer cooperation of the Defendants, and particularly their executives, through the GSI strengthened the substantial inter-competitor relationships that already existed between them and allowed them to successfully implement the anticompetitive conduct alleged herein. Aarskog of Mowi is on record as stating that the efforts of the GSI could be utilized as a means of increasing prices.

192.     In July of 2020, Mowi, which had created and championed the GSI for over seven years suddenly abandoned it in the wake of the ongoing antitrust investigations on two continents.

193.     **Joint Executive Meetings And Sharing Of Sensitive Commercial Information Under The Auspices Of The NSC.** The close cooperation among Defendants is further exhibited by what happened at the NSC.

194.     Primarily the CEOs or other directors of the Defendants would attend on their behalf.

195.     Sharing of confidential company-specific information was also encouraged through the data collection practices used by its consultant SAS on behalf of the NSC. On its website, SAS touts how it has given confidential "sensitive market insight" to the NSC's members, including Defendants:

> The Norwegian Seafood Council employs around 17 people to work on analysis and reporting on a daily basis. The analysis department has recently set up a new database to give businesses access to sensitive market statistics, including an overview of their own market shares and a comparison of their prices with those of competitors.

> Customers can compare themselves to other exporters in terms of both price and share of the market.

196.     This practice of providing horizontal competitors ongoing price and market share data about each other—a practice to which these competitors obviously agreed—is a real cause for concern. As discussed above, it was a key aspect of the price-fixing conspiracy among FOS, SSGA, SSA, and SSB back in 1989-91.

197.     As the Federal Trade Commission ("FTC") has said:

> [F]orming a trade association does not shield joint activities from antitrust scrutiny: Dealings among competitors that violate the law would still violate the law even if they were done through a trade association. For instance, it is illegal to use a trade association to control or suggest prices of members. It is illegal to use information-sharing programs, or standardized contracts, operating hours, accounting, safety codes, or transportation methods, as a disguised means of fixing prices.

> One area for concern is exchanging price or other sensitive business data among competitors, whether within a trade or professional association or other industry

group. Any data exchange or statistical reporting that includes current prices, or information that identifies data from individual competitors, can raise antitrust concerns if it encourages more uniform prices than otherwise would exist.

198.    Likewise, the United States government delegation stated to the Organization for Economic Cooperation & Development's Competition Committee in a 2010 report that "certain information exchanges among competitors may violate Section 1 of the Sherman Act, which prohibits a 'contract, combination…or conspiracy' that unreasonably restrains trade." The presentation was principally authored by the United States Department of Justice ("DOJ") and is part of a list of such submissions on its website.  The United States government noted that "[i]n addition to serving as evidence of an unlawful agreement, information exchanges likely to affect prices may, under certain circumstances, be illegal in and of themselves."  Even if the information exchange is not itself an unlawful agreement, it can be powerful evidence of an agreement to fix prices because "[t]he antitrust concern is that information exchanges may facilitate anticompetitive harm by advancing competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens competition. Thus, for example, exchanges on price may lead to illegal price coordination." The United States delegation noted that actual evidence of competitive harm, such as industry-wide price movements resulting from the exchange, are a strong factor in finding illegality. Other identified factors that may be considered include: (a) "[t]he nature and quantity of the information (extensive exchange of information regarding pricing, output, major costs, marketing strategies and new product development is more likely to have anticompetitive implications);" (b) "[h]ow recent the shared data is (sharing of past data is generally deemed less problematic than sharing current data);" (c) "[t]he parties' intent in sharing the information (an anticompetitive intent, such as an intent to stabilize prices, is problematic);" (d) "[t]he industry structure (in concentrated industries, an exchange among few firms could be more likely to harm competition);" and (e) "[t]he frequency of exchanges (the more frequent the exchange, the more problematic it may be)." The frequent detailed information exchanges among competitors through the NSC satisfy these criteria.

199.    The DOJ and the FTC had made a similar point in their 2000 Antitrust Guidelines

for Collaborations Among Competitors ("DOJ-FTC Guidelines"):

> [I]n some cases, the sharing of information related to a market in which the
> collaboration operates or in which the participants are actual or potential
> competitors may increase the likelihood of collusion on matters such as price,
> output, or other competitively sensitive variables. The competitive concern depends
> on the nature of the information shared. Other things being equal, the sharing of
> information relating to price, output, costs, or strategic planning is more likely to
> raise competitive concern than the sharing of information relating to less
> competitively sensitive variables. Similarly, other things being equal, the sharing
> of information on current operating and future business plans is more likely to raise
> concerns than the sharing of historical information. Finally, other things being
> equal, the sharing of individual company data is more likely to raise concern than
> the sharing of aggregated data that does not permit recipients to identify individual
> firm data.

200.    **Defendants' Activities Through The North Atlantic Seafood Forum**.

Defendants have also used events organized in part by third parties to communicate with each

other on cooperative pricing arrangements for salmon or products derived therefrom.  One such

event is the annual North Atlantic Seafood Forum ("NASF"), which is described as "[t]he world's

largest seafood business conference" and has occurred every March for the last 14 years in Bergen,

Norway and generally lasts for three days. It is sponsored in part by major players in the salmon

industry, such as Grieg, Mowi, and Lerøy.

201.    In recent years, the NASF conference has proceeded with an initial opening address

called "The View from the Bridge" given by so-called "Global Seafood Industry Captains." A

speaker at the 2015 meeting was Ole-Eirik Lerøy. These are then typically lunch and "networking"

sessions followed by what are called "parallel sessions" devoted to particular industry sectors "for

the latest update on industry challenges, supply and market outlook, prices, innovation and

business, and sustainability issues." One such parallel session at NASF is a half day "industry

workshop" during the conspiracy period alleged herein and was devoted to "global salmon supply,

markets and prices."

