UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-21551-CIV-ALTONAGA/Louis

In re:

FARM-RAISED SALMON
AND SALMON PRODUCTS
ANTITRUST LITIGATION
_____/

## ORDER

**THIS CAUSE** is before the Court on Defendants'[1] Motion to Dismiss the Second Consolidated Amended Direct Purchaser Class Action Complaint for Failure to State Claim [ECF No. 296], filed on January 15, 2021. Plaintiffs[2] filed an Opposition [ECF No. 298] to the Motion; to which Defendants filed a Reply [ECF No. 304]. The Court has carefully considered the Second Consolidated Amended Direct Purchaser Class Action Complaint ("SCAC") [ECF Nos. 246, 251-1],[3] the parties' written submissions, the record, and applicable law. For the following reasons, the Motion is denied.

## I.     BACKGROUND

This class action is brought on behalf of direct purchasers of farm-raised Atlantic salmon[4]

---

[1] Defendants are Mowi ASA; Mowi USA, LLC; Marine Harvest Canada, Inc.; Mowi Ducktrap, LLC; Grieg Seafood ASA; Grieg Seafood BC Ltd.; Ocean Quality AS; Ocean Quality North America Inc.; Ocean Quality USA Inc.; Ocean Quality Premium Brands, Inc; SalMar ASA; Lerøy Seafood AS; Lerøy Seafood USA Inc.; Cermaq Group AS; Cermaq US LLC; Cermaq Canada Ltd.; Cermaq Norway AS; and entities owned or controlled by them (collectively, "Defendants"). (*See* SCAC ¶ 1).

[2] Plaintiffs are Euclid Fish Company; Euro USA Inc.; Schneider's Fish and Sea Food Corporation; Beacon Fisheries, Inc.; Cape Florida Seafood; The Fishing Line LLC; and Hesh's Seafood, Inc. (collectively, "Plaintiffs"). (*See* SCAC ¶ 1).

[3] Citations to the SCAC are to the unredacted version. (*See* [ECF No. 251-1]). The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

[4] The term "salmon" refers to "Atlantic salmon." (SCAC 5 n.2 (quotation marks omitted)).

and salmon products asserting claims against Defendants for violations of sections 1 and 3 of the Sherman Act, *see* 15 U.S.C. §§ 1, 3. (*See* SCAC ¶ 3 & n.2). Defendants allegedly engaged in the unlawful coordination of prices charged to direct purchasers of salmon between April 10, 2013 and the present. (*See id.*). Plaintiffs allege Defendants have been engaging in the following misconduct:

- Applying a coordinated strategy to fix, raise, or stabilize spot prices of farmed Norwegian salmon through inter-competitor transactions reported to the NASDAQ[5] Salmon Index,[6] which is used as the reference point by Defendants to set the prices of salmon and salmon products worldwide[; and]

- Coordinating sales prices and exchanging commercially sensitive information through in-person meetings and telephonic and written communications in order to reduce competition between Defendants within the European Union for salmon, and thereby facilitating supra-competitive spot pricing reported by the N[ASDAQ] Salmon Index.

(*Id.* ¶ 7 (alterations added)).

     ***The parties***.

     <u>*The Plaintiffs*</u>. Plaintiffs are Ohio, New York, Florida, New Jersey, and Pennsylvania corporations. (*See id.* ¶¶ 15–21). Plaintiffs are direct purchasers of salmon that have suffered monetary losses as a result of Defendants' antitrust violations. (*See id.*). Plaintiffs seek to represent a class "consisting of all persons and entities in the United States, its territories, and the District of Columbia who directly purchased farm-raised Atlantic salmon or products derived therefrom from one or more Defendants and/or entities owned or controlled by them from April 10, 2013 until the effects of the anticompetitive conduct alleged herein cease[.]" (*Id.* ¶ 9 (alteration

---

[5] The National Association of Securities Dealers Automated Quotations Exchange ("NASDAQ").

[6] The NASDAQ Salmon Index "is the weighted average of weekly reported sales prices and corresponding volumes in fresh Atlantic Superior Salmon, head on gutted reported to NASDAQ's offices in Copenhagen, Denmark by a panel of Norwegian salmon exporters and salmon producers with export licenses." (*Id.* 1 n.1).

added)).

*The Defendants*.[7] Defendants include the world's leading salmon producers and their subsidiaries and affiliates. (*See id.* ¶¶ 22–101).

*The Mowi Defendants*.[8]  Defendant, Mowi ASA, is a "global corporate brand" and the largest producer of salmon. (*Id.* ¶ 23 (quotation marks omitted)).  Mowi ASA operates through numerous subsidiaries and divisions in 25 countries, including the United States. (*See id.* ¶ 25; *see also id.* ¶¶ 26–48).  Defendants, Mowi USA, LLC; Mowi Ducktrap, LLC; and Marine Harvest Canada, Inc., are wholly owned and controlled subsidiaries of Mowi ASA. (*See id.* ¶¶ 41–48).

*The Grieg Defendants*.[9]  Defendant, Grieg ASA, is one of the world's leading fish farming companies specializing in salmon. (*See id.* ¶ 49).  Defendant, Grieg Seafood BC Ltd., a wholly owned and controlled subsidiary of Grieg ASA, farms salmon on 22 sites in British Columbia. (*See id.* ¶ 61).  Grieg ASA targets and sells its salmon to the United States using its sales and distribution agent, Defendant, Ocean Quality AS. (*See id.* ¶¶ 50–54).  Ocean Quality AS operates in the United States and Canada through three wholly owned subsidiaries: Defendants, Ocean Quality North America Inc., Ocean Quality USA Inc., and Ocean Quality Premium Brands.[10] (*See id.* ¶ 50).

*The SalMar Defendant*.  Defendant, SalMar ASA ("SalMar"), a foreign corporation, is one

---

[7] On March 6, 2020, Plaintiffs filed a Notice of Voluntary Dismissal Without Prejudice [ECF No. 196], dismissing the claims asserted against Defendant, Scottish Sea Farms Ltd. ("Scottish Sea Farms").

[8] Mowi ASA; Mowi USA, LLC; Mowi Ducktrap, LLC; and Marine Harvest Canada, Inc. are collectively referred to as "Mowi[.]"

[9] Grieg Seafood ASA ("Grieg ASA"); Grieg Seafood BC Ltd.; Ocean Quality AS; Ocean Quality North America Inc.; Ocean Quality USA Inc.; and Ocean Quality Premium Brands, Inc. are collectively referred to as "Grieg[.]" (*See* SCAC ¶ 72).

[10] The term "Ocean Quality" refers to Ocean Quality AS acting on behalf of itself; Ocean Quality North America Inc.; Ocean Quality USA Inc.; Ocean Quality Premium Brands, Inc.; and Grieg ASA. (*See* SCAC ¶ 72).

of the world's largest and most efficient producers of salmon.  (*See id.* ¶¶ 73–74).  SalMar targets and transacts business in the United States, including Florida.  (*See id.* ¶¶ 76–78).

*The Lerøy Defendants.*[11]  Defendant, Lerøy Seafood Group ASA, a seafood production and distribution company, is the world's second largest salmon and trout farming company.  (*See id.* ¶ 81–82).  Defendant, Lerøy Seafood USA Inc., is the U.S. distribution subsidiary for Lerøy Seafood Group ASA.  (*See id.* ¶¶ 84–85).  Lerøy Seafood USA Inc. sells and distributes Lerøy Seafood Group ASA's farmed salmon throughout the United States.  (*See id.*).

*The Cermaq Defendants.*[12]  Defendant, Cermaq Group AS, is the parent company of Defendants, Cermaq US LLC, Cermaq Canada Ltd., and Cermaq Norway AS.  (*See id.* ¶¶ 91, 97).  Cermaq operates the third-largest salmon farming, processing, and sales company in the world.  (*See id.* ¶ 93).  Its sales to U.S. customers sometimes account for more than double its sales within Norway and up to nearly 25 percent of the group's global revenues.  (*See id.* ¶ 96).

*Agents and co-conspirators*.  Defendants' alleged acts "were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of the respective Defendants' businesses or affairs."  (*Id.* ¶ 98; *see also id.* ¶ 101).  The Defendant parent entities exercise dominance and control over all their subsidiary entities; and the subsidiary entities have a unity of purpose and interest with their respective parents.  (*See id.* ¶ 98).  The "subsidiaries played a critical role in the conspiracy in that they (as well as the respective parent Defendants) sold price-fixed salmon and products derived therefrom to direct purchasers outside Defendants' conspiracy in the United States, including Florida."  (*Id.*; *see also id.* ¶ 99).

---

[11] Lerøy Seafood AS and Lerøy Seafood USA Inc. are collectively referred to as "Lerøy[.]"

[12] Cermaq Group AS, Cermaq US LLC, Cermaq Canada Ltd., and Cermaq Norway AS are collectively referred to as "Cermaq[.]"

***The facts****.*

*The European Commission and the Department of Justice investigations*.   Plaintiffs' allegations parallel those of the European Commission ("EC") in the European Union and the Department of Justice ("DOJ") in the United States, both of which are investigating illegal anticompetitive behavior in the farmed salmon market.  (*See id.* ¶ 102).