202.    NASF sessions are heavily attended by representatives of the Defendants, including

during at the 2015 session, Grieg's Per Grieg, Lerøy's Beltestad, and Mowi's Aarskog, as well as

Brattvoll. Indeed, Brattvoll was a presenter on global salmon demand at the 2015 and 2016 sessions—and as noted above, his company, Morpol, was a primary driver of demand.

**E.      During The Class Period, Defendants Have Engaged In Closely Parallel Pricing Behavior That Has Resulted In Record Profitability.**

203.     

204.





205. 

206.

207. 





208. The chart below depicts how spot prices, measured on weekly basis (*e.g.*, 1-52) began to dramatically separate from their five-year average starting in spring of 2013, when NASDAQ became the primary benchmark:



58

209.    By comparison, in 2012, the comparison of prices from the prior five-year average reflects that prices in 2012 were below the five-year average.



210.    These price increases—and Defendants' coordinated behavior that caused them—have come at the expense of Plaintiffs and the Class, who have paid more for salmon than they otherwise would have in the absence of Defendants' anticompetitive conduct.

211.    Meanwhile, Defendants' conspiracy has resulted in huge profits for them, with most of the Defendants more than *doubling* their profits in the relevant period.

212.    For example, Mowi mapped out its profits and EBIT levels since 2013 in the following chart, which reflects that profits more than tripled during this period:



213.     Grieg similarly reported that its EBIT per kg gutted weight of fish (in Norwegian Kroners) has increased during the course of the Class Period. According to Grieg's 2017 annual report, its EBIT was 0.7 Kroners/kg in 2015, 18.0 Kroners/kg in 2016, and 14.4 Kroners/kg in 2017. Grieg's Q4 2018 Quarterly Report announced an EBIT per kg (in Norwegian Kroner) of 14.72 for 2018.

214.     Lerøy has also experienced substantial increases in EBIT/kg (also measured in Norwegian Kroner), increasing from 8.8 Kroners in 2015 to 18.9 Kroners in 2016, and 23.6 Kroners in 2017. In 2018, Lerøy's EBIT/kg was 19.6 Kroners.

215.     In its 2013 annual report, Cermaq also noted that its revenues had increased 57 percent from the previous year, noting that "[t]he growth in operating revenues was essentially coming from a surge in market prices for all salmonid species during the year, in particular in the second half, while higher volumes sold in the Cermaq farming companies also contributed positively." In its 2014 annual report, Cermaq highlighted that "[o]perationally we had our best year ever in our Norwegian operations, despite the significant challenges in the marketplace following the Russian import embargo for the last five months of the year." In its 2015 annual report, where Cermaq adopted a fiscal year accounting system that resulted in 15 months of data and that differed from previous years, Cermaq said that "[o]perating revenues were NOK 8 198.7 million in fiscal year 2015, while 2014 showed total operating revenue of NOK 5 616.1 million." In 2016, Cermaq reported that "Cermaq Norway delivered its best annual EBIT result ever" explaining that "market prices at record high levels were the key driver for profit during the fiscal year 2016, yielding historical results for Cermaq Norway and Cermaq Canada."

216.     Like Cermaq and the other Defendants, SalMar recorded record prices during the relevant period as well. SalMar's 2013 annual report states that: "2013 was another record year for SalMar. The combination of higher harvested volumes and high salmon prices boosted the Group's overall revenues to NOK 6.25 billion, while operating profit came to NOK 1.26 billion." SalMar's 2014 annual report states: "2014 was another record year for SalMar. Indeed, using the phrase 'another record year' is becoming something of a habit when describing SalMar's performance.

60

Once again it was a combination of a higher harvested volume and higher salmon prices that helped boost the Group's consolidated gross revenues to NOK 7.19 billion, and its operating profit to NOK 1.88 billion." SalMar's 2015 annual report likewise states that: "SalMar posted very strong results in 2015. Gross operating revenues of NOK 7.3 billion and an operating profit of NOK 1.4 billion plainly show that SalMar is continuing to develop and create extremely good financial results. The volume harvested decreased slightly to 136.400 tonnes, but good salmon prices led to higher sales revenues." In SalMar's 2016 annual report, it explains that "[i]n the financial year covered by this report, SalMar's financial value creation reached a level never previously achieved. The Group generated gross operating revenues of NOK 9,030 million, made an Operational EBIT of NOK 2,432 million and a net profit of NOK 2,651 million. The exceptionally high earnings in 2016 follow several years of very strong profitability . . . ." SalMar's 2017 annual report again reports record profits and critically notes that "[t]he high level of earnings in 2017 reflect high salmon prices and good profitability not only at SalMar but in the entire industry[,]" thus suggesting that SalMar's prices were aligned with those of the other Defendants.

217.   Similarly, the stock prices of Mowi, Grieg, SalMar, and Lerøy have all risen dramatically since early 2013.

**F.   Defendants' Pricing Behavior Is Not Justified By Cost Factors.**

218.   Defendants frequently—and falsely—asserted that cost increases justified their price increases, but their own data disproves their purported justification. For example, the following chart from Mowi indicates that the "cost in box" of producing salmon (per kilogram) has increased approximately half of one Euro (or less) during the Class Period—far less than salmon prices:



219.     The biggest single production cost for producers of farmed salmon is feed. As Mowi notes in its 2018 Handbook: "Historically, the two most important ingredients in fish feed have been fish meal and fish oil. The use of these two marine raw materials in feed production has been reduced in favour of ingredients such as soy, sunflower, wheat, corn, beans, peas, poultry by-products (in Chile and Canada) and rapeseed oil. This substitution is mainly due to heavy constraints on the availability of fish meal and fish oil." The following chart from that Handbook, however, shows that the price of these feed components either stabilized or declined in the period since mid-2015.