In February 2019, the EC opened an antitrust investigation into the world's major producers of farm-raised salmon after "receiv[ing] information . . . that Norwegian producers of farmed Atlantic salmon participate or ha[d] participated in anti-competitive agreements and/or concerted practices related to different ways of price coordination in order to sustain and possibly increase the prices for Norwegian salmon." (*Id.* ¶ 103 (alterations added; other alteration adopted); *see also id.* ¶ 5).  In its letters announcing the investigation, the EC raised concerns that the Norwegian producers: (1) "coordinat[ed] sales prices and exchang[ed] commercially sensitive information;" (2) "agree[d] to purchase production from other competitors when these other competitors sell at lower prices;" and (3) "appl[ied] a coordinated strategy to increase spot prices of farmed Norwegian salmon in order to secure higher price levels for long-term contracts." (*Id.* ¶ 104 (alterations added)).

The EC raided Mowi, Grieg, and SalMar's operations due to concerns that the companies may have violated European Union antitrust rules that prohibit cartels and restrict business practices.  (*See id.* ¶¶ 105–08).  The EC also inspected Scottish Sea Farms, a company jointly owned by Lerøy and SalMar, but not Cermaq, as it has no facilities within the European Union. (*See id.* ¶¶ 80, 109–10, 112).  To justify the raids, the EC "must have reasonable grounds for suspecting an infringement of the competition rules; it must be borne in mind that the inspections carried out by the [EC] are intended to enable it to gather the necessary documentary evidence to

check the actual existence and scope of a given factual and legal situation concerning which it already possesses certain information." (*Id.* ¶ 111 (alteration added; other alteration adopted; quotation marks omitted)).  The SCAC details two historical antitrust investigations within the salmon industry occurring in 1992 and 2003.  (*See id.* ¶¶ 113–14).

In the United States, the DOJ is investigating the same potential illegal practices the EC is investigating in Europe.  (*See id.* ¶¶ 117–21).  In November 2019, the DOJ issued grand jury subpoenas to Mowi, Grieg, Lerøy, SalMar, and Ocean Quality seeking information on practices similar to those being investigated by the EC.  (*See id.*).  The fact that the subpoenas in question were issued by a criminal grand jury indicates the DOJ is considering a criminal prosecution against Defendants.  (*See id.* ¶ 122).  The issuance of the subpoenas to Mowi, Grieg, Lerøy, SalMar and Ocean Quality reasonably supports collusion.  (*See id.* ¶¶ 117–21).

Either after the EC raids or after the DOJ-issued subpoenas, several developments occurred at certain Defendant companies that were unusual and suspicious.  (*See id.* ¶ 123).  By way of examples: (1) executives at Mowi ASA and Ocean Quality AS either resigned without any explanation or abruptly left for undisclosed reasons (*see id.* ¶¶ 124–26); (2) Grieg ASA abruptly terminated its joint venture with non-party, Bremnes Fryseri AS in Ocean Quality AS (*see id.* ¶¶ 51, 127); and (3) Mowi unilaterally withdrew from the Global Salmon Initiative ("GSI"), an organization developed by Mowi ASA's CEO and whose members included the Norwegian entities for Mowi, Grieg, Lerøy, Cermaq, and SalMar (*see id.* ¶ 128).

*The market allegations*.  The salmon market is susceptible to manipulation by Norway's major salmon producers because, in large part, "the spot market for salmon in Oslo, Norway is the most important benchmark for salmon prices around the globe[.]"  (*Id.* ¶ 129 (alteration added)).  The NASDAQ Salmon Index's formulated spot price directly serves as the benchmark price for

the sale of salmon around the world, including in the United States.  (*See id.* ¶¶ 129–30).

In 2012, the "key players" in the salmon industry were involved in a process to replace the existing price index (where independent salmon exporters reported purchase prices) with a new index based on spot sales prices paid to salmon producers with export licenses and subsidiaries or affiliates of such producers that engaged in exportation, such as the Defendants.  (*Id.* ¶ 131 (quotation marks omitted)).  The "key players" — vertically integrated companies like the Norwegian Defendants[13] — insisted they wanted a uniform salmon price, something that would facilitate spot market manipulation.  (*Id.* ¶ 132 (quotation marks omitted)).  The NASDAQ Salmon Index, formally unveiled in April 2013, provided Defendants the direct ability to impact and influence the market through their purchases of salmon on the spot market.  (*See id.* ¶¶ 131–33).

Under the new approach, an Advisory Panel consisting of 10 companies (exporters representing 50–60 percent of all Norwegian salmon) would report on a weekly basis spot prices for head on gutted Fresh Atlantic Superior Salmon during the previous week.  (*See id.* ¶¶ 129, 134–35).  This information was then compiled into an overall Index price, with separate weighted average prices for salmon from Norway across 10 different weight classes (1 to 2 kilograms to over 9 kilograms).  (*See id.* ¶ 135).  Mowi, SalMar, Cermaq, and Ocean Quality were members of the Advisory Panel during the period alleged in the SCAC.[14]  (*See id.* ¶¶ 136–37).  Mowi's subsidiary, Nova Sea, of which Mowi owns nearly 50 percent, was a reporting member of the Advisory Panel.  (*See id.* ¶ 136).  The NASDAQ Salmon Index Advisory Panel "manipulated the index price for salmon through their weekly reports on their spot sales and could thereby increase

---

[13] The "Norwegian Defendants" are Mowi ASA, Grieg ASA, Ocean Quality AS, SalMar, Lerøy Seafood AS, and Cermaq Group AS.

[14] Although Lerøy did not serve on the panel, Scottish Sea Farms represented its interests.  (*See* SCAC ¶¶ 80, 136, 155).

prices across the industry, including to customers in the United States." (*Id.* ¶ 138; *see also, e.g.*, *id.* ¶¶ 139–52).

The SCAC identifies Morpol ASA ("Morpol"), of which Mowi owns 48.5 percent and exercised effective (and later, majority) control, as a key player in the manipulation of the NASDAQ Salmon Index. (*See, e.g.*, *id.* ¶¶ 8, 27, 29, 30, 132, 140–41, 143, 147, 151, 184). Morpol was the single largest buyer on the spot market; in 2014, for example, Morpol's purchases constituted approximately 70% of the spot market commerce. (*See id.* ¶¶ 147–48). Morpol's "transactions with Mowi and the other Defendants set the NASDAQ Salmon Index price to which Defendants' prices, including contract prices, were pegged, and thus, none of Morpol's competitors were in a position to obtain materially better pricing than the supra-competitive pricing Morpol accepted as the dominant purchaser of salmon on the spot market." (*Id.* ¶ 150).

The SCAC states:

> There is no legitimate pro-competitive justification for the key industry players — the Norwegian Defendants here — to sell substantial quantities of salmon to Morpol on the spot market. Mowi was fully capable of supplying Morpol's salmon requirements through internal transfers, rather than through spot market purchases (which were then used to set salmon prices worldwide). In fact, Morpol's salmon needs amounted to only approximately 10% of Mowi's salmon production on an annual basis. Likewise, SalMar and other vertically integrated Defendants had their own "value-added" subsidiaries like Morpol, and instead of directing that salmon to those subsidiaries (or other non-competitor customers), sold the product on the spot market to Morpol. Morpol's spot market purchases create the appearance of greater consumer demand for these fish than actually is present in the market and that increases and/or stabilizes salmon prices at supra-competitive levels when these spot trades are reported to market participants.

(*Id.* ¶ 151).

*Interfirm and intrafirm communications and the Russian ban*. Norway's farmed salmon industry "is very close-knit, with executives often moving from a position at one Defendant to a position at another and executives at the Defendant companies talking freely to each other about price or competition." (*Id.* ¶ 153). As early as 2013, top management from each of the Defendant

companies met and discussed issues impacting the industry, including the potential for a Russian ban of imports of salmon, and cooperation efforts. (*See, e.g.*, *id.* ¶¶ 154, 156). The SCAC includes details of emails and communications among Defendants — including the names of people involved, dates of conversations, and topics of discussion — that, according to Plaintiffs, support an inference of collusion. (*See id.* ¶¶ 154–57, 162–64, 167, 175–85).

For example, the SCAC states:

> [O]n April 4, 2014, SalMar's Witzøe [(SalMar's largest shareholder)] explained to its CEO Nordhammer that he had attended a dinner meeting with Lerøy's [CEO] Beltestad, during which they discussed a pricing model for their salmon based on NASDAQ spot prices. Around the same time, Witzøe and Beltestad were communicating with Jim Gallagher of [Scottish Sea Farms] via email. In one of those emails, Gallagher referenced a recent conversation with Witzøe, and perhaps Beltestad as well, regarding NASDAQ prices. Gallagher confirmed that, as they had discussed, [Scottish Sea Farms] would make sure its prices were ahead of NASDAQ prices on a week-to-week basis. He also directly asked Witzøe to contact Beltestad to confirm what prices Lerøy was offering. These conversations reflect these Defendants' understanding of the importance of pricing above NASDAQ prices and their open-book approach to dealing with one another to ensure pricing conformed to prices reported by the NASDAQ salmon index.