220.    In sum, as the foregoing chart reflects, the price increases for salmon in 2013 and following years, viewed in relation to production costs, represent a structural break from past practices. Indeed, in prior periods, the Norwegian farmed salmon industry had been accused of dumping their product overseas at unreasonably low prices.

221.    Nor can increased demand explain the price increases since mid-2013. In fact, as noted, Defendants lost a major market—Russia—in 2014, which became a permanent loss in 2015.

222.    The following charts comparing spot prices depict how Defendants managed to avoid a catastrophic drop in prices after the 2014 Russian ban was implemented and how they began to raise prices (measured on a weekly basis) beyond the prior five-year averages:



223.    As reflected below, the 2016 comparison is particularly notable with Defendants taking prices well beyond anything they had been able to achieve in the past.



224.    Moreover, all of the three foregoing charts include some collusive prices in the prior "five year" average prices, given that, as Plaintiffs allege, Defendants began to manipulate prices on the spot market and otherwise starting in April of 2013.

225.    Aarskog of Mowi explained that "2016 was a great year for Marine Harvest, with both record earnings and cash flow generation. I am very proud of the work all our colleagues have put in to achieve these results."

### G.    The Structure And Characteristics Of The Market For Salmon Support The Existence Of A Collusive Restraint.

226.    The structure and other characteristics of the market for salmon—and particularly the way in which pricing is established through NASDAQ Salmon index prices—make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive.

227.    The DOJ has emphasized that structural market factors can be important in assessing whether conspiratorial conduct in violation of the antitrust laws has occurred.  Indeed, the DOJ has explained that:

> While collusion can occur in almost any industry, it is more likely to occur in some industries than in others. An indicator of collusion may be more meaningful when industry conditions are already favorable to collusion.

> Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers,

or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers and the rest are "fringe" sellers who control only a small fraction of the market.

The probability of collusion increases if other products cannot easily be substituted for the product in question or if there are restrictive specifications for the product being procured.

The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.

Repetitive purchases may increase the chance of collusion, as the vendors may become familiar with other bidders and future contracts provide the opportunity for competitors to share the work.

Collusion is more likely if the competitors know each other well through social connections, trade associations, legitimate business contacts, or shifting employment from one company to another.

Bidders who congregate in the same building or town to submit their bids have an easy opportunity for last-minute communications.

228.    All these factors are present here. As explained below: (a) the Norwegian farmed salmon industry is dominated by a few top producers with a number of smaller players; (b) farmed Atlantic salmon is a standardized product not readily substitutable with other types of salmon; (c) opportunities to conspire abound in numerous trade associations and industry meetings, and otherwise; (d) Marine Harvest, Ocean Quality, Grieg, and Lerøy are all headquartered in Bergen, Norway; and (e) there is mobility among executives of certain Defendants, such as Aarskog and Bratvoll moving from Lerøy to Mowi, Aarhus moving from Lerøy to Ocean Quality, and Aakre moving from Mowi to Cermaq.

### 1.    Industry Concentration Facilitates Collusion.

229.    A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

230.    Here, there has been significant (and rapid) consolidation of salmon farming operations around the globe in recent years, as Mowi reports:

## Industry Structure

### 7.2  Number of players in producing countries



The graph shows the number of players producing 80% of the farmed salmon and trout in each major producing country.

Historically, the salmon industry was dominated by several small firms. As illustrated above, it was the case in Norway, and to some extent in Scotland and Chile.

During the last decades the salmon farming industry has been through a period of consolidation in all regions and this is expected to continue.

231.    The vast majority of the 22 remaining salmon farming companies in Norway are "fringe sellers," to use the words of the DOJ. And the Norwegian Defendants dominate the market.

232.    According to Mowi's own figures, Norway's salmon industry is dominated by Defendants Mowi, Lerøy, SalMar, Cermaq, and Grieg:

## Industry Structure

### 7.1 Top 5-10 players of farmed Atlantic salmon

| | Top 10 - Norway | H.Q. | Top 5 - United Kingdom | H.Q. | Top 5 - North America | H.Q. | Top 10 - Chile | H.Q. |
|---|---|---|---|---|---|---|---|---|
| 1 | Mowi | 230,400 | Mowi | 38,400 | Cooke Aquaculture | 60,800 | "New Aquachile" (Agrosuper) | 109,000 |
| 2 | Salmar | 142,500 | The Scottish Salmon Co. | 29,900 | Mowi | 39,300 | Mitsubishi / Cermaq | 66,000 |
| 3 | Leroy Seafood | 137,800 | Scottish Seafarms | 27,500 | Mitsubishi / Cermaq | 21,800 | Salmones Multiexport | 64,800 |
| 4 | Mitsubishi / Cermaq | 57,400 | Cooke Aquaculture | 21,600 | Grieg Seafood | 16,600 | Mowi | 53,200 |
| 5 | Grieg Seafood | 46,100 | Grieg Seafood | 11,900 | * | | Blumar | 47,600 |
| 6 | Nova Sea | 37,900 | * | | | | Camanchaca | 43,600 |
| 7 | Nordlaks | 36,100 | | | | | Australis Seafood | 34,500 |
| 8 | Norway Royal Salmon | 36,000 | | | | | Ventisqueros | 30,300 |
| 9 | Sinkaberg-Hansen | 27,500 | | | | | Invermar | 20,000 |
| 10 | Alsaker Fjordbruk | 26,000 | | | | | Marine Farm | 19,800 |
| | Top 10 | 777,700 | Top 5 | 129,300 | Top 5 | 138,500 | Top 10 | 449,000 |
| | Others | 350,400 | Others | 8,900 | Others | 10,200 | Others | 160,700 |
| | Total | 1,128,100 | Total | 138,200 | Total | 148,700 | Total | 609,700 |

All figures in tonnes GWT
* The industry in the UK and North America are best described by top 5 and top 4 producers, respectively.