(*Id.* ¶ 162 (alterations added)).

In August 2014, Russia banned imports of Norwegian seafood in response to economic sanctions imposed by the United States and European Union; the Russian ban was extended in July 2015 and remains in effect. (*See id.* ¶¶ 165, 172). Mowi, SalMar, Ocean Quality, Grieg, and Lerøy participated in an emergency meeting to discuss the Russian ban and the potential fall-out on prices, agreeing "on the importance of not talking down prices." (*Id.* ¶ 165). Defendants' prices ramped drastically upward in 2014 and 2015 despite Norwegian salmon producers losing their biggest traditional customer, Russia; the price increases resulted in huge profits for Defendants. (*See id.* ¶¶ 166–68, 170–71, 173). At this time, "one would have expected that each of the Norwegian Defendants would compete more vigorously with each other on prices in an effort to

increase sales and thereby wrest market share from their rivals[;] [t]hat did not happen." (*Id.* ¶ 173 (alterations added)).  Instead, Defendants reacted by continuing their meetings and colluding together.  (*See id.* ¶¶ 173–85).

*Trade Associations and Industry Organizations*.  During the period alleged in the SCAC, Norway's key players in the farmed salmon industry and their subsidiaries transitioned from a culture of competition to one of cooperation.  (*See id.* ¶ 188).  Defendants were members of various trade associations and had the opportunity to exchange commercially sensitive information at trade association meetings.  (*See id.* ¶¶ 186–87, 190–96, 200–02).

The SCAC provides details regarding the Norwegian Seafood Council (the "NSC"), a trade organization that is the industry's main source for market insight based on statistics, trade information, consumption, and consumer insight.  (*See id.* ¶¶ 186, 194–95).  SAS Data Management, a data analytics firm, created a database and analytical tools for the NSC that allow industry members to share current individualized computer data, including pricing data.  (*See id.* ¶ 186).  The practice of providing horizontal competitors real-time ongoing price and market share data — a practice to which these competitors obviously agreed — is "a real cause for concern." (*See id.* ¶ 196; *see also id.* ¶¶ 195, 197–99).  Information exchanges "can be powerful evidence of an agreement to fix prices because the antitrust concern is that information exchanges may facilitate anticompetitive harm by advancing competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens competition." (*Id.* ¶ 198 (alteration adopted; quotation marks omitted); *see also id.* ¶¶ 197, 199).

*The Davidsen presentation and Global Salmon Initiative*.  At a 2016 speech, the Deputy Managing Director of the Norwegian Seafood Federation, Trond Davidsen, announced the Norwegian salmon industry had "moved from battling each other in trade wars to cooperating[;]"

that "cross border activity in the industry has moved the whole industry into a new way of thinking[;]" this "will probably decrease the risk of any battles between the producing countries in the future[;]" and "that we need to develop our industry to meet the global demand rather than fight each other." (*Id.* ¶¶ 187–88 (alterations added)). Davidsen's reference to "trade wars" or "battles" or "fighting" are code words for price competition. (*Id.* ¶ 189 (alteration adopted; quotation marks omitted)).

The commitment to cooperation is reflected in the activities of the GSI. (*See id.* ¶ 190). In 2013, a small group of executives of farming salmon companies formed the GSI to engage in "precompetitive cooperation." (*Id.* ¶ 191 (quotation marks omitted)). Mowi, SalMar, Grieg, and Lerøy were original members of the GSI. (*See id.*). "The closer cooperation of the Defendants, and particularly their executives, through the GSI strengthened the substantial inter-competitor relationships that already existed between them and allowed them to successfully implement the anticompetitive conduct alleged" in the SCAC. (*Id.*). In July 2020, Mowi abandoned the GSI in the wake of ongoing investigations in two continents. (*See id.* ¶ 192).

*The North Atlantic Seafood Forum*. The North Atlantic Seafood Forum is the world's largest seafood business conference and is held every March in Bergen, Norway. (*See id.* ¶ 200). The conference is sponsored by major players in the salmon industry, including Grieg, Mowi, and Lerøy. (*See id.*). Representatives of at least one Defendant (and typically many more) also attended networking sessions and workshops devoted to particular industry sectors. (*See id.* ¶¶ 201–02). One such parallel session attended by Defendants' representatives during the conspiracy period was devoted to "global salmon supply, markets and prices." (*Id.* ¶ 201 (quotation marks omitted)).

*Parallel pricing and record profitability*. Plaintiffs include pricing charts illustrating the

Norwegian Defendants[15] all increased their wholesale salmon prices at roughly the same time and at similar levels. (*See id.* ¶¶ 204–09; *id.*, App. A [ECF No. 251-2]). These "price increases — and Defendants' coordinated behavior that caused them — have come at the expense of Plaintiffs and the class, who have paid more for salmon than they otherwise would have in the absence of Defendants' anticompetitive conduct." (SCAC ¶ 210). Defendants "reported record profits during the conspiracy period, in part through manipulation of the NASDAQ Salmon Index prices and the use of them to set wholesale prices." (*Id.* ¶ 203). Most Defendants more than doubled their profits in the relevant period. (*See id.* ¶¶ 211–17).

*Pricing behavior and cost factors.* Defendants frequently and falsely asserted "cost increases justified their price increases, but their own data disproves their purported justification." (*Id.* ¶ 218). Plaintiffs provide charts showing Defendants' pricing behavior is not justified by cost factors. (*See id.* ¶¶ 218–20). Nor can increased demand explain Defendants' price increases since mid-2013. (*See id.* ¶ 221). Plaintiffs rely on spot price charts for 2014, 2015, and 2016, which, according to Plaintiffs, "depict how Defendants managed to avoid a catastrophic drop in prices after the 2014 Russian ban was implemented and how they began to raise prices (measured on a weekly basis) beyond the prior five-year averages[.]" (*Id.* ¶ 222 (alteration added); *see also id.* ¶¶ 223–25).

*Farm-raised salmon market structure.* The structure and characteristics of the Atlantic salmon market facilitate collusion, including (1) high industry concentration; (2) barriers to new entry; (3) a commoditized product and price correlation; and (4) perishable products and inelastic production. (*See id.* ¶¶ 226–28).

*Industry concentration.* A highly concentrated market is more susceptible to collusion and

---

[15] Plaintiffs do not provide specific wholesale pricing for Cermaq and SalMar. (*See* SCAC ¶ 203).

anticompetitive practices. (*See id.* ¶ 229). In recent years, there has been significant and rapid consolidation of salmon farming operations around the globe. (*See id.* ¶¶ 230–31). Norway's salmon industry is dominated by Mowi, Lerøy, SalMar, Cermaq, and Grieg. (*See id.* ¶¶ 232–35; *see also id.* ¶ 252 (emphasizing chart that illustrates Norway's dominance in the global salmon industry, with about 52 percent of supply)).

*Barriers to new entry.* Significant barriers to entry suppress competition in markets; here, the farming salmon market has high entrance barriers. (*See id.* ¶ 236). Specifically, the production of farm-raised salmon is capital intensive, must occur in appropriate geographic locations, and is a lengthy process. (*See id.* ¶¶ 237–44). All of these operate as barriers to entry. (*See id.*).

*Commodity product and price correlation.* A market involving a commodity-like product, like salmon, is more susceptible to collusion. (*See id.* ¶¶ 245–46). Commodity products "are fungible, and consumers and other purchasers have a variety of supply options which makes raising prices by any one supplier difficult in the absence of a conspiracy." (*Id.* ¶ 245).

The NASDAQ Salmon Index serves as the price for salmon across the globe. (*See id.* ¶ 246). Because prices are linked across the globe, Defendants closely monitor these prices. (*See id.* ¶ 247). Anticompetitive conduct affecting salmon prices in one market will affect global prices. (*See id.* ¶ 248). The Norwegian salmon gate prices are strongly linked, and Defendants' collusion on Norwegian prices directly affects prices for farmed salmon raised elsewhere under the "law of one price." (*Id.* ¶ 249 (quotation marks omitted); *see also id.* ¶¶ 250–51).

*Perishable products and inelastic production.* Salmon is perishable and marketed fresh; as such, all production in one period must be consumed in the same period. (*See id.* ¶ 253). The supplied quantity is also inelastic because "the production level is difficult and expensive to adjust as the planning/production cycle is three years long." (*Id.*). Plaintiffs state:

> [I]n the absence of coordinated conduct among producers, Defendants are price-takers and cannot control the price of their product. They are unable to reduce the supply of salmon in the short term to raise prices unilaterally, and they must sell during a very short window while their product is fit for human consumption. In the long term, Defendants would have limited incentives to restrict supply when prices are high, thus creating an oversupply in the market that would depress prices in the absence of collusion. These market constraints make the market more susceptible to collusion than markets where goods are not perishable and production levels can be rapidly modulated. . . . As claimed price-takers, Defendants had every incentive to collude to ensure that the price they took in the market was as high as they could collectively get it.

(*Id.* ¶ 254 (alterations added)).