Mowi Group represents the largest total production, harvesting around one fifth of the salmon produced in Norway, and about one third of the total production in North America and the UK.

233.     And as alleged above, Mowi during the relevant period had substantial ownership in Grieg and continues to have a nearly 50% ownership interest in Nova Sea, the sixth largest player in the salmon market.

234.     As noted above, SalMar and Lerøy are joint owners of SSF. This fact is conducive to collusion, and examples of such collusion have been discussed above. As explained in the DOJ's and FTC's joint guidelines on collaborations among competitors. Indeed, the DOJ-FTC joint guidelines provide:

> Marketing collaborations may involve agreements on price, output, or other competitively significant variables, or on the use of competitively significant assets, such as an extensive distribution network, that can result in anticompetitive harm. Such agreements can create or increase market power or facilitate its exercise by limiting independent decision making; by combining in the collaboration, or in certain participants, control over competitively significant assets or decisions about competitively significant variables that otherwise would be controlled independently; or by combining financial interests in ways that undermine incentives to compete independently. For example, joint promotion might reduce or eliminate comparative advertising, thus harming competition by restricting information to consumers on price and other competitively significant variables.

67

235.     SalMar and Lerøy have sometimes referred to SSF as a "joint venture"; however, that label is not dispositive of the legal treatment to be accorded to SSF. As stated by the United States Supreme Court in *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 598 (1951), "[n]or do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves can be justified by labeling a project a 'joint venture'. Perhaps every agreement to restrain trade could be so labeled."

### 2.     Barriers To New Entry Are High.

236.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. The market for farming salmon has high entrance barriers.

237.     The production process for farmed salmon is costly and lengthy. Mowi has diagrammed the process for breeding and growing farm-raised salmon as follows:

The life cycle of salmon starts in freshwater and involves several stages before the young salmon (smolt) are ready for the sea.



**1**

**EGGS**
Fertilised eggs are kept in incubation tanks in fresh water. There are approximately 5,000 eggs per litre. The eggs hatch into tiny fish (alevins), which have a yolk sac that provides nutrition until they are large enough to feed themselves.

**2**

**PARR**
Once they weigh about six grams, the fish are moved to larger freshwater tanks or to an open net cage in a lake. The fish now develop into parr and once they weigh about 60–80 grams they're ready to move on to the smolt stage.



**SMOLT**
This stage is when the fish undergo a physiological change that enables them to move from fresh water to seawater and become young adult salmon. The smolts are kept in net pens in the sea until they mature into adult salmon.

**HARVEST**
After just over a year in the sea the fish will have reached market weight (4.5 to 5.5kg) and are then harvested – in a variety of ways depending on the region.

238.    A report commissioned by the EU titled "Developing Innovative Market Orientated Prediction Toolbox to Strengthen the Economic Sustainability and Competitiveness of European Seafood on Local and Global markets" further depicts how salmon is processed:



239.    Thus, production of farmed salmon is capital intensive, and the development of marketable fish is a lengthy process—both of which operate as a barrier to entry.

240.    Salmon is viewed as a separate product distinct from other types of salmon. The EC, in approving Mowi's acquisition of Morpol, a salmon processor, noted that there is a separate product market for the farming and processing of farmed Atlantic salmon.

241.    Mowi's 2018 Investor's Handbook notes that there are relatively few locations in the world that provide the right mix of oceanic conditions for salmon farming and a political

environment willing to allow the practice. Moreover, even if new entry could occur in the right geographic location, no additional salmon supply could be brought online in the short run:



The main coastal areas adopted for salmon farming are depicted on the above map. The coastlines are within certain latitude bands in the Northern and Southern Hemisphere.

A key condition is a temperature range between zero and 18-20°C. The optimal temperature range for salmon is between 8 and 14°C.

Salmon farming also requires a certain current to allow a flow of water through the farm. The current must however be below a certain level to allow the fish to move freely around in the sites. Such conditions are typically found in waters protected by archipelagos and fjords and this rules out many coastlines.

Certain biological parameters are also required to allow efficient production. Biological conditions vary significantly within the areas adopted for salmon farming and are prohibitive in certain other areas.

Political willingness to permit salmon farming and to regulate the industry is also required. Licence systems have been adopted in all areas where salmon farming is carried out.

242.    Mowi also explains that "[i]n all salmon producing regions, the relevant authorities have a licensing regime in place. In order to operate a salmon farm, a license is the key prerequisite. The licenses constrain the maximum for each company and the industry as a whole."

243.     Moreover, wild caught salmon cannot reasonably constrain prices for farm-raised salmon. National Public Radio summarized the breeding and cost advantages that farm-raised salmon have over wild caught salmon in an August 29, 2017 article:

> Why Are Atlantic Salmon Raised In The Pacific Northwest?
>
> Atlantic salmon are not native to the Pacific Northwest. For years, they have been bred to become easier to farm — they're more "highly domesticated," according to the Washington Department of Fish and Wildlife. Most commercial fish farms raise Atlantic salmon.
>
> The WDFW says Atlantic salmon is a "favored species" to farm in cold marine waters because the species grows quickly and consistently, is resistant to disease, and is something people like to eat. Farmed Atlantic salmon are more docile than wild fish.
>
> Atlantic salmon also have been bred to more "efficiently turn feed into flesh," says Michael Rust, the science adviser for NOAA's office of aquaculture.
>
> What used to cost several dollars per pound to grow, worldwide, now costs about $1.25, Rust says. That makes for higher profits.
>
> In the U.S., Washington and Maine are the two largest Atlantic salmon producing states, but they're small beans compared to salmon farms in Canada, Norway and Chile.
>
> Atlantic salmon today, Rust says, probably grow twice as fast as when aquaculture first started.