*Direct purchasers in the United States*. Defendants' activities, including those undertaken overseas, impact direct purchasers of farm-raised salmon and products derived therefrom in the United States. (*See id.* ¶ 255). The United States is the second largest global market behind only the European Union. (*See id.* ¶¶ 255–56). Defendants' own documents and communications reflect anticompetitive conduct in Europe impacted sales in the United States due to the control exercised by the parent entities in Norway. (*See id.* ¶¶ 257–64).

*Tolling of the statute of limitations*. Plaintiffs' claims are not barred by the applicable four-year statute of limitations both under the injury discovery rule and the doctrine of fraudulent concealment. (*See id.* ¶ 265). Plaintiffs allege Defendants took affirmative acts to mislead them. (*See id.* ¶¶ 267–70, 272–73). Plaintiffs were unaware of Defendants' conspiracy and could not have learned of it through the exercise of due diligence until February 2019, when the EC commenced its investigation. (*See id.* ¶¶ 266, 274).

*Injury and proposed class*. The named Plaintiffs claim to have "sustained injury to their businesses or property, having paid higher prices for salmon and products derived therefrom than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages[.]" (*Id.* ¶ 290 (alteration added); *see also id.* ¶¶ 287–89). They seek to certify the following class:

All persons and entities in the United States who purchased farm-raised
Atlantic salmon and/or products derived therefrom directly from Defendants, any
current or former subsidiary or affiliate of Defendants, or any co-conspirator,
between April 10, 2013 until the effects of the anticompetitive conduct alleged
herein cease.  Excluded from the Class are Defendants, Defendants' parent
companies, subsidiaries, affiliates, officers, directors, employees, assigns,
successors, agents, or co-conspirators, and the Court and its staff.

(*Id.* ¶ 275; *see also id.* ¶¶ 276–82).

*The SCAC and Defendants' Motion*.  The SCAC alleges violations of sections 1 and 3 of
the Sherman Act, *see* 15 U.S.C. §§ 1, 3.  (*See* SCAC ¶¶ 3, 291–99).  Defendants jointly move to
dismiss the SCAC.  (*See generally* Mot.).  They argue: (1) Plaintiffs fail to allege direct evidence
of an agreement; (2) Plaintiffs do not plead parallel conduct or plus factors sufficient to sustain a
Sherman Act claim without direct evidence; and (3) the class members' claims are time-barred.
(*See generally* Mot.; Reply).

## II.  STANDARD

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient
factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft
v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added; quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.
544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,'
. . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.*
(alteration added) (quoting *Twombly*, 550 U.S. at 555).  Pleadings must contain "more than labels
and conclusions, and a formulaic recitation of the elements of a cause of action will not do."
*Twombly*, 550 U.S. at 555 (citation omitted).  Indeed, "only a complaint that states a plausible
claim for relief survives a motion to dismiss."  *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S.
at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows
the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.* at 678 (alteration added; citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).

When reviewing a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and takes the factual allegations as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

## III.    ANALYSIS

As stated, Plaintiffs assert claims under sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3. (*See* SCAC ¶¶ 3, 291–99).

***The Sherman Act***.  Section 1 of the Sherman Act provides "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."[16]  15 U.S.C. § 1 (alterations added).  "Despite the different terminology, there is no magic unique to each term in [section] 1; the terms 'contract,' 'combination,' and 'conspiracy' are used interchangeably to capture the concept of concerted action, that is an 'agreement.'" *Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*, -- F.3d --, 2021 WL 822194, at *5 (11th Cir. Mar. 4, 2021) (alteration added; some quotation marks and citation omitted).  "The purpose of the Sherman Act is to protect consumers from injury that

---

[16] Because section 3 of the Sherman Act merely extends section 1's prohibitions to U.S. territories and the District of Columbia, the Court analyzes Plaintiffs' claims under section 1's standards. *See Robinson v. Jackson Hewitt, Inc.*, No. 19-9066, 2019 WL 5617512, at *5 n.7 (D.N.J. Oct. 31, 2019) (analyzing the plaintiffs' section 3 claims under the same standards as it did the plaintiffs' section 1 claims because section 3's language is virtually the same as section 1's); *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 107 n.10 (S.D.N.Y. 2015) ("Substantively, . . . Section 3 claims are analyzed in the same manner as Section 1 claims." (alteration added; citation omitted)).

results from diminished competition." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334–35 (7th Cir. 2012) (citation omitted). "[T]he Supreme Court has long concluded that Congress intended only to prohibit 'unreasonable' restraints on trade." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (alteration added; citation omitted). Thus, section 1 "prohibits (1) conspiracies that (2) unreasonably (3) restrain interstate or foreign trade." *Id.* (citation omitted).

Adequately stating a section 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. The "crucial question" with regard to a conspiracy claim under section 1 "is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express[.]" *Id.* at 553 (alteration added; other alteration adopted; quotation marks and citation omitted). To prove an antitrust conspiracy, the plaintiff "should present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (alteration added; quotation marks and citations omitted).

"Direct evidence of an agreement is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665, at *7 (N.D. Ill. Nov. 6, 2020) (quotation marks and citations omitted); *see also Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("[A] plaintiff may . . . assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws. . . . Such evidence would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." (alterations added; citation omitted)). "[I]t

is only in rare cases that a plaintiff can establish the existence of a conspiracy by showing an explicit agreement; most conspiracies are inferred from the behavior of the alleged conspirators." *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991) (alteration added; citation omitted).

As an alternative, a plaintiff "may present circumstantial facts supporting the inference that a conspiracy existed." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) (quotation marks and citation omitted). A conspiracy "may be inferred on the basis of conscious parallelism,[17] when such interdependent conduct is accompanied by circumstantial evidence and plus factors such as defendants' use of facilitating practices." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (alteration added; citations omitted). In other words, "[a]llegations of parallel conduct . . . are insufficient standing alone to raise an inference of conspiracy[;]" rather, "a plaintiff must allege sufficient plus factors to make the parallel conduct more probative of conspiracy than of conscious parallelism." *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 726 (11th Cir. 2020) (alterations added; quotation marks and citations omitted). Such plus factors "may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Citigroup, Inc.*, 709 F.3d at 136 (quotation marks, citation, and footnote call number omitted); *see also In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010) (explaining circumstantial evidence can include "speeches at industry conferences, announcements of future prices, statements on

---

[17] Conscious parallelism is a "process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) (citation omitted).

earnings calls, and in other public ways" (collecting cases)).

*Discussion*.  Defendants raise three principal arguments in support of their request that the Court dismiss the SCAC.[18]  (*See generally* Mot.; Reply).  First, Defendants contend Plaintiffs fail to allege parallel conduct.  (*See* Mot. 17–22).  Second, Defendants insist even if parallel conduct is sufficiently alleged, Plaintiffs do not include allegations of the plus factors necessary to suggest a conspiracy.  (*See id.* 22–42).  Third, Defendants maintain Plaintiffs' claims are time-barred.  (*See id.* 42–47).  The Court addresses each argument in turn.

<u>*Parallel conduct*</u>.  Defendants contend Plaintiffs do not plead enough parallel conduct in the form of increased spot prices or other pricing of salmon.  (*See id.* 17–22; Reply 8–12).

"A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted similarly."  *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015) (quotation marks and citations omitted).  "Parallel conduct occurs when competitors act similarly or follow the same course of action — for example, adopting similar policies at or around the same time in response to similar market conditions."  *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 915 (N.D. Cal. 2019) (citations omitted).  Examples of parallel conduct allegations that suffice under the *Twombly* standard include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties[;]" and "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason[.]"  *Twombly*, 550 U.S. at 556 n.4 (alterations added; quotation marks and citations omitted).

---

[18] As noted, Defendants also contend "Plaintiffs do not allege direct evidence that Defendants agreed to fix prices."  (Mot. 15–17).  Plaintiffs concede they offer no direct evidence that Defendants have entered into a price-fixing agreement.  (*See* Resp. 19 (stating Plaintiffs need not allege direct evidence of a conspiracy)).

The parallel conduct element of Plaintiffs' claims anchors on Defendants' alleged collusive manipulation of the NASDAQ Salmon Index and coordinated price increases.  (*See* Resp. 19–36).

Plaintiffs first cite the Defendants' (or their co-venturers') purported scheme to manipulate the spot price for salmon by submitting noncompetitive prices to the NASDAQ Salmon Index, all in an effort to increase salmon prices.  (*See* SCAC ¶¶ 129, 138–39, 258–64).  The NASDAQ Salmon Index serves as the benchmark price for the sale of salmon around the world, including in the United States.  (*See id.* ¶ 129).  The Index is based on (1) sales prices paid to salmon producers with export licenses and subsidiaries or affiliates of such producers that engaged in exportation, such as Defendants; and (2) weekly reports of actual physical transactions by an Advisory Panel of 10 Norwegian salmon producers or exporters.  (*See id.* ¶¶ 131–32, 134–36).  The SCAC details Defendants' membership in the NASDAQ Salmon Index's Advisory Panel; and it alleges Mowi, its partial subsidiary Nova Sea, SalMar (who represented Lerøy's interest), Cermaq, and Ocean Quality AS (formerly co-owned and controlled by Grieg) held positions on the Advisory Panel. (*See id.* ¶¶ 136–37).