244.     Wild caught salmon is generally up to twice as expensive per pound as farm-raised salmon.

### 3.     Farm-Raised Salmon Is A Commodity Product And Prices Are Correlated Across The Globe.

245.     Mowi explains that salmon production is a "commodity" business.  A report issued in 2018 by the EU confirms this point: "[t]he output of most salmonid aquaculture, and Atlantic salmon in particular, is highly commoditised i.e., there is little differentiation between farms and competition is based purely on price. These products, mostly head-on gutted fresh fish, serve as raw material for further processing. In that situation, large enterprises which can reduce costs of production through economies of scale and offer the lowest price, have a competitive advantage."

Commodity products are fungible, and consumers and other purchasers have a variety of supply options which makes raising prices by any one supplier difficult in the absence of a conspiracy.

246.    Salmon is also viewed as a commodity product by third parties. As noted above, the NASDAQ Salmon Index serves as the price for salmon across the globe. Market analysts have also recognized that farmed salmon is a commodity.

247.    Furthermore, according to Grieg, salmon prices are linked across the globe, and the Defendants and others closely follow these prices. Likewise, Mowi says in its 2018 Handbook that "[c]omparing FCA Oslo, FOB Miami and FOB Seattle, there is a clear indication of a global market as prices correlate to a high degree." ("FCA" is a trade term indicating that a seller is responsible for the delivery of goods to a specific destination; "FOB" is an acronym for "Free on board," which indicates whether the seller or the buyer is liable for goods that are damaged or destroyed during shipping).

248.    Mowi also recognizes that "price correlation across regional markets is generally strong for Atlantic salmon." Accordingly, anticompetitive conduct affecting salmon prices in one market will affect prices globally. In fact, Mowi tracks the correlation of salmon prices globally in the normal course of its business, as reflected in paragraph 166.

249.    This point was also recognized in a 2016 report issued by the Fish Pool and DNB Foods & Seafood (which is part of Norway's largest financial services organization) titled "World market for salmon: pricing and currencies." The report pointed out that Norwegian farmed salmon gate prices are "strongly linked" and that the collusion by Defendants on those Norwegian prices directly affected prices for farmed salmon raised elsewhere pursuant to the "law of one price."

250.    Indeed, the 2016 report also noted that:



251. The 2016 report further elaborates on the economic principle of the "law of one price" as it relates to the salmon market in the Unites States, a fact supported by Defendants' own use of the NASDAQ Salmon Index to calculate wholesale salmon prices in the United States:

# The law of one price
## *Norwegian and Chilean prices are linked*

- Price US = Norwegian farm gate price + air freight cost Atlantic
- Price US = Chilean farm gate price + air freight cost Americas
- Chilean farm gate price = Norwegian farm gate price + difference in freight cost Atlantic vs Americas



Must be measured in same currency. There can be price premiums/discount due to perceived or real differences in quality, consistency of supply, etc. There will be time lags in price adjustments due to logistics.

    **4.**    **Norwegian Companies Dominate The Production Of Farm-Raised Salmon And The Defendants Are The Largest Global Producers.**

252.    A January 3, 2018 article in SalmonBusiness.com—an industry publication—illustrates Norway's dominance in the salmon industry in the following graphic, with about 52% of supply:



**5.    Farmed Salmon Production Is Highly Inelastic And The Product Is Perishable.**

253.    Mowi acknowledges that:

Due to the long production cycle and the short shelf life of the fresh product (about 3 weeks), the spot price clears on the basis of the overall price/quantity preference of customers. As salmon is perishable and marketed fresh, all production in one period has to be consumed in the same period. In the short term, the production level is difficult and expensive to adjust as the planning/production cycle is three years long. Therefore, the supplied quantity is very inelastic in the short term, while demand also shifts according to the season. This has a large effect on the price volatility in the market.

254.    Accordingly, in the absence of coordinated conduct among producers, Defendants are price-takers and cannot control the price of their product. They are unable to reduce the supply of salmon in the short term to raise prices unilaterally, and they must sell during a very short window while their product is fit for human consumption. In the long term, Defendants would have limited incentives to restrict supply when prices are high, thus creating an oversupply in the market that would depress prices in the absence of collusion. These market constraints make the

market more susceptible to collusion than markets where goods are not perishable and production levels can be rapidly modulated. As Mowi has noted in its 2018 annual report, "[a]lthough the market price of salmon is established through supply and demand for the product, in the short term, salmon producers are expected to be price takers. The long production cycle and a short time window available for harvesting leave salmon farmers with limited flexibility to manage their short-term supply." As claimed price-takers, Defendants had every incentive to collude to ensure that the price they took in the market was as high as they could collectively get it.