According to the SCAC, starting in April 2013, Defendants assumed the role of price makers once they joined the Advisory Panel and acquired the ability to manipulate the weekly spot prices reported by the NASDAQ.  (*See id.* ¶¶ 131–32, 136–38).  Plaintiffs allege Norway's salmon producers — and specifically, Defendants — rigged the spot market by using subsidiary companies to fix, raise, or stabilize the spot prices for salmon.  (*See id.* ¶¶ 140, 145–46, 150–51).

By way of example, Morpol, a subsidiary of Mowi and one of the world's largest buyers of salmon, is identified as a key player in the inflation of prices for salmon around the world, including the United States.  (*See id.* ¶¶ 29–30, 141, 148).  Plaintiffs state "Morpol was the single largest buyer on the spot market, and the prices it paid for salmon heavily influenced the index

prices reported by the NASDAQ Salmon Index[,]" emphasizing the fact that "Morpol's purchases constituted approximately 70% of the spot market commerce in 2014 alone." (*Id.* ¶ 148 (alteration added)). These spot market purchases, all of which were not legitimate arms'-length transactions, created the appearance of greater consumer demand than actually was present in the market and increased and/or stabilized salmon prices at supra-competitive levels when these spot trades were submitted to the NASDAQ Salmon Index price and then, in turn, reported to market participants. (*See id.* ¶¶ 8, 30, 142–43, 146, 148–49; *see also id.* ¶ 30 (citing article describing how in a week where Morpol did not purchase salmon on the spot market, prices fell); *id.* ¶ 150 ("Morpol's transactions with . . . Defendants set the NASDAQ Salmon Index price to which Defendants' prices, including contract prices, were pegged, and thus, none of Morpol's competitors were in a position to obtain materially better pricing than the supra-competitive pricing Morpol accepted as the dominant purchaser of salmon on the spot market." (alteration added))).

Morpol's spot market purchases were not limited to transactions with Mowi, its parent company; "[i]ndeed, in 2014, Morpol purchased on the spot market: nearly nine million kg of fish from [Mowi]; nearly 3.3 million kg from Lerøy; nearly 3 million kg from Cermaq; nearly 2.6 million kg from SalMar; and nearly 700,000 kg from Ocean Quality." (*Id.* ¶ 147 (alterations added)). Plaintiffs allege Norway's salmon producers[19] engaged in the same type of conduct, at

---

[19] Defendants complain that Plaintiffs simply point to "vague third-party statements that unnamed 'companies in Norway' and 'major players' made spot market purchases via 'a truckload here and a truckload there.'" (Reply 9). Yet, Plaintiffs allege (and provide a chart illustrating) "Norway's salmon industry is dominated by Defendants[,] Mowi, Lerøy, SalMar, Cermaq, and Grieg[.]" (SCAC ¶ 232 (alterations added); *see also id.* ¶ 228 ("[T]he Norwegian farmed salmon industry is dominated by a few top producers with a number of smaller players[.]" (alterations added)); *id.* ¶ 231 ("[T]he Norwegian Defendants dominate the market." (alteration added)); Resp. 29 ("Defendants, according to the SCAC, are the five largest players in the Norwegian farmed salmon market; they account for nearly 83% of production among the top ten players as listed by Mowi." (citing SCAC ¶ 232))). Norway's salmon producers and major players by definition include Mowi, Lerøy, SalMar, Cermaq, and Grieg. (*See* SCAC ¶ 232). Plaintiffs' allegations suggest Defendants, not just Morpol and Mowi, were engaging in spot market purchases in order to keep the Index price — and by extension, their prices — high.

(or near) the same time, in the same market.[20]  (*See id.* ¶ 140 ("Since at least 2014, . . . Norway's salmon producers, including Mowi, have been rigging the spot market by using subsidiary companies . . . to fix, raise, or stabilize the spot price for salmon." (alterations added)); *id.* ¶ 144 ("In 2017, . . . . Stale Hoyem [], general manager of Suempol Norway, one of the biggest smoked salmon producers in Poland and Europe, . . . [stated] one [] thing that affects prices is that some of the major players choose to create their own purchasing departments buying a truckload here and a truckload there[,] . . . suggesting this 'daily' practice is heavily influencing prices on the spot market." (alterations added; alteration adopted; quotation marks omitted))).  Plaintiffs further highlight Defendants' coordinated efforts, discussions, and cooperation to engage in this course of conduct.  (*See, e.g.*, *id.* ¶¶ 146, 152, 154, 162, 164–65, 167–68, 185).

Plaintiffs bolster their spot market allegations with examples of parallel price movements by several Defendants — namely, Mowi, Lerøy, and Ocean Quality AS[21] — during the class period.  The SCAC includes charts of: (1) 2018 U.S wholesale prices for 3/4 kilogram salmon sold by Mowi, Lerøy, and Ocean Quality AS (*see id.* ¶¶ 204, 207; App. A 11–12); (2) 2015–2018 U.S. wholesale prices for 4/5 kilogram sold by Mowi and Lerøy (*see* SCAC ¶ 205; App. A 3, 6, 9); (3) 2015–2018 U.S. wholesale prices for 5/6 kilogram sold by Mowi and Lerøy (*see* SCAC ¶ 206;

---

[20] Defendants insist these allegations do not hint at parallel conduct.  (*See* Mot. 18–19; Reply 8).  Defendants contend Plaintiffs do not (1) "point to any parallel spot market sales or purchases by Defendants[;]" (2) "explain how spot market sales by Defendants that are not members of the NASDAQ Salmon Index Panel could support the alleged conspiracy[;]" (3) "provide any facts to support their conclusory assertion that spot sales were made at 'supra-competitive' prices[;]" or (4) "allege any specific spot market sales to Morpol."  (Mot. 18–19 (alterations added; emphasis omitted)).  It appears Defendants consider Plaintiffs' allegations individually — not as a whole.  The Court is unconvinced such an exacting pleading standard applies and declines to parse Plaintiffs' allegations to determine whether each allegation is plausible.  *Cf. Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010) (rejecting the defendants' contention that *Twombly* requires a plaintiff resting on allegations of parallel conduct to identify a "specific time, place or person involved in each conspiracy allegation").

[21] (*See* SCAC ¶ 50 ("Grieg ASA targets and sells its salmon to the United States, including Florida, using its majority-owned sales agent, Ocean Quality AS[.]" (alteration added))).

App. A 4, 7, 10); (4) 2015–2017 U.S. wholesale prices for 3/4 kilogram salmon sold by Mowi and

Lerøy (*see* App. A 2, 5, 8); (5) 2018 U.S. wholesale prices for 4/5 kilogram salmon sold by Mowi,

Lerøy, and Ocean Quality AS (*see id.* 13); and (6) 2018 U.S. wholesale prices for 5/6 kilogram

salmon sold by Mowi, Lerøy, and Ocean Quality AS (*see id.* 14).  Plaintiffs maintain "[a]ll of these

charts show parallel pricing movements by several of [] Defendants and provide strong evidence

that United States wholesale prices (including contract prices) for salmon sold by [] Defendants

were highly correlated and that these prices were directly linked by Defendants to Index prices."[22,]

[23]  (Resp. 26 (alterations added); *see also* SCAC ¶ 207 (noting "there is a striking similarity in the

United States wholesale pricing . . . for each of these Defendants" during the class period, and

these wholesale prices "closely parallel the published NASDAQ Salmon Index prices" (alteration

added)); *id.* ¶¶ 139, 258–63).

Plaintiffs also include charts of spot market activity in 2013–2016 that "depict[] how spot

prices, measured on [a] weekly basis[,] . . . began to dramatically separate from their five-year

average starting in spring of 2013, when NASDAQ became the primary benchmark[.]"  (SCAC ¶¶

---

[22] Defendants insist that Plaintiffs fail to allege parallel pricing by any Defendant (*see* Mot. 19); yet Defendants admit Plaintiffs' charts indicate Defendants' pricing moved, at times, in similar directions. (*Compare* Mot. 21 ("The S[C]AC thus alleges nothing more than that the pricing purportedly offered by certain Defendants has moved at times in *similar directions*[.]" (alterations and emphasis added)), *and* Reply 11 ("Plaintiffs' graphs show nothing more than that certain Defendants' purported pricing at times has moved in *similar directions*[.]" (alteration and emphasis added))), *with SD3, LLC*, 801 F.3d at 427 (stating as a general rule, "[a] plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted '*similarly*.'" (alteration and emphasis added; citations omitted)).