**H.    The Alleged Conspiracy Adversely Affected Direct Purchasers In The United States, Which Is A Substantial Market For Salmon.**

255.    The activities of Defendants, including those undertaken overseas, impact direct purchasers in the United States of farm-raised salmon and products derived therefrom. The United States is the second largest global market for salmon behind only the EU, as Mowi reports in the graphic below:

## Global volume by market

| Markets | Estimated volumes | | Compared to Q4 2017 | | Est. volumes Q3 2018 | 12 month comparison | | |
|---|---|---|---|---|---|---|---|---|
| | Q4 2018 | Q4 2017 | Volume | % | | LTM | PTM | % |
| EU | 274 900 | 268 100 | 6 800 ↑ | 2.5% | 247 600 | 955 700 | 921 200 | 3.7% |
| Russia | 24 300 | 23 200 | 1 100 ↑ | 4.7% | 22 000 | 87 200 | 69 800 | 24.9% |
| Other Europe | 22 900 | 24 500 | -1 600 ↓ | -6.5% | 20 200 | 81 900 | 79 500 | 3.0% |
| **Total Europe** | **322 100** | **315 800** | **6 300 ↑** | **2.0%** | **289 800** | **1 124 800** | **1 070 500** | **5.1%** |
| USA | 107 700 | 103 000 | 4 700 ↑ | 4.6% | 102 200 | 427 900 | 397 700 | 7.6% |
| Brazil | 24 000 | 21 800 | 2 200 ↑ | 10.1% | 21 600 | 89 400 | 79 900 | 11.9% |
| Other Americas | 38 600 | 31 000 | 7 600 ↑ | 24.5% | 29 500 | 122 700 | 108 300 | 13.3% |
| **Total Americas** | **170 300** | **155 800** | **14 500 ↑** | **9.3%** | **153 300** | **640 000** | **585 900** | **9.2%** |
| China / Hong Kong | 25 800 | 27 300 | -1 500 ↓ | -5.5% | 24 700 | 101 700 | 86 000 | 18.3% |
| Japan | 16 300 | 15 900 | 400 ↓ | 2.5% | 12 800 | 53 900 | 57 700 | -6.6% |
| South Korea / Taiwan | 15 600 | 12 100 | 3 500 ↑ | 28.9% | 12 700 | 56 000 | 45 500 | 23.1% |
| Other Asia | 22 200 | 21 400 | 800 ↑ | 3.7% | 15 100 | 73 100 | 83 500 | -12.5% |
| **Total Asia** | **79 900** | **76 700** | **3 200 ↑** | **4.2%** | **65 300** | **284 700** | **272 700** | **4.4%** |
| All other markets | 32 900 | 30 400 | 2 500 ↑ | 8.2% | 29 400 | 116 000 | 108 800 | 6.6% |
| **Total** | **605 200** | **578 700** | **26 500 ↑** | **4.6%** | **537 800** | **2 165 500** | **2 037 900** | **6.3%** |
| Inflow to US from Europe | 25 700 | 25 100 | 600 ↑ | 2.4% | 22 000 | 93 800 | 95 300 | -1.6% |
| Inflow to EU from Chile | 8 400 | 12 200 | -3 800 ↓ | -31.1% | 7 600 | 37 700 | 38 300 | -1.6% |

Source: Kontali

- Strong demand globally
- Europe: Increased consumption at higher prices
- US: Convenient and consumer friendly pre-packed products drive growth
- Asia: Increased consumption. Lack of available large sized fish and certain trade restrictions temporarily impacted consumption in China/Hong Kong

Page 26

Source: Kontali
Note: Atlantic Salmon (GWT), LTM: Last Twelve Months, PTM: Previous Twelve Months"

MOWI

256.    A December 12, 2018 article from *Intrafish* further explains:

Salmon import volumes into the United States through October rose 10.5 percent, reaching 272,676 metric tons, according to new figures released by the National Marine Fisheries Service (NMFS).

The value of Atlantic salmon imports rose as well, by 9.5 percent, to reach $2.9 billion (€2.6 billion), up from $2.6 billion (€2.3 billion) during the same period last year.

257.    Defendants' own documents reflect that anticompetitive conduct in Europe impacted U.S. sales due to the control exercised by the parent entities in Norway.

258.   For example, 



261.

262.

263.

264.

## VII.      TOLLING OF THE STATUTE OF LIMITATIONS

265.     The Class members' claims are not barred by the applicable four-year statutes of limitations both under the injury discovery rule and the doctrine of fraudulent concealment.

266.     Defendants' conspiracy was self-concealing. Plaintiffs were unaware of it and could not have learned about it through the exercise of due diligence until February of 2019, when the EC commenced its investigation.

267.     Even then, Defendants' anticompetitive conduct was unknown to Plaintiffs until they reviewed Defendants' document productions made to the EC and DOJ (which still represent only a small fraction of Defendants' relevant documents). ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████. And even then, there is still information missing. For example, ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████.

268.     Further, each of the Defendants suggested in each of their annual reports published during the relevant period that the salmon market was competitive and working fairly for the ultimate benefit to Defendants' customers. For example, Lerøy's 2018 annual report had a strong commitment to its customers, claiming "[e]verything we do is ultimately to benefit our customers" and that its activities were "based on competitive processes allowing our customers to succeed." This was false and misleading, and Defendants undertook a duty to fully disclose that they were engaged in anticompetitive conduct once they issued affirmatively misleading statements that the market was competitive.

269.     Similarly, in a report submitted to the United States Securities and Exchange Commission ("SEC") by Marine Harvest in April of 2015, it reiterated that salmon farmers are expected to be price takers in the market from week to week, and further elaborated "We face

competition from other producers of seafood" and "[t]he bases on which we compete include: price" among other things. This was false and misleading, and Defendants undertook a duty to fully disclose that they were engaged in anticompetitive conduct that affected prices once they issued affirmatively misleading statements that the market was competitive.