[23] Defendants also contend Plaintiffs' pricing charts show Defendants' prices "were rarely the same" and "often moved in different directions[.]"  (Mot. 20 (alteration added; emphasis omitted)).  Plaintiffs are not required to plead parallel conduct that is simultaneous or identical.   *See, e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 69 (D.D.C. 2016) ("Plaintiffs do not need to demonstrate that Defendants cut or limited capacity in exactly the same way in order to adequately allege parallel conduct." (collecting cases)); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010) ("Plaintiffs are not required to plead simultaneous price increases — or that the price increases were identical — in order to demonstrate parallel conduct." (citation omitted)); *City of Moundridge v. Exxon Mobil Corp.*, No. Civ. A. 04-940, 2009 WL 5385975, at *5 (D.D.C. Sept. 30, 2009) ("Price-fixing can occur even though the price increases are not identical in absolute or relative terms." (citations omitted)).

CASE NO. 19-21551-CIV-ALTONAGA/Louis

208, 222–23 (alterations added)); *see also id.* ¶ 210 (alleging "[t]hese price increases — and Defendants' coordinated behavior that caused them — have come at the expense of Plaintiffs and the Class" (alteration added))). Plaintiffs support their parallel pricing allegations with Defendants' contemporaneous earnings reports, which reflect record profits during the class period.[24] (*See id.* ¶¶ 211–17). They allege Defendants attributed these unprecedented earnings to high prices, which, according to Plaintiffs, were a product of the noncompetitive spot prices reported on the NASDAQ Salmon Index. (*See id.* ¶¶ 139, 210, 215–16).

The Court finds Plaintiffs adequately allege parallel conduct by Defendants.[25] Plaintiffs' facts, taken together, sufficiently show Defendants engaged in parallel conduct by coordinating spot market price increases through inter-competitor (and subsidiary) sales to influence the NASDAQ Salmon Index price, which, in turn, increased the price of salmon across the industry

---

[24] Defendants maintain "allegations that individual Defendants increased profits over time . . . do not support an inference of conspiracy." (Mot. 22 (alteration added; citing *In re Generic Pharms. Pricing Antitrust Litig.*, 386 F. Supp. 3d 477, 483 (E.D. Pa. 2019) ("[The plaintiffs] ha[ve] not directed the [c]ourt to any authority that would support the proposition that [the defendants'] conduct . . . was parallel to the manufacturer [d]efendants' conduct simply because each are alleged to have seen increased profits." (alterations added))). Although at first glance the point is alluring, the plaintiffs in *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, unlike Plaintiffs here, "ma[d]e[] no explicit allegations of parallel conduct by [the defendants]." 386 F. Supp. 3d at 483 (alterations added). Plaintiffs' allegations of increased profits are relevant when considering the entirety of the SCAC's parallel conduct allegations — especially given the allegations Defendants attributed those unprecedented earnings to high spot market prices. (*See* SCAC ¶¶ 139, 210, 215–16).

[25] Defendants contend Plaintiffs insufficiently allege SalMar, Grieg, and Cermaq's participation in the conspiracy, citing "Plaintiffs['] fail[ure] to allege *any* pricing behavior at all" for these Defendants. (Mot. 19 (alterations added; original emphasis); *see also* Reply 11). If Plaintiffs' parallel conduct allegations hinged on pricing charts, the Court would likely agree with Defendants. Unfortunately for these Defendants, that is not the case. (*See, e.g.*, SCAC ¶ 136 (alleging SalMar and Cermaq were members of the Advisory Panel); *id.* ¶¶ 139–40, 144, 147, 150, 152, 185 (discussing Defendants' alleged involvement with the NASDAQ Salmon Index and the spot market); *id.* ¶¶ 204, 207; App. 11–14 (providing wholesale pricing data for Grieg's sales agent in the United States, Ocean Quality AS); SCAC ¶¶ 208–09 (supplying charts of spot market activity in 2013–2016); *id.* ¶¶ 213, 215–16 (providing earnings reports for these Defendants and alleging these unprecedented earnings were a product of the noncompetitive spot prices reported on the NASDAQ Salmon Index); Resp. 16 (collecting allegations)). These allegations plausibly tie SalMar, Grieg, and Cermaq to the conspiracy.

(including in the United States) as illustrated by Defendants' correlated pricing and earnings reports. (*See, e.g.*, SCAC ¶¶ 29–30, 129–32, 134–52, 154, 162, 164–65, 167–68, 185, 204–07, 211–17, 228, 231–32, 257–64; App. A 2–14). Stated differently, Plaintiffs provide enough parallel conduct allegations with respect to spot prices and other pricing of salmon. Plaintiffs thus clear the first hurdle.

*Plus factors*. Plaintiffs' parallel conduct allegations are not enough to raise an inference of conspiracy. *See, e.g.*, *Auto. Alignment & Body Serv., Inc.*, 953 F.3d at 726 (citation omitted). Plaintiffs put forth additional circumstantial evidence they claim suggests an illegal agreement: (1) significant price increases for salmon relative to the period before the Index was created, despite stable or declining costs and a substantial reduction in demand due to the Russian ban; (2) the structural characteristics of the salmon market; (3) Defendants' transition from historically battling each other in the pre-conspiracy period to cooperating during the conspiracy period; (4) the Norwegian Defendants' sales of salmon at artificially high prices to competitors; (5) interfirm and intrafirm communications; (6) Defendants' access to each other's sensitive pricing and market share information; (7) Defendants' membership in trade organizations; and (8) ongoing parallel antitrust investigations by the EC and DOJ. (*See* Resp. 21, 37). In rebuttal, Defendants insist these "purported 'facts' do not support [Plaintiffs'] claim[s]." (Mot. 23 (alterations added); *see also id.* 23–42; Reply 13–23).

*Market dynamics and conditions*. Plaintiffs describe characteristics of the salmon market which they contend support the plausibility of the alleged conspiracy. (*See* SCAC ¶¶ 226–54). They state "[t]he structure and other characteristics of the market for salmon — and particularly the way in which pricing is established through NASDAQ Salmon [I]ndex prices — make it conducive to anticompetitive conduct among Defendants and make collusion particularly

attractive." (*Id.* ¶ 226 (alterations added)). Plaintiffs allege (1) the salmon market is characterized by high market concentration, with Mowi, Lerøy, SalMar, Cermaq, and Grieg dominating the salmon industry (*see id.* ¶¶ 229–35); (2) new entrants to the market are precluded by significant barriers to entry, including costly and lengthy production costs and limited geographic locations to farm salmon (*see id.* ¶¶ 236–44); (3) salmon is a commoditized product, with competition based purely on price (*see id.* ¶¶ 245–53); and (4) price inelasticity (*see id.* ¶¶ 253–54).

Plaintiffs further allege Defendants' price increases cannot be explained by market or economic conditions. (*See id.* ¶¶ 157, 169–70, 172–73, 218–21). According to Plaintiffs, Defendants raised their prices despite a reduced demand following the Russian import ban, which ordinarily would not be expected of competitive salmon producers. (*See id.* ¶¶ 157, 169–70, 221; *see also id.* ¶¶ 169–70 (explaining that in 2017, Russia's import ban wiped out 10 percent of Norway's salmon market; and Norway lost 2.3 billion dollars from the fish trade with Russia); *id.* ¶ 173 ("[O]ne would have expected that each of the Norwegian Defendants would compete more vigorously with each other on prices in an effort to increase sales and thereby wrest market share from their rivals. That did not happen." (alteration added))). Plaintiffs plead (and provide a chart illustrating) Defendants' price increases were not justified by cost factors. (*See id.* ¶¶ 218–19; *see also id.* ¶ 219 (chart showing that pricing of feed components either stabilized or declined in the period since mid-2015)). The Court agrees with Plaintiffs that these allegations contribute to their circumstantial case.[26]

---

[26] Defendants contend the SCAC's "attempt to focus on a single source of demand, while ignoring other supply and demand factors during the same period, renders Plaintiffs' claim[s] implausible." (Mot. 40 (alteration added; citing SCAC ¶¶ 8, 26, 82, 93, 161, 168, 237, 242, 246–48, 255–56)). The Court disagrees the cited allegations render Plaintiffs' claims implausible. Although Defendants insist "[t]he Russian import ban impacted only a small portion of total global demand" (Mot. 38–39 (alteration added)), Plaintiffs plausibly allege Defendants reacted to this constriction of the market by colluding together to manipulate the NASDAQ Salmon Index in order to protect themselves from the effect of the ban. (*See* SCAC ¶¶ 8,

*Deviations from pre-conspiracy behavior.* Plaintiffs allege Defendants' shift from competition to cooperation and their coordinated price increases for salmon reflect a drastic change from pre-conspiracy behavior. (*See id.* ¶¶ 188–89, 208–09, 220, 222–24). They emphasize a 2016 speech by the Deputy Managing Director of the Norwegian Seafood Federation, Trond Davidsen, during which he explained "how the salmon industry in recent years ha[d] shifted from competition to cooperation[.]" (*Id.* ¶ 188 (alterations added); *id.* (concluding "all parties involved in the salmon business agree[d]" to focus on "develop[ing] [the] industry to meet the global demand rather than fight each other." (alterations added))). As to Defendants' pricing behavior, Plaintiffs provide charts comparing high spot market prices for Norwegian salmon in 2014–2016 with a 5-year average of such prices. (*See id.* ¶¶ 208–09, 222–24; *id.* ¶ 222 (explaining these charts "depict how Defendants . . . began to raise prices . . . beyond the prior five-year averages" (alterations added)); *id.* ¶ 223 (emphasizing the 2016 price comparison because Defendants took prices "well beyond anything they had been able to achieve in the past."))). Plaintiffs sufficiently plead Defendants' shift from competition to cooperation and their pricing conduct constituted a change in behavior. The Court thus considers these allegations with all other allegations to see if they are enough to imply agreement.