270.   In addition, several Defendants suggested publicly that they had little influence over price. As Mowi has noted in its annual reports, including the 2018 report, "[a]lthough the market price of salmon is established through supply and demand for the product, in the short term, salmon producers are expected to be *price takers*" (emphasis added). Similarly, in Grieg's 2017 annual report, it also stated that it was a price-taker and not a price-maker. Specifically, it stated: "Salmon farmers are in general *price takers* as the salmon market primarily is a fresh market supplied by producers that have a short time window available for harvesting." (Emphasis added). These were false and misleading statements. The truth, as alleged herein, was that Defendants, through their anticompetitive conduct, fixed, raised, and/or maintained salmon spot prices on the NASDAQ Salmon Index, and thus, they were in fact price-makers and not mere price-takers. Once Grieg and Mowi commenced to speak on their ability to influence prices for salmon, they owed a duty to fully disclose the true facts.

271.   Moreover, as alleged above, when Polish processors started complaining of Morpol's purchasing activity in January 2014, Mowi and Morpol's Bratvoll repeatedly took the public position that those complaints were without any foundation.

272.   And Defendants conducted much of their collusive conduct in face-to-face meetings and surreptitious telephone calls to avoid a written record.

273.   Additionally, all of the families of companies here have public codes of conduct or ethical guidelines that prohibit illegal conduct and/or corrupt conduct. These codes or guidelines were violated by each Defendant family as described herein, and their failure to disclose violations of their publicly stated commitments to ethical and lawful behavior affirmatively misled the Class.

274.     The anticompetitive alleged herein was a self-concealing one, and Plaintiffs could not have discovered its existence through the exercise of due diligence prior to the EC's investigation in February of 2019.

## VIII.     CLASS ACTION ALLEGATIONS

275.     Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons and entities in the United States who purchased farm-raised Atlantic salmon and/or products derived therefrom directly from Defendants, any current or former subsidiary or affiliate of Defendants, or any co-conspirator, between April 10, 2013 until the effects of the anticompetitive conduct alleged herein cease. Excluded from the Class are Defendants, Defendants' parent companies, subsidiaries, affiliates, officers, directors, employees, assigns, successors, agents, or co-conspirators, and the Court and its staff.

276.     While Plaintiffs do not know the exact number of Class members, Plaintiffs believe the class size is so numerous that joinder is impracticable given Defendants' substantial nationwide presence.

277.     Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Class, thereby making relief to the Class as a whole appropriate. Such questions of law and fact common to the Class include, but are not limited to:

a)      Whether Defendants and their co-conspirators engaged in anticompetitive conduct among themselves to restrict output and fix, raise, maintain, or stabilize the prices of salmon and products derived therefrom;

b)      The identity of the participants in the alleged anticompetitive conduct;

c)      The duration of the alleged anticompetitive conduct and the acts carried out by Defendants and their co-conspirators in furtherance of it;

d)      Whether the alleged anticompetitive violated Sections 1 and 3 of the Sherman Act;

e)      Whether the conduct of Defendants and their co-conspirators, as alleged in
this SCAC, caused injury to the business or property of Plaintiffs and the
members of the Class;

f)      The effect of the alleged conspiracy on the price of salmon and products
derived therefrom during the Class Period;

g)      The appropriate injunctive and related equitable relief for Plaintiffs and the
Class; and

h)      The appropriate class-wide measure of damages.

278.    Plaintiffs' claims are typical of the claims of the members of the Class, and
Plaintiffs and undersigned counsel will fairly and adequately protect the interests of the Class.
Plaintiffs and all members of the Class are similarly affected by Defendants' unlawful conduct in
that they paid artificially inflated prices for farm-raised salmon and products derived therefrom
from Defendants and/or their co-conspirators.

279.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the
claims of the other members of the Class. Plaintiffs' interests are coincident with, and not
antagonistic to, those of the other members of the Class. Plaintiffs are represented by competent
counsel who are experienced in the prosecution of antitrust and class action litigation.

280.    The questions of law and fact common to the members of the Class predominate
over any questions affecting only individual members, including legal and factual issues relating
to liability and damages.

281.    Class action treatment is a superior method for the fair and efficient adjudication of
the controversy, in that, among other things, such treatment will permit a large number of similarly
situated persons to prosecute their common claims in a single forum simultaneously, efficiently,
and without the unnecessary duplication of evidence, effort and expense that numerous individual
actions would engender. The benefits of proceeding through the class mechanism, including
providing injured persons or entities with a method for obtaining redress for claims that might not

be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

282.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## IX.    INTERSTATE TRADE AND COMMERCE

283.    Hundreds of millions of dollars of transactions in farm-raised salmon and products derived therefrom are entered into each year in interstate commerce in the United States and the payments for those transactions flowed in interstate commerce.

284.    Defendants' manipulation of the market has a direct, substantial, and foreseeable impact on interstate commerce in the United States.

285.    Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States, by contracting, combining, conspiring to restrain trade with respect to salmon and products derived therefrom.

286.    Defendants' unlawful conduct has a direct and adverse impact on competition in the United States. Absent Defendants' contract, combination, conspiracy, and/or agreement to manipulate the market for the sale of salmon and products derived therefrom, the prices of farm-raised salmon and products derived therefrom would have been determined by a competitive, efficient market.

## X.    PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY

287.    Defendants' antitrust conspiracy had the following effects, among others:

a)    Price competition has been restrained or eliminated with respect to the pricing of salmon and products derived therefrom;

b)    The prices of salmon and products derived therefrom have been fixed, raised, maintained, or stabilized at artificially inflated levels;

c)    Purchasers of salmon and products derived therefrom have been deprived of the benefits of free and open competition; and

d)     Purchasers of salmon and products derived therefrom paid artificially inflated prices.

288.    The purpose of the anticompetitive conduct of Defendants and their co-conspirators was to fix, raise, stabilize, and/or maintain the price of salmon and products derived therefrom.