*Spot market transactions.* Plaintiffs plausibly allege Defendants' spot market transactions to competitors constituted anticompetitive conduct. (*See* SCAC ¶¶ 147, 150–51, 185). Plaintiffs explain "[t]here is no legitimate pro-competitive justification for the key industry players — the Norwegian Defendants [] — to sell substantial quantities of salmon to Morpol on the spot market[,]" citing (1) Morpol's interests in keeping its costs to a minimum; (2) the fact Morpol is not confronted with tight deadlines associated with fresh fish as a processor that specializes in

---

147, 156, 165, 167, 173; *see also id.* ¶¶ 8, 215–17 (explaining Defendants attributed high profits to market and spot prices, not high production costs or strong demand)).

smoked seafood products; and (3) Defendants' decision to sell salmon to Morpol at high spot prices to set the Index price rather than directing that salmon to value-added subsidiaries or other non-competitor customers. (*Id.* ¶ 151 (alterations added); *see also id.* ¶¶ 29, 150, 152). Rather than be selective about when and how it acquired salmon, or obtain supply from its parent, Mowi, Morpol allegedly paid supra-competitive prices to create the appearance of greater consumer demand for these fish and, in doing so, elevated the benchmark prices for salmon around the globe. (*See id.* ¶¶ 129, 149–51). Although Defendants offer legitimate reasons for these spot market transactions (*see* Mot. 24–25), Plaintiffs need not rebut these reasons to defeat a motion to dismiss. *See In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 721 (S.D.N.Y. 2017) ("At the motion to dismiss stage, . . . plaintiffs need not offer evidence that tends to rule out the possibility that the defendants were acting independently." (alteration added; other alteration adopted; quotation marks and citation omitted)).

*Interfirm and intrafirm communications*. Plaintiffs maintain the SCAC "plead[s] specific communications among Defendants that support an inference of collusion." (Resp. 33 (alteration added)). Plaintiffs point to bilateral and multilateral agreements not to compete and a high level of communications among Defendants (*see, e.g.*, SCAC ¶¶ 153–56, 162–65, 174–84), including: a 2013 lunch meeting between Mowi, Morpol, and Lerøy's top management, during which they discussed issues impacting the industry (*see id.* ¶ 154); 2013 and 2014 meetings between SalMar and Lerøy, in which they discussed plans of non-competition and cooperation between the companies (*see id.* ¶¶ 154–55, 162); and 2013–2017 meetings and dinners between certain Defendants, during which they discussed not talking down prices in response to the Russian ban (*see id.* ¶ 165), cooperation (*see id.* ¶¶ 163–64, 176, 178–82, 184), and strategic exchanges (*see id.* ¶¶ 164, 177, 183–84). Plaintiffs identify Defendants who were in attendance; the years of the

meetings, lunches, and dinners; and the contents of those communications.  (*See id.* ¶¶ 154–56, 162–65, 174–81).

At this stage of the litigation, the Court finds the alleged substance and quantity of these communications, and the players involved, support a reasonable inference of conspiracy.  *Cf. Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 322 (S.D.N.Y. 2018) (concluding the plaintiffs plausibly alleged "multiple interfirm meetings at conferences, private dinners, and EquiLend board meetings, including the 2009 meeting convened by Bank of America[;]" "meetings between Wipf and Conley[;]" "a 2009 meeting between Bank of America and Goldman Sachs executives[;]" "meetings between Morgan Stanley, Goldman Sachs, and other Defendants at private dinners and conferences[;]" and "meetings of EquiLend's Board" (alterations added)).

*Participation in trade organizations and industry forums.*  Plaintiffs claim Defendants' involvement in various trade associations and industry forums facilitated Defendants' ability to coordinate price increases and collude.  (*See* Resp. 42–43).  "[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (alteration added); *see also Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 301 n.4 (E.D.N.Y. 2017) (noting a "defendant's membership in a trade association hardly renders plausible the conclusion that entity and certain other members are functioning as an ongoing, organized, structured enterprise in conducting their business." (quotation marks and citations omitted)).  However, "participation in a trade association, where [the] [d]efendants had opportunities to exchange information or make agreements, coupled with allegations of parallel conduct . . . , are sufficient to tie the[] defendants to the conspiracies."  *Miami Prods. & Chem. Co.*

*v. Olin Corp.*, 449 F. Supp. 3d 136, 164 (W.D.N.Y. 2020) (alterations added; quotations marks and citations omitted).

Plaintiffs allege Defendants belonged to trade and industry organizations — namely, the NSC, the GSI, the Norwegian Seafood Federation, and the North Atlantic Seafood Forum — and exchanged confidential company-specific information.  (*See* SCAC ¶¶ 186–87, 190–96, 200–02). According to Plaintiffs, NSC members, including the Norwegian Defendants, were able to receive confidential information on the market shares and pricing of their individual competitors.  (*See id.* ¶ 186; *see also id.* ¶ 195 ("SAS [Data Management, a data analytics vendor to the NSC,] touts how it has given confidential 'sensitive market insight' to the NSC's members, including . . . an overview of their own market shares and a comparison of their prices with those of competitors." (alterations added))).

The SCAC includes allegations that the NSC sponsored quarterly market and leader group meetings, during which NSC members — including key executives of Defendants — met and discussed, among other topics, the "subject of industry cooperation."  (*Id.* ¶ 194; *see also id.* ¶ 165 (alleging Mowi, SalMar, Ocean Quality, Grieg, and Lerøy participated in an NSC emergency meeting to "discuss the Russian ban and the potential fall-out on prices if the market was not corrected."); *id.* ¶¶ 200–02 (pleading the North Atlantic Seafood Forum held annual meetings where Defendants' key executives participated in "parallel sessions devoted to particular industry sectors for the latest update on industry challenges, supply and market outlook, prices, innovation and business, and sustainability issues." (quotation marks omitted))).  Plaintiffs further state the activities of the GSI — to which Mowi, Grieg, Lerøy, and SalMar belonged — "strengthened the substantial inter-competitor relationships that already existed between the[se] [Defendants] and allowed them to successfully implement [] anticompetitive conduct[.]"  (*Id.* ¶ 191 (alterations

added); *see also id.* ("Mowi['s former CEO] is on record as stating that the efforts of the GSI could be utilized as a means of increasing prices." (alterations added))).

Plaintiffs' allegations of Defendants' involvement in various trade associations and industry forums add plausibility.  Plaintiffs do not merely allege Defendants were part of a conspiracy because they belonged to trade and industry organizations; rather, Plaintiffs plead facts indicating Defendants' involvement in these organizations — in particular, meeting or speaking to one another during the widely-attended conferences and/or sharing confidential company-specific information — facilitated Defendants' ability to coordinate price increases and conspire.  (*See id.* ¶¶ 186–87, 190–96, 200–02).[27]  This plus factor suggests Defendants participated in a conspiracy.

*Government investigations.*  Plaintiffs maintain the EC and DOJ investigations indicate an agreement was made.  (*See* Resp. 37–39).  As both parties note, some courts have held that where allegations are sparse, the existence of government inquiries are insufficient to raise an inference of conspiracy; while others have held government investigations can bolster conspiracy allegations.  (*Compare* Mot. 25–27, *and* Reply 16–17 & nns.5–6, *with* Resp. 37–39 & n.18); *see*

---

[27] Defendants contend "none of Plaintiffs' allegations regarding Defendants' communications and participation in meetings go beyond mere opportunities to conspire" (Mot. 29 (emphasis omitted)); "it is entirely appropriate for trade associations to discuss such industry issues, and Defendants' participation in those discussions does not support an inference of conspiracy" (*id.* 31); "the [SAS] database does not provide access to company-specific real-time pricing" (*id.* 32 (alteration added)); and "unsupported assertions . . . are entirely implausible given that . . . NSC is owned and operated by the Norwegian Ministry of Trade, Industry and Fisheries, a governmental body; and [] participation in NSC is required by Norwegian law" (*id.* 33 (alterations added)).  As Plaintiffs persuasively argue, "[t]hese trade association activities . . . constitute a recognized plus factor to be considered *in the context of the totality of the facts pled in the SCAC*."  (Resp. 42 (alterations and emphasis added; footnote call number omitted)).  Again, Plaintiffs include additional details addressing Defendants' joint involvement in trade associations and do not simply rely on the fact Defendants belonged to these associations.  *Compare In re Interior Molded Doors Antitrust Litig.*, No. 3:18-cv-00718, 2019 WL 4478734, at *5 (E.D. Va. Sept. 18, 2019) ("These two things — the defendants' mutual attendance of at least eight separate annual trade association meetings and their history of swapping executives — make it more plausible that the alleged conspiracy spawned from meetings at trade shows or conventions."), *with* (SCAC ¶ 194 (mutual attendance at quarterly NSC meetings), *id.* ¶¶ 200–02 (mutual attendance at annual North Atlantic Seafood Forum meetings), *and id.* ¶¶ 153, 228 (noting the mobility among executives of certain Defendants)).