289.    The precise amount of the overcharge impacting the prices of salmon and products derived therefrom paid by Plaintiffs and the Class can be measured and quantified using well-accepted models.

290.    As a result of Defendants' violations of the antitrust laws, Plaintiffs and the members of the Class have sustained injury to their businesses or property, having paid higher prices for salmon and products derived therefrom than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## XI.    CAUSE OF ACTION

**Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)**
**(Contracts, Combinations, Or Conspiracies In Restraint Of Trade)**

291.    Plaintiffs repeat the allegations set forth above.

292.    From at least April 10, 2013 until the date that the effects of Defendants' unlawful conduct cease, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regards to salmon and products derived therefrom in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

293.    The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for salmon and products derived therefrom in the United States and elsewhere.

294.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators accomplished those things that they combined and conspired to do, including:

—exchanging competitively sensitive information among themselves, with the aim to fix, increase, maintain, or stabilize prices of salmon and products derived therefrom in the United States and elsewhere;

—participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels and otherwise to fix, increase, maintain, or stabilize prices of salmon and products derived therefrom in the United States and elsewhere;

—participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached; and

—engaging in conduct designed to raise and stabilize the prices of salmon sold on the spot market and pursuant to contracts.

295.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, raise, or stabilize prices of salmon and products derived therefrom.

296.    Defendants' anticompetitive conduct had the following effects, among others:

—Price competition in the market for salmon and products derived therefrom has been restrained, suppressed, and/or eliminated;

—Prices for salmon and products derived therefrom provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States and elsewhere; and

—Plaintiffs and members of the Class who purchased salmon and products derived therefrom from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

297.    Plaintiffs and members of the Class have been injured and will continue to be injured in their business and property by paying more for salmon and products derived therefrom

purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

298.     The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

299.     Plaintiffs and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

## XII.     PRAYER FOR RELIEF

300.     WHEREFORE, Plaintiffs and the Class respectfully request the following relief:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as representatives of the Class and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.     The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a per se violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

C.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees and all other persons acting or claiming to act on their behalf from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination allege herein or from entering into any other contract, conspiracy, or combination having a similar purpose or effect and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     That Judgment be entered against Defendants, jointly and severally, and in favor of

87

Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, and pre- and post-judgment interest at the highest legal rate to the extent provided by law;

E.     That each of the Defendants and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees and their officers, directors, agents, and representatives and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining, or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

F.     That the Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues so triable.

Dated: October 16, 2020.

Respectfully submitted,

PODHURST ORSECK, P.A.
By: /s/ Peter Prieto
Peter Prieto, FBN 501492
John Gravante, III, FBN 617113
Matthew P. Weinshall, FBN 84783
Alissa Del Riego, FBN 99742
SunTrust International Center
One S.E. 3rd Ave, Suite 2300
Miami, FL 33131
Tel: (305) 358-2800
pprieto@podhurst.com

88

jgravante@podhurst.com
mweinshall@podhurst.com
adelriego@podhurst.com

Interim Co-Lead Counsel for Direct
Purchaser Plaintiff Class

HAUSFELD LLP
Michael P. Lehmann (pro hac vice)
Christopher L. Lebsock (pro hac vice)
600 Montgomery St. #3200
San Francisco, CA 94111
Tel: (415) 633-1908
mlehmann@hausfeld.com
clebsock@hausfeld.com

HAUSFELD LLP
Reena A. Gambhir (pro hac vice)
1700 K Street, N.W., Suite 650
Washington D.C. 20006
Tel: (202) 540-7200
rgambhir@hausfeld.com

Interim Co-Lead Counsel
for Direct Purchaser Plaintiff Class

KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
Robert C. Gilbert, FBN 561861
Daniel E. Tropin, FBN 100424
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (305) 384-7269
gilbert@kolawyers.com
tropin@kolawyers.com

Direct Purchaser Plaintiffs' Liaison Counsel

FREED KANNER LONDON &
MILLEN, LLC
Kimberly A. Justice, (pro hac vice)
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
kjustice@fklmlaw.com

FREED KANNER LONDON &
MILLEN, LLC
Steven A. Kanner, (pro hac vice)
Douglas A. Millen, (pro hac vice)
Brian M. Hogan, (pro hac vice)
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
skanner@fklmlaw.com
dmillen@fklmlaw.com
bhogan@fklmlaw.com

PRETI, FLAHERTY, BELIVEAU
& PACHIOS, LLP
Gregory P. Hansel, FBN 607101
Randall B. Weill (pro hac vice)
Michael S. Smith (pro hac vice)
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Tel: (207) 791-3000
ghansel@preti.com
rweill@preti.com
msmith@preti.com

STEYER LOWENTHAL
BOODROOKAS ALVAREZ & SMITH, LLP
Allan Steyer (pro hac vice)
Jill M. Manning (pro hac vice)
D. Scott Macrae (pro hac vice)
235 Pine Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 421-3400
asteyer@steyerlaw.com
jmanning@steyerlaw.com
smacrae@steyerlaw.com

WOLLMUTH MAHER & DEUTSCH LLP
Ronald J. Aranoff (pro hac vice)
Ryan J. Keenan (pro hac vice)
Scott C. Ferrier (pro hac vice)
500 Fifth Avenue, 12th Floor
New York, NY 10110
Tel: (212) 382-3300
raranoff@wmd-law.com
rkeenan@wmd-law.com
sferrier@wmd-law.com

Members of Direct Purchaser Plaintiffs'
Executive Committee

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 16, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify the foregoing document is being served this day on all counsel of record via transmission of notice of Electronic Filing generated by CM/ECF.

By: <u>/s/ Peter Prieto</u>
    Peter Prieto, FBN 501492