*also, e.g.*, *In re Loc. TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *8 (collecting cases).

The SCAC details the ongoing concurrent investigations of price fixing in the salmon market by both the EC and DOJ.  (*See* SCAC ¶¶ 4–6, 102–28).  Plaintiffs first highlight the EC's investigatory requests sent to Mowi ASA, Grieg ASA, SalMar, Lerøy Seafood AS in 2019, which state these Defendants allegedly (1) "coordinat[ed] sales prices and exchang[ed] commercially sensitive information;" (2) "agree[d] to purchase production from other competitors when these other competitors sell at lower prices;" and (3) "appl[ied] a coordinated strategy to increase spot prices of farmed Norwegian salmon in order to secure higher price levels for long-term contracts." (*Id.* ¶ 104 (alterations added); *id.* ¶¶ 106–09 (investigatory requests were accompanied by inspections at Defendants' facilities in the European Union); *id.* ¶ 115 (noting the current EC investigation is examining price movements of Norwegian salmon after the Russian ban); *id.* ¶¶ 257–64 (linking Defendants' anticompetitive conduct in Europe to U.S. wholesale prices)). Plaintiffs also emphasize the fact the DOJ issued grand jury subpoenas to Mowi, Grieg, SalMar, Lerøy, and Ocean Quality seeking information on practices similar to those being investigated by the EC.  (*See id.* ¶ 116; *see also id.* ¶¶ 117–22 (enhancing grand jury subpoena allegations with discussion of the DOJ policies regarding grand jury investigation and providing excerpts of certain Defendants' statements and press releases)).

Although the pendency of these government investigations is not determinative standing alone, the Court considers these allegations with the other factors discussed.  In doing so, the Court finds this factor supports, albeit weakly, the plausibility of Plaintiffs' antitrust conspiracy allegations.[28]  *See, e.g.*, *In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-md-2670, 2017

---

[28] *In re Florida Cement & Concrete Antitrust Litigation*, 746 F. Supp. 2d 1291 (S.D. Fla. 2010) ("*FCCAL*"), on which Defendants rely, is off point.  There, the undersigned held (1) international government investigations into conduct entirely separate from and not connected to that alleged in the pleading could not support an inference of conspiracy; and (2) "the decision by the Florida Attorney General to investigate

WL 35571, at *8 (S.D. Cal. Jan. 3, 2017) (noting "it would be improper to draw a conclusion that a pending government investigation on its own supplies sufficient factual material to survive a . . . motion to dismiss" but nevertheless "consider[ing] the pending [government] investigation in concert with [the] [p]laintiffs' other allegations" (alterations added)).

*Recap*.  Viewing the allegations together, and not in isolation, Plaintiffs allege a plausible conspiracy existed through circumstantial facts.  These facts include: (1) the Norwegian Defendants' (or their co-venturers') participation in the NASDAQ Salmon Index; (2) Defendants' coordinated manipulation of salmon prices by reporting inflated sales prices to the NASDAQ; (3) the increase in prices for salmon despite stable or declining production costs and dwindling demand due to the Russian ban; (4) Defendants' use of spot market transactions to drive higher Index prices; (5) interfirm and intrafirm communications discussing the avoidance of price competition and encouraging cooperation; (6) U.S. pricing charts, which show parallel price movements by several Defendants; (7) Defendants' access to pricing and market-share information; (8) Defendants' transition from battling each other to cooperating during the relevant period; and (9) parallel ongoing antitrust investigations by the EC and DOJ.  (*See generally* SCAC; Resp. 21).  In sum, the SCAC contains enough factual material to "nudge[] [Plaintiffs'] claims across the line from conceivable to plausible[.]"  *Twombly*, 550 U.S. at 570 (alterations added).

<u>*Statute of limitations*</u>.  "An antitrust action must be brought 'within four years after the cause of action accrues.'"  *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1500 (11th Cir. 1985) (quoting 15 U.S.C. § 15b).  Defendants' alleged anticompetitive conspiracy began on

---

one Defendant and one executive of that Defendant d[id] not make the conspiracy alleged . . . more plausible because the outcome of the investigation [could not] be predicted." *Id.* at 1315–16 (alterations added).  The allegations in *FCCAL* are not analogous to the allegations presented here.  (*See, e.g.*, SCAC ¶¶ 4–6, 102–28, 257–64 (discussing the EC and DOJ's decisions to investigate numerous Defendants, not one; and providing connection between the international investigation of anticompetitive conduct and Defendants' alleged conduct in the SCAC)).

April 10, 2013 and has continued to the present.  (*See* SCAC ¶ 3).  Plaintiffs filed this action on April 23, 2019.  (*See generally* Class Action Compl. [ECF No. 1]).  Thus, if the statute of limitations applies, the damages period would begin no earlier than April 23, 2015.  (*See* Resp. 47; Reply 25).  Plaintiffs allege (1) the statute of limitations should be tolled because Defendants fraudulently concealed the conspiracy and (2) a continuing antitrust violation.[29]  (*See* SCAC ¶¶ 3, 9, 265).

"Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."  *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971) (citations omitted).  "In the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues . . . [and] the statute of limitations runs from the commission of the act."  *Id.* (alterations added; citations omitted).

"When fraudulent concealment of antitrust-law violations occurs, it tolls the statute of limitations."  *Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.*, No. 12-61360-Civ, 2012 WL 6102068, at *12 (S.D. Fla. Dec. 7, 2012) (citation omitted).  To avail itself of this doctrine, a plaintiff must demonstrate that the defendant "concealed the conduct complained of, and that plaintiff[] failed, despite the exercise of due diligence on [its] part, to discover the facts that form the basis of [its] claim."  *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999) (alterations added; other alteration adopted; quotation marks and citation omitted).  "To satisfy the due-diligence requirement, a plaintiff must demonstrate that once it either knew of its claim or had notice sufficient to prompt it to investigate, it pursued the claim diligently."  *Credit*

---

[29] Plaintiffs also seek refuge in the injury discovery rule.  (*See* SCAC ¶ 265; Resp. 48 n.24).  Since Plaintiffs adequately allege Defendants concealed their conspiracy, the Court does not address Plaintiffs' alternative argument.

*Bureau Servs., Inc.*, 2012 WL 6102068, at *12 (alteration adopted; quotation marks and citations omitted).   Ordinarily, whether a plaintiff is on "notice" of its claim is a question of fact.  *Id.* (quotation marks and citations omitted); *see also Morton's Mkt., Inc.*, 198 F.3d at 828 ("The commencement of the statute of limitations is a question of fact." (citation omitted)).

The SCAC contains no allegations conclusively establishing the action's untimeliness. (*See generally* SCAC).  Plaintiffs sufficiently allege Defendants' affirmative efforts to conceal and cover up their anticompetitive conspiracy.  (*See, e.g.*, *id.* ¶¶ 267–71, 273 (identifying Defendants' affirmatively misleading statements, which, according to Plaintiffs, obscured the anticompetitive conduct that affected prices)).  Plaintiffs proffer the Defendants' anticompetitive conduct was only discovered "through the exercise of due diligence [in] February [] 2019, when the EC commenced its investigation."  (*Id.* ¶ 266 (alterations added); *see also id.* ¶¶ 267, 274).  Plaintiffs' allegations are sufficient to survive Defendants' Motion.  In any event, "[a]s many courts have noted in the antitrust conspiracy context, it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly where the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators."  *In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007) (alteration added; collecting cases).

Plaintiffs further plead a continuing violation.  They state Defendants engaged in anticompetitive conduct to inflate the price of salmon on April 10, 2013; that they continued engaging in this conduct and raising prices through the present; and that Defendants directly sold salmon and salmon products to Plaintiffs "between April 10, 2013 and the present."[30]  (SCAC ¶

---

[30] Defendants request the Court set the bounds of the damages period available to Plaintiffs.  (*See* Reply 25 ("And in the event that the continuing violations doctrine were to apply, Plaintiffs themselves concede the class period — and, accordingly, the damages period — would begin no earlier than April 23, 2015.")).

3; *see also id.* ¶¶ 9, 275).  Given these allegations, Defendants' statute-of-limitations position does not provide a basis to dismiss Plaintiffs' claims in their entirety.

## IV.    CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss the Second Consolidated Amended Direct Purchaser Class Action Complaint for Failure to State Claim **[ECF No. 296]** is **DENIED**.  Defendants have until and including **April 6, 2021** to file separate answers to Plaintiffs' Second Consolidated Amended Direct Purchaser Class Action Complaint **[ECF Nos. 246, 251-1]**.  A scheduling order will issue by separate order.

**DONE AND ORDERED** in Miami, Florida, this 23rd day of March, 2021.

*Cecilia M. Altonaga*
_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

---

The Court declines to do so at the motion-to-dismiss stage, especially given the other allegations that Defendants concealed the anticompetitive conspiracy